# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

FEDERAL DEPOSIT INSURANCE CORP,

     Plaintiff,

vs.

TRADE STREET HOLDINGS, LLC F/K/A
BCOM CCB HOLDINGS, LLC

     Defendant.

_____/

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that the PLAINTIFF, FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC"), as Receiver for CORTEZ COMMUNITY BANK ("Cortez"), by and through undersigned counsel, and pursuant to the Federal Rules of Civil Procedure and 12 U.S.C. § 1819 (b)(2)(B), hereby removes the state court action described below to this Court and states:

## INTRODUCTION

The FDIC seeks to removal pursuant to 12 U.S.C. § 1819 (b)(2)(B) which grants the FDIC the power to remove state court actions in which it is a party.

## PROCEDURAL AND BACKGROUND FACTS

1.    Cortez initiated the present lawsuit against Defendant TRADE STREET HOLDINGS, LLC F/K/A BCOM CCB HOLDINGS, LLC ("Trade Street") on or about March 3, 2011 in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County,

1

EHRENSTEIN CHARBONNEAU CALDERÍN
501 Brickell Key Drive · Suite 300 · Miami, FL 33131 · T. 305.722.2002 · F. 305.722.2001 · www.ecclegal.com

Florida seeking damages for breach of contract arising from an investment agreement executed between Cortez and Trade Street.

2.       On Friday, April 29, 2011, Plaintiff, Cortez Community Bank of Brooksville, FL was closed by the Florida Office of Financial Regulation, and the FDIC was appointed Receiver.

3.       The FDIC was substituted as party in interest pursuant to a court order dated...

4.       This action is a civil action of which this Court has original jurisdiction under 12 U.S.C. § 1819 (2010), and may be removed pursuant to § 1819 (b)(2)(B) which states:

> (B)  REMOVAL.--Except as provided in subparagraph (D), the Corporation may, without bond or security, remove any action, suit, or proceeding from a State court to the appropriate United States district court before the end of the 90-day period beginning on the date the action, suit, or proceeding is filed against the Corporation or the Corporation is substituted as a party.

5.       The Eleventh Circuit further holds that the "FDIC may remove an action under § 1819 irrespective of its alignment as plaintiff or defendant." *F.D.I.C. v. S & I 85-1*, Ltd., 22 F.3d 1070, 1073 (11th Cir.  1994) *(citing e.g., Beighley v. FDIC*, 868 F.2d 776, 779 n. 6 (5th Cir.1989) (recognizing that § 1819 permits removal by FDIC "whether it is plaintiff or defendant in the lawsuit"); *FSLIC v. Frumenti Dev. Corp.*, 857 F.2d 665, 666-67 n. 1 (9th Cir.1988) (noting that FDIC may remove an action as plaintiff under § 1819); *In re Franklin Nat'l Bank*, 532 F.2d at 843 (holding that FDIC, pursuant to § 1819, may remove any action regardless of its alignment as plaintiff or defendant).

6.       The FDIC was substituted as plaintiff and became a party on to the lawsuit on July 19, 2012.  Therefore, the 90-day statutory period in which to remove the case runs through October 17, 2012, and removal is timely.

EHRENSTEIN CHARBONNEAU CALDERÍN
501 Brickell Key Drive · Suite 300 · Miami, FL 33131 · T. 305.722.2002 · F. 305.722.2001 · www.ecclegal.com

7.     Undersigned has reviewed the docket, and Defendant's unopposed motion for extension of time to answer the complaint is the only motion are pending as of the date of this notice.

8.     A copy of all process, pleadings, and orders, served upon defendant in the state court action are attached hereto as **Exhibit "A"**.

DATED this 31st day of July, 2012

Respectfully Submitted,

EHRENSTEIN CHARBONNEAU CALDERIN
501 Brickell Key Drive
Suite 300
Miami, FL 33131
T. 305-722-2002 F. 305-722-2001

By: _____/s/_____
      Michael D. Ehrenstein, Esq.
      Fla. Bar. No. 857378
      michael@ecclegal.com
      Latasha N. Johnson, Esq.
      lnj@ecclegal.com
      Fla. Bar. No. 81970

### CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was served CM/ECF and electronic mail on this 31st day of July, 2012 upon: Michael N. Kreitzer, Esq, Bilzin Sumberg Baena Price & Axelrod LLP 1450 Brickell Ave, Suite 2300 Miami FL 33131.

By: _____/s/_____
      Latasha N. Johnson, Esq.

3

EHRENSTEIN CHARBONNEAU CALDERÍN
501 Brickell Key Drive · Suite 300 · Miami, FL 33131 · T. 305.722.2002 · F. 305.722.2001 · www.ecclegal.com

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☒ CIVIL<br>☐ DISTRICTS<br>☐ FAMILY<br>☐ OTHER | **CIVIL COVER SHEET** | 11- 07 0 0 3 CA 0 4 |

| PLAINTIFF | VS. DEFENDANT | |
|---|---|---|
| CORTEZ COMMUNITY BANK | TRADE STREET HOLDINGS, LLC f/k/a<br>BCOM CCB HOLDINGS, LLC | CLOCK IN<br>**ORIGINAL**<br>**FILED**<br>MAR - 3 2011<br>**HARVEY RUVIN**<br>CLERK |

The civil cover sheet and the information contained here does not replace the filing and service of pleadings or other papers as required by law. This form is required by the Clerk of Court for the purpose of reporting judicial workload data pursuant to Florida Statute 25.075. See instructions and definitions on reverse of this form.

**TYPE OF CASE** (If the case fits more than one type of case, select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x in both the main category and subcategory boxes.

☐ 001 - Eminent Domain
☒ 003 - Contracts and Indebtedness
☐ 010 - Auto Negligence
☐ 022 - Products Liability
☐ 023 - Condominium
☐ **Negligence - Other**
  ☐ 097 - Business Governance
  ☐ 098 - Business Torts
  ☐ 099 - Environmental/Toxin Tort
  ☐ 100 - Third Party Indemnification
  ☐ 101 - Construction Defect
  ☐ 102 - Mass Tort
  ☐ 103 - Negligent Security
  ☐ 104 - Nursing Home Negligence
  ☐ 105 - Premises Liability - Commercial
  ☐ 106 - Premises Liability - Residential
  ☐ 107 - Negligence - Other
☐ **Real Property/Mortgage Foreclosure**
  ☐ 108 - Commercial Foreclosure $0 - $50,000
  ☐ 109 - Commercial Foreclosure $50,001 - $249,999
  ☐ 110 - Commercial Foreclosure $250,000 or more
  ☐ 111 - Homestead Residential Foreclosure $0 - $50,000
  ☐ 112 - Homestead Residential Foreclosure $50,001 - $249,999
  ☐ 113 - Homestead Residential Foreclosure $250,000 or more
  ☐ 114 - Non-Homestead Residential Foreclosure $0 - $50,000
  ☐ 115 - Non-Homestead Residential Foreclosure $50,001 - $249,999
  ☐ 116 - Non-Homestead Residential Foreclosure $250,000 or more
  ☐ 117 - Other Real Property Actions $0 - $50,000
  ☐ 118 - Other Real Property Actions $50,001 - $249,999

☐ 119 - Other Real Property Actions $250,000 or more
☐ **Professional Malpractice**
  ☐ 094 - Malpractice - Business
  ☐ 095 - Malpractice - Medical
  ☐ 096 - Malpractice - Other professional
☐ **Other**
  ☐ 120 - Antitrust/Trade Regulation
  ☐ 121 - Business Transactions
  ☐ 122 - Constitutional Challenge - Statute or Ordinance
  ☐ 123 - Constitutional Challenge - Proposed amendment
  ☐ 124 - Corporate Trust
  ☐ 125 - Discrimination - Employment or Other
  ☐ 126 - Insurance Claims
  ☐ 127 - Intellectual Property
  ☐ 128 - Libel/Slander
  ☐ 129 - Shareholder Derivative Action
  ☐ 130 - Securities Litigation
  ☐ 131 - Trade Secrets
  ☐ 132 - Trust Litigation
☐ **133 - Other Civil Complaint**
  ☐ 009 - Bond Estreature
  ☐ 014 - Replevin
  ☐ 024 - Witness Protection
  ☐ 080 - Declaratory Judgment
  ☐ 081 - Injunctive Relief
  ☐ 082 - Equitable Relief
  ☐ 083 - Construction Lien
  ☐ 084 - Petition for Adversary Preliminary Hearing
  ☐ 085 - Civil Forfeiture
  ☐ 086 - Voluntary Binding Arbitration
  ☐ 087 - Personal Injury Protection (PIP)

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

REMEDIES SOUGHT (check all that apply):

☒    monetary;

☐    non-monetary declaratory or injunctive relief;

☐    punitive

NUMBER OF CAUSES OF ACTION: [ 1 ]

(specify)  Plaintiff seeks damages for Defendant's breach of Contract in the amount of the stipulated Contract termination fee of $400,000 and/or all transactional costs and damages incurred by Plaintiff

IS THIS CASE A CLASS ACTION LAWSUIT?

☐  Yes

☒  No

HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?

☒  No

☐  Yes   If "Yes", list all related cases by name, case number, and court.

_____

_____

_____

IS JURY TRIAL DEMANDED IN COMPLAINT?

☐  Yes

☒  No

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief.

Signature _____   Florida Bar # _995381_
                     Attorney or party                                        (Bar # if attorney)

_Robert J. Angerer Jr._                              _March 2, 2011_
(type or print name)                                       Date

CLK/CT 96 Rev. 12/09                                        Clerk's web address: www.miami-dadeclerk.com

| ☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. |
| --- |
| ☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. |

| DIVISION | | CASE NUMBER |
| --- | --- | --- |
| ☒ CIVIL<br>☐ DISTRICTS<br>☐ FAMILY<br>☐ OTHER | **CIVIL COVER SHEET** | 11-0?003 CA 04 |

| PLAINTIFF | VS. DEFENDANT | CLOCK IN |
| --- | --- | --- |
| CORTEZ COMMUNITY BANK | TRADE STREET HOLDINGS, LLC f/k/a BCOM CCB HOLDINGS, LLC | |

The civil cover sheet and the information contained here does not replace the filing and service of pleadings or other papers as required by law. This form is required by the Clerk of Court for the purpose of reporting judicial workload data pursuant to Florida Statute 25.075. See instructions and definitions on reverse of this form.

**TYPE OF CASE** (If the case fits more than one type of case, select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x in both the main category and subcategory boxes.

☐ 001 - Eminent Domain
☒ 003 - Contracts and Indebtedness
☐ 010 - Auto Negligence
☐ 022 - Products Liability
☐ 023 - Condominium
☐ **Negligence - Other**
  ☐ 097 - Business Governance
  ☐ 098 - Business Torts
  ☐ 099 - Environmental/Toxin Tort
  ☐ 100 - Third Party Indemnification
  ☐ 101 - Construction Defect
  ☐ 102 - Mass Tort
  ☐ 103 - Negligent Security
  ☐ 104 - Nursing Home Negligence
  ☐ 105 - Premises Liability - Commercial
  ☐ 106 - Premises Liability - Residential
  ☐ 107 - Negligence - Other
☐ **Real Property/Mortgage Foreclosure**
  ☐ 108 - Commercial Foreclosure $0 - $50,000
  ☐ 109 - Commercial Foreclosure $50,001 - $249,999
  ☐ 110 - Commercial Foreclosure $250,000 - or more
  ☐ 111 - Homestead Residential Foreclosure $0 - $50,000
  ☐ 112 - Homestead Residential Foreclosure $50,001 - $249,999
  ☐ 113 - Homestead Residential Foreclosure $250,000 or more
  ☐ 114 - Non-Homestead Residential Foreclosure $0 - $50,000
  ☐ 115 - Non-Homestead Residential Foreclosure $50,001 - $249,999
  ☐ 116 - Non-Homestead Residential Foreclosure $250,000 or more
  ☐ 117 - Other Real Property Actions $0 - $50,000
  ☐ 118 - Other Real Property Actions $50,001 - $249,999

☐ 119 - Other Real Property Actions $250,000 or more
☐ **Professional Malpractice**
  ☐ 094 - Malpractice - Business
  ☐ 095 - Malpractice - Medical
  ☐ 096 - Malpractice - Other professional
☐ **Other**
  ☐ 120 - Antitrust/Trade Regulation
  ☐ 121 - Business Transactions
  ☐ 122 - Constitutional Challenge - Statute or Ordinance
  ☐ 123 - Constitutional Challenge - Proposed amendment
  ☐ 124 - Corporate Trust
  ☐ 125 - Discrimination - Employment or Other
  ☐ 126 - Insurance Claims
  ☐ 127 - Intellectual Property
  ☐ 128 - Libel/Slander
  ☐ 129 - Shareholder Derivative Action
  ☐ 130 - Securities Litigation
  ☐ 131 - Trade Secrets
  ☐ 132 - Trust Litigation
☐ **133 - Other Civil Complaint**
  ☐ 009 - Bond Estreature
  ☐ 014 - Replevin
  ☐ 024 - Witness Protection
  ☐ 080 - Declaratory Judgment
  ☐ 081 - Injunctive Relief
  ☐ 082 - Equitable Relief
  ☐ 083 - Construction Lien
  ☐ 084 - Petition for Adversary Preliminary Hearing
  ☐ 085 - Civil Forfeiture
  ☐ 086 - Voluntary Binding Arbitration
  ☐ 087 - Personal Injury Protection (PIP)

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

REMEDIES SOUGHT (check all that apply):

☒   monetary;

☐   non-monetary declaratory or injunctive relief;

☐   punitive

NUMBER OF CAUSES OF ACTION: [ 1 ]

(specify)  Plaintiff seeks damages for Defendant's breach of Contract in the amount of the stipulated Contract termination fee of $400,000 and/or all transactional costs and damages incurred by Plaintiff

IS THIS CASE A CLASS ACTION LAWSUIT?

☐  Yes

☒  No

HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?

☒  No

☐  Yes    If "Yes", list all related cases by name, case number, and court.

_____

_____

_____

IS JURY TRIAL DEMANDED IN COMPLAINT?

☐  Yes

☒  No

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief.

Signature _____  Florida Bar # __995381__
                    Attorney or party                                    (Bar # if attorney)

_Robert J. Angerer Jr._____                    _March 2, 2011_____
(type or print name)                                    Date

**IN THE ELEVENTH CIRCUIT COURT**
**IN AND FOR DADE COUNTY, FLORIDA**

**CORTEZ COMMUNITY BANK,**

      **Plaintiff,**

    **v.**

**TRADE STREET HOLDINGS, LLC, f/k/a**
**BCOM CCB HOLDINGS, LLC**

      **Defendants.**

_____/

Case No. _____

**COMPLAINT**

COMES NOW the Plaintiff, **CORTEZ COMMUNITY BANK,** by and through

its undersigned attorneys, and sues the Defendant, **TRADE STREET HOLDINGS,**

**LLC, f/k/a/ BCOM CCB HOLDINGS, LLC,** and for its complaint states as follows:

    1.    This is a breach of contract action for damages that exceed $15,000, and

thus jurisdiction in this Court is proper pursuant to *Fla. Stat.* 26.012(2)(a).

    2.    The Plaintiff, Cortez Community Bank ("CCB") is a Florida banking

corporation located in Spring Hill, Florida.

    3.    The Defendant, Trade Street Holdings, LLC ("Trade Street") is a Delaware

limited liability company with its principal office located in Aventura, Florida.

    4.    On February 22, 2010, Plaintiff CCB and Defendant Trade Street entered

into a Stock Purchase Agreement (the "Agreement") (attached hereto as Exhibit A).

Subsequent to entering the Agreement, Trade Street changed its name from BCOM CCB

Holdings, LLC.

1

5.     Under Section 2.1 of the Agreement, Trade Street agreed to purchase 8,108,1083 new shares of CCB Common Stock from CCB ("Transaction"), in exchange for Fifteen million and 00/100 U.S. Dollars ($15,000,000) (the "Consideration").

6.     Section 8.1(c) of the Agreement, establishes as a condition precedent to the closing of the Transaction the receipt of all "Consents" required for the consummation of the Transaction

7.     "Consents" is defined as "any consent, approval, authorization, clearance...by any filing or registration with, any Person," which necessarily includes consents for and by Regulatory Authorities.

8.     Pursuant to Section 7.3 of the Agreement, Trade Street was obligated to prepare on behalf of themselves, and "use their best efforts in the preparation and . . . filing of, all applications and other necessary and appropriate documents with all Regulatory Authorities having jurisdiction over the transactions" set out in the Agreement within forty-five (45) calendar days from the signing of the Agreement.

9.     Pursuant to Section 7.4 of the Agreement, Trade Street agreed "to use, and to cause its Subsidiaries to use, its best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things . . . as soon as practicable" after the date of the Agreement necessary to complete the transactions contemplated by the Agreement.

10.    The Board of Governors of the Federal Reserve (the "Fed") is a "Regulatory Authority", as defined in Section 1.1(a) of the Agreement, having jurisdiction over the transactions within the meaning of Section 7.3 of the Agreement, but Trade Street elected not to prepare and/or file an application to the Board of Governors of the Federal Reserve System for approval of the consummation of the Transaction.

2

11.    Trade Street's failure to prepare and/or file an application with the Fed is a failure to use its best efforts as required by Sections 7.3 and 7.4 of the Agreement.

12.    Trade Street's failure to prepare and/or file an application with the Fed is a knowing, willful and/or intentional breach of the Agreement.

13.    Pursuant to Section 9.2(e) of the Agreement, CCB is entitled to a Termination Fee of four hundred thousand dollars ($400,000), in the event CCB terminates the Agreement due to any "knowing, intentional, fraudulent or willful breach by Trade Street". The Termination Fee is an "agreed upon liquidated damages amount" as the Parties agreed that it would be impracticable to determine the actual damages and that such Termination Fee would not "deemed to be in the nature of a penalty." CCB is entitled to "all reasonable Transaction Costs incurred by the CCB Companies" upon an ordinary breach by Trade Street.

14.    Pursuant to Section 9.2(e) of the Agreement, CCB has exercised its right to terminate the Agreement and collect the Termination Fee because the termination was a result of Trade Street's "knowing, intentional, fraudulent, or willful" material breach of the Agreement. On October 14, 2010, CCB delivered a demand letter to Trade Street, demanding payment of the required Termination. (Attached hereto as Exhibit "B"). As of the date of this Complaint, Trade Street has failed to pay CCB the Termination Fee.

15.    CCB has incurred Transaction Costs in the negotiation of the Agreement including but not limited to attorneys fees, accounting fees, consultant fees and other costs associated with the preparation, assessment and negotiation of the Agreement.

16.    CCB has suffered damages as a result of Trade Street's breach of the Agreement including but not limited to attorneys fees, accounting fees, consultant fees

and other costs associated with securing substitute capital or the damages resulting from the consequences of being unable to raise substitute capital.

WHEREFORE Plaintiff demands judgment for:

a) the $400,000 Termination Fee;

b) all Transactional Costs incurred by the Plaintiff; or

c) all damages incurred as a result of Trade's Streets Breach of the Agreement;

together with interest and the costs of this action.

ROBERT J. ANGERER, JR. ESQ.
Florida Bar No.: 995381
NICOLETTE L. BIDARIAN, ESQ.
Florida Bar No.: 83795
**IGLER & DOUGHERTY, P.A.**
2457 Care Drive
Tallahassee, Florida 32308
T: (850) 878-2411
F: (850) 878-1230
*Attorneys for Plaintiff, Cortez Community Bank*

EXECUTION COPY

STOCK PURCHASE AGREEMENT

BY AND BETWEEN

BCOM CCB HOLDINGS, LLC

AND

CORTEZ COMMUNITY BANK

DATED AS OF FEBRUARY 22, 2010

MIAMI 2043493.11 7876331198



# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE I. |  | 1 |
| 1.1. Definitions. |  | 1 |
| ARTICLE II. NEW SHARES ISSUANCE |  | 11 |
| 2.1. New Shares Issuance. |  | 11 |
| 2.2. Anti-Dilution Provisions. |  | 11 |
| 2.3. Effect on Rights Holders. |  | 12 |
| 2.4. Time and Place of Closing. |  | 13 |
| ARTICLE III. PRE-CLOSING AMENDMENTS |  | 13 |
| 3.1. Articles of Incorporation. |  | 13 |
| 3.2. Bylaws. |  | 13 |
| ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF CCB |  | 13 |
| 4.1. Organization, Standing, and Power. |  | 14 |
| 4.2. Authority; No Breach By Agreement. |  | 14 |
| 4.3. Capital Stock. |  | 15 |
| 4.4. CCB Subsidiaries. |  | 16 |
| 4.5. CCB Financial Statements. |  | 16 |
| 4.6. Absence of Undisclosed Liabilities. |  | 17 |
| 4.7. Absence of Certain Changes or Events. |  | 17 |
| 4.8. Tax Matters. |  | 18 |
| 4.9. Loan Portfolio; ALLL. |  | 19 |
| 4.10. Assets. |  | 20 |
| 4.11. Intellectual Property. |  | 21 |
| 4.12. Environmental Matters. |  | 21 |
| 4.13. Compliance with Laws. |  | 22 |
| 4.14. Labor Relations. |  | 22 |
| 4.15. Employee Benefit Plans. |  | 23 |
| 4.16. Material Contracts. |  | 24 |
| 4.17. Litigation. |  | 25 |
| 4.18. Reports. |  | 25 |
| 4.19. Statements True and Correct. |  | 26 |
| 4.20. Regulatory Matters. |  | 26 |
| 4.21. Takeover Laws. |  | 27 |
| 4.22. Charter Provisions. |  | 27 |
| 4.23. Corporate Documents and Books and Records. |  | 27 |
| 4.24. Internal Controls. |  | 27 |
| 4.25. Transaction with Affiliates. |  | 27 |
| 4.26. Investment Securities; Derivatives. |  | 28 |
| 4.27. CRA, Anti-Money Laundering, OFAC and Customer Information Security. |  | 28 |

4.28. Authorization of New Shares.      29
4.29. Board Recommendation.      29
4.30. Fairness Opinions.      29

ARTICLE V. REPRESENTATIONS AND WARRANTIES OF BCOM      29

5.1. Organization, Standing, and Power.      29
5.2. Authority; No Breach By Agreement.      30
5.3. Compliance with Laws.      30
5.4. Investment.      31
5.5. Litigation.      31
5.6. Statements True and Correct.      31
5.7. Regulatory Matters.      31

ARTICLE VI. CONDUCT OF BUSINESS PENDING CONSUMMATION      32

6.1. Affirmative Covenants of CCB.      32
6.2. Negative Covenants of CCB.      35
6.3. Acquisition Transactions.      37
6.4. Covenants of BCOM.      39
6.5. Adverse Changes in Condition.      40
6.6. Reports.      40

ARTICLE VII. ADDITIONAL AGREEMENTS      40

7.1. Inspection.      40
7.2. Proxy Statement and Shareholder Approval.      40
7.3. Applications.      41
7.4. Agreement as to Efforts to Consummate.      41
7.5. Right to Indemnity Adjusted Shares.      42
7.6. Investigation and Confidentiality.      43
7.7. Press Releases.      44
7.8. Takeover Laws.      44
7.9. Directorship.      44

ARTICLE VIII. CONDITIONS PRECEDENT TO OBLIGATIONS TO CONSUMMATE      44

8.1. Conditions to Obligations of Each Party.      44
8.2. Conditions to Obligations of BCOM.      45
8.3. Conditions to Obligations of CCB.      47

ARTICLE IX. TERMINATION      48

9.1. Termination.      48
9.2. Effect of Termination.      49

ARTICLE X. MISCELLANEOUS      51

10.1. Expenses.      51
10.2. Brokers and Finders.      51
10.3. Entire Agreement.      51

| | | |
|---|---|---|
| 10.4. Amendments. | | 51 |
| 10.5. Waivers. | | 52 |
| 10.6. Assignment. | | 52 |
| 10.7. Notices. | | 52 |
| 10.8. Governing Law. | | 54 |
| 10.9. Counterparts. | | 54 |
| 10.10. Captions. | | 54 |
| 10.11. Interpretations. | | 54 |
| 10.12. Enforcement of Agreement. | | 55 |
| 10.13. Dispute Resolution. | | 55 |
| 10.14. Jurisdiction; Jury Trial Waiver; Prevailing Party. | | 56 |
| 10.15. Time is of the Essence. | | 57 |
| 10.16. Severability. | | 57 |

# STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT is made and entered into as of February 22, 2010, by and between BCOM CCB HOLDINGS, LLC, a Delaware limited liability company, having its principal office at 19950 W. Country Club Drive, 8th Floor, Aventura, Florida 33180 ("BCOM"), and Cortez Community Bank, a Florida banking corporation having its main office at 1000 South Broad Street, Brooksville, FL 34601 ("CCB").

## Recitals

This Agreement provides for the direct purchase by BCOM from CCB, and the direct issuance by CCB to BCOM, of newly and validly issued, fully paid and non-assessable shares of the CCB Common Stock, at a price per share specified in this Agreement. Upon the consummation of such purchase and issuance, BCOM shall own up to approximately 81.8% and no less than 80% (in each case, on a fully diluted basis) of the capital stock of CCB. The transactions described in this Agreement are subject to the approvals of the FDIC, the Board of Governors of the Federal Reserve System, the Office of Financial Regulation of the State of Florida and any and all other applicable federal and state regulatory authorities, and the satisfaction of certain other conditions described in this Agreement. As a condition and inducement to BCOM's willingness to enter into this Agreement, CCB and each of the members of the board of directors of CCB that is a shareholder thereof and each of the officers of CCB that is a shareholder thereof have entered into a Voting Agreement dated as of the date hereof in the form attached hereto as **Exhibit A** pursuant to which each such director and/or officer will vote his or her shares of CCB Common Stock in favor of all amendments to the Articles of Incorporation and Bylaws of CCB contemplated hereby and the New Shares Issuance and the other transactions contemplated by this Agreement.

Certain capitalized terms used in this Agreement are defined in Section 1.1 of this Agreement.

**NOW, THEREFORE,** in consideration of the above Recitals and the warranties, representations, covenants and agreements of each of the Parties set forth herein, the Parties hereby agree as follows:

## ARTICLE I.

### 1.1. Definitions.

(a)     Except as otherwise provided herein, the capitalized terms set forth below shall have the following meanings:

"**Accredited Investor**" has the meaning set forth in Regulation D promulgated under the Securities Act of 1933, as amended.

"**Acquisition Transaction**" with respect to CCB, means any (i) direct or indirect acquisition or purchase of 10% or more of the total assets of CCB, in a single transaction or series of transactions, (ii) direct or indirect acquisition or purchase of 10% or more of any class

of equity securities of CCB, in a single transaction or series of transactions (including through an equity issuance, merger, consolidation, share exchange, business combination or other similar transaction), (iii) tender offer or exchange offer (including a self-tender offer) that if consummated would result in any Person beneficially owning 10% or more of any class of equity securities of CCB, (iv) merger, consolidation, share exchange, business combination, reorganization, recapitalization, reclassification, liquidation or dissolution or other similar transaction involving CCB or (v) public announcement of an agreement, proposal, plan or intention to do any of the foregoing, other than the transactions contemplated by this Agreement.

"**Act**" means Chapters 665 and 658, Florida Statutes, as amended.

"**Affiliate**" of a Person means: (i) any other Person directly, or indirectly through one or more intermediaries, controlling, controlled by, or under common control with such Person; (ii) any officer, director, partner, employee, or direct or indirect beneficial owner of any 10% or greater equity or voting interest of such Person; (iii) any other Person for which a Person described in clause (ii) acts in any such capacity; or (iv) immediate family members (including spouse, brothers, sisters, parents and other lineal descendants) of a Person.

"**Agreement**" means this Stock Purchase Agreement, including the Exhibits, Schedules and Disclosure Memoranda delivered pursuant hereto and incorporated herein by reference, each and all as amended and/or restated from time to time.

"**Assets**" of a Person means all of the assets, properties, businesses, and rights of such Person of every kind, nature, character and description, whether real, personal or mixed, tangible or intangible, accrued or contingent, or otherwise relating to or utilized in such Person's business, directly or indirectly, in whole or in part, including, without limitation, those carried on the books and records of such Person and intangibles in the nature of goodwill or going concern value, whether or not carried on the books and records, and whether or not owned in the name of such Person or any Affiliate of such Person and wherever located.

"**BCOM Company**" means, individually, BCOM or any BCOM Subsidiary, and "**BCOM Companies**" means, collectively, any two or more BCOM Subsidiaries or BCOM and any one or more BCOM Subsidiaries.

"**BCOM Disclosure Memorandum**" means the written information entitled "BCOM Disclosure Memorandum" delivered prior to the date of this Agreement to CCB describing in reasonable detail the matters contained therein and, with respect to each disclosure made therein, specifically referencing each Section of this Agreement under which such disclosure is being made. Information disclosed with respect to one Section shall not be deemed to be disclosed for purposes of any other Section not specifically referenced with respect thereto.

"**BCOM Subsidiaries**" means the Subsidiaries of BCOM and any corporation, bank, savings association, or other organization acquired as a Subsidiary of BCOM in the future and owned by BCOM at any time up to immediately prior to the Closing.

"**Book Value**" means, as of any particular date, the stockholder's equity of CCB, as determined in accordance with GAAP; provided, however, that the term Book Value shall be deemed to exclude the effects of any and all realizations of extraordinary and/or nonrecurring

gains and the recognition of other income from the disposition of assets and/or liabilities and/or through similar extraordinary and/or non-recurring transactions that were recognized for the period beginning on November 1, 2009 and ending immediately prior to the Condition Fulfillment Date, provided, however, that recoveries arising from or as a result of loans or other extensions of credit that had been partially reserved for or written off shall not be excluded from the calculation of Book Value.

"**Brokered Deposit**" has the meaning set forth in 12 C.F.R. Section 337.6.

"**CCB**" has the meaning prescribed in the preamble of this Agreement.

"**CCB Common Stock**" means the common stock of CCB, with a par value as of the date of this Agreement of $5.00 per share, and, following the amendment of the Articles of Incorporation of CCB contemplated hereby, a par value as of immediately prior to Closing of $1.00 per share.

"**CCB Disclosure Memorandum**" means the written information entitled "CCB Disclosure Memorandum" delivered prior to the date of this Agreement to BCOM describing in reasonable detail the matters contained therein and, with respect to each disclosure made therein, specifically referencing each Section of this Agreement under which such disclosure is being made. Information disclosed with respect to one Section shall not be deemed to be disclosed for purposes of any other Section not specifically referenced with respect thereto.

"**CCB Financial Statements**" shall have the meaning assigned to such term in Section 4.5.

"**CCB Rights**" means all Rights with respect to CCB Common Stock.

"**Closing Date**" means the date on which the Closing occurs.

"**Consent**" means any consent, approval, authorization, clearance, exemption, waiver, or similar affirmation by, or any notice or other notification to, or any filing or registration with, any Person pursuant to any Contract, Law, Order, or Permit.

"**Contract**" means any written or oral agreement, arrangement, authorization, commitment, contract, indenture, instrument, lease, obligation, plan, practice, restriction, understanding, or undertaking of any kind or character, note or other document to which any Person is a party or that is binding on any Person or its capital stock, Assets, or business; provided, however, that such term shall be construed as excluding state or federal laws or regulations or policy statements applicable generally to all financial institutions.

"**CRA**" means the Community Reinvestment Act, as amended.

"**Default**" means (i) any breach or violation of or default under any Contract, Order, or Permit, (ii) any occurrence of any event that with the passage of time or the giving of notice or both would constitute a breach or violation of or default under any Contract, Order or Permit, or (iii) any occurrence of any event that with or without the passage of time or the giving of notice would give rise to a right to terminate or revoke, change the current terms of, or renegotiate, or to

accelerate, increase, or impose any Liability under, any Contract, Order or Permit or impose any Lien on any Asset.

"**Draft Consent Oder**" means that certain draft consent Order proposed by the FDIC and disclosed in Section 4.7(b) of the CCB Disclosure Memorandum and attached as Exhibit 4.7(b)(vi) thereto, as the same exists on the date hereof.

"**Environmental Laws**" means all Laws relating to pollution or protection of human health or the environment (including ambient air, surface water, ground water, land surface or subsurface strata) and which are administered, interpreted or enforced by the United States Environmental Protection Agency and state and local agencies with jurisdiction over, and including common law in respect of, pollution or protection of the environment, including the Comprehensive Environmental Response Compensation and Liability Act, as amended, 42 U.S.C. 9601 *et seq.* ("CERCLA"), the Resource Conservation and Recovery Act, as amended, 42 U.S.C. 6901 *et seq.* ("RCRA"), and other Laws relating to emissions, discharges, releases, or threatened releases of any Hazardous Material, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling of any Hazardous Material.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any entity that is treated as a single employer with CCB for purposes of Section 414 of the Internal Revenue Code.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**FBCA**" means the Florida Business Corporation Act, Chapter 607, Florida Statutes, as amended.

"**FDIC**" means the Federal Deposit Insurance Corporation.

"**GAAP**" means generally accepted accounting principles in the U.S., consistently applied during the periods involved.

"**Hazardous Material**" means: (i) any hazardous substance, hazardous material, hazardous waste, regulated substance, or toxic substance (as those terms are defined by any applicable Environmental Laws); and, (ii) any chemicals, pollutants, contaminants, petroleum, petroleum products, or oil (and specifically shall include Chinese drywall, asbestos requiring abatement, removal, or encapsulation pursuant to the requirements of governmental authorities and any polychlorinated biphenyls).

"**Insider**" has the meaning set forth in Section 12 C.F.R. 215.2(h) of Federal Reserve Regulation O, as amended.

"**Intellectual Property**" means copyrights, patents, trademarks, service marks, service names, trade names, applications therefor, technology rights and licenses, computer software (including any source or object codes therefor or documentation relating thereto), trade secrets, franchises, know-how, inventions, and other intellectual property rights and proprietary rights.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"**Knowledge**" as used with respect to a Person (including references to such Person being aware of a particular matter) means those facts that are actually known, following reasonable inquiry under the circumstances, by the present Chairman, Chief Executive Officer, President, Chief Operating Officer, Chief Financial Officer, Chief Investment Officer, Chief Accounting Officer, Chief Loan Officer, General Counsel or any other officer of such Person.

"**Law**" means any code, law, ordinance, regulation, policy statement, resolution, reporting or licensing requirement, rule or statute applicable to a Person or its Assets, Liabilities, operations or business, including those promulgated, interpreted, or enforced by any Regulatory Authority.

"**Liability**" means any direct or indirect, primary or secondary, liability, indebtedness, obligation, penalty, cost or expense (including legal fees and costs of investigation, collection, and defense), claim, deficiency, guaranty, or endorsement of or by any Person (other than endorsements of notes, bills, checks, and drafts presented for collection or deposit in the Ordinary Course of Business) of any type, whether accrued or unaccrued, known or unknown, absolute or contingent, liquidated or unliquidated, matured or unmatured, or otherwise.

"**Lien**" means any conditional sale agreement, default of title, easement, encroachment, encumbrance, hypothecation, infringement, lien, mortgage, pledge, reservation, restriction, security interest, title retention, or other security arrangement, or any adverse right or interest, charge, or claim of any nature whatsoever (including any Rights) of, on, or with respect to any property or property interest, other than (i) Liens for current property Taxes not yet due and payable, and (ii) for pledges to secure deposits in the Ordinary Course of Business.

"**Litigation**" means any action, arbitration, cause of action, suit, mediation, litigation, order, claim, complaint, criminal prosecution, demand, governmental or other examination or investigation, hearing, formal inquiry, administrative or other proceeding, or notice (written or oral, in draft or final form) by any Person alleging potential Liability or requesting information relating to or affecting a Party, its business, its operations, its Assets (including Contracts related to it), or the transactions contemplated by this Agreement, but shall not include regular, periodic examinations of depository institutions and their Affiliates by Regulatory Authorities, nor routine correspondence related thereto.

"**Material**" for purposes of this Agreement means material, as determined in light of the facts and circumstances of the matter in question; provided that any specific monetary amount stated in this Agreement shall determine materiality in that instance.

"**Material Adverse Effect**" on a Party means an event, change, effect, condition, circumstance, development or occurrence which, individually or together with any other an event, change, effect, condition, circumstance, development or occurrence, has or could reasonably be expected to have, in the reasonable judgment of the other Party, a Material adverse impact or effect on: (i) the business, operations, assets, liabilities, financial condition, value, business prospects, ability to deliver products or services, operating results, cash flow, or net

worth or employee, customer or vendor relations of such Party (or any Subsidiaries); or, (ii) the ability of such Party to perform its obligations under this Agreement or to consummate the New Shares Issuance or the other transactions contemplated by this Agreement, provided that "Material Adverse Effect" and "Material adverse impact" shall not be deemed to include the impact of: (a) changes in banking and similar Laws of general applicability or interpretations thereof by courts or governmental authorities which do not disproportionately affect such Party (other than any such Laws that Materially adversely impact the business plan submitted for approval by BCOM to the Regulatory Authorities with respect to the operations of CCB or otherwise Materially adversely affect the economic and other rights and benefits contemplated by this Agreement to be derived by BCOM from this transaction); (b) changes in GAAP or regulatory accounting principles generally applicable to banks, savings associations, and their holding companies which do not disproportionately affect such Party; (c) actions and omissions of a Party (or any of its Subsidiaries) taken with the prior informed written consent of the other Party in contemplation of the transaction contemplated hereby; and (d) the direct effects of specific compliance with this Agreement on the operating performance of the Parties, including expenses incurred by the Parties in consummating the transactions contemplated by this Agreement.

"**Monthly Average Basis**" means, with respect to any ratio, the arithmetic mean of such ratio as calculated over the immediately preceding thirty (30) calendar day period.

"**Operating Property**" means any property owned by the Party in question or by any of its Subsidiaries or in which such Party or Subsidiary holds a tenant's leasehold interest, and, where required by the context, includes the owner, tenant or operator of such property, but only with respect to such property.

"**Order**" means any administrative decision or award, decree, injunction, judgment, order, quasi-judicial decision or award, enforcement action, ruling, or writ of any federal, state, local, or foreign or other court, arbitrator, mediator, tribunal, administrative agency or Regulatory Authority, in each case, whether in draft or final form.

"*Ordinary Course of Business*" means the ordinary course of business consistent with past custom and practice (including with respect to scope, quantity, quality and frequency), without the requirement of a separate or special authorization by the board of directors, stockholders, partners, managers (in the case of a limited liability company), or members of a Person.

"**Other Assets**" means the summation of line items 5, 6, 7, 8, 9, 10 and 11 of Schedule RC—Balance Sheet of the form titled Consolidated Reports of Condition and Income for A Bank With Domestic Offices Only (OMB Number 7100-036).

"**Participation Facility**" means any facility or real property in which the Party in question or any of its Subsidiaries participates in the management and, where required by the context, said term means the owner or operator of such facility or real property, but only with respect to such facility or property.

"**Party**" means either CCB or BCOM, and "**Parties**" means both CCB and BCOM.

"**Permit**" means any federal, state, local, and foreign governmental approval, authorization, certificate, easement, filing, franchise, license, notice, permit, charter or right to which any Person is a party or that is or may be binding upon or inure to the benefit of or subject to any Person or its securities, Assets, business or operations.

"**Person**" means a natural person or any legal, commercial, or governmental entity, such as, but not limited to, a corporation, general partnership, joint venture, limited partnership, limited liability company, trust, business association, group acting in concert, or any person acting in a representative capacity.

"**Proxy Statement**" means the proxy statement used by CCB to solicit the approval of its shareholders of all amendments to the Articles of Incorporation and Bylaws of CCB contemplated hereby and the New Shares Issuance and the other transactions contemplated by this Agreement, and all materials delivered in connection therewith (including all proxy cards).

"**Regulatory Authorities**" means, collectively, the Federal Trade Commission, the United States Department of Justice, the Board of Governors of the Federal Reserve System, the Office of Thrift Supervision (including its predecessor, the Federal Home Loan Bank Board), the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the Office of Financial Regulation of the State of Florida, the Federal Reserve Bank of Atlanta, the Federal Home Loan Bank of Atlanta, the Department of State of the State of Florida and all other federal, state, county or local regulatory agencies having jurisdiction over the Parties and their respective Subsidiaries.

"**Regulatory Consents**" means, collectively, all Consents with respect to all Regulatory Authorities required for consummation of the New Shares Issuance and of all the other transactions contemplated hereby (including the amendments to the Articles of Incorporation and Bylaws of CCB contemplated hereby) and including the Consents identified on Section 8.1(b).

"**Rights**" means all arrangements, calls, commitments, Contracts, options, rights to subscribe to, scrip, understandings, warrants, or other binding obligations of any character whatsoever relating to, or securities or rights convertible into or exchangeable for, shares of the capital stock of a Person or by which a Person is or may be bound to issue additional shares of its capital stock or other Rights.

"**Securities Laws**" means the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, the Investment Company Act of 1940, as amended, the Investment Advisors Act of 1940, as amended, the Trust Indenture Act of 1939, as amended, and the rules and regulations of any Regulatory Authority promulgated thereunder.

"**Shareholder Representative**" means Thomas Hogan, Jr. and, automatically and without further action in the event of such Person's death or physical or mental incapacity to act, it means and shall be R. Victor Taglia. In the event R. Victor Taglia succeeds Thomas Hogan, Jr. as the Shareholder Representative, then R. Victor Taglia shall immediately name and appoint, by written notice to BCOM, a successor selected in R. Victor Taglia's sole discretion (except that such successor shall in no event be Donald R. Page, who shall in no event be the Shareholder Representative) to serve as the Shareholder Representative in the event of R. Victor

Taglia's death or physical or mental incapacity to act. In the event of R. Victor Taglia's death or physical or mental incapacity to act prior to succeeding Thomas Hogan, Jr. as the Shareholder Representative, then Thomas Hogan, Jr. shall immediately name and appoint, by written notice to BCOM, a successor selected in Thomas Hogan, Jr.'s sole discretion (except that such successor shall in no event be Donald R. Page, who shall in no event be the Shareholder Representative) to serve as the Shareholder Representative in the event of Thomas Hogan, Jr.'s death or physical or mental incapacity to act. In the event that both Thomas Hogan, Jr. and R. Victor Taglia have died or become subject to a physical or mental incapacity to act without there being a successor duly named and appointed as hereinabove provided, then the Shareholder Representative shall be any natural Person appointed by the affirmative vote of the holder(s) of a majority of the outstanding shares of CCB Common Stock that do not constitute New Shares or Indemnity Adjusted Shares at a duly called and held special meeting of the shareholders of CCB (except that such successor shall in no event be Donald R. Page, who shall in no event be the Shareholder Representative). Each and all of the foregoing Persons and their respective successors shall be deemed for all purposes to have been designated and appointed by the shareholders of CCB, as part of their approval of all amendments to the Articles of Incorporation and Bylaws of CCB contemplated hereby and the New Shares Issuance and the other transactions contemplated by this Agreement, to act with full and absolute authority on their behalf as their Shareholder Representative in his or her sole discretion as contemplated by this Agreement, including to bind each shareholder of CCB and to execute and deliver any and all agreements and other documents and instruments on their behalf.

"**Shareholders' Meeting**" means the meeting of the shareholders of CCB to be held pursuant to Section 7.2 of this Agreement, including any adjournment or postponements thereof.

"**Subsidiaries**" means all those corporations, banks, associations, or other entities of which the entity in question owns or controls 10% or more of the outstanding equity securities either directly or through an unbroken chain of entities as to each of which 10% or more of the outstanding equity securities is owned directly or indirectly by its parent; provided, there shall not be included any such entity the equity securities of which are owned or controlled in a fiduciary capacity.

"**Substandard Loan**" means a loan that is inadequately protected by the current sound worth and paying capacity of the obligor or of the collateral pledged.

"**Superior Proposal**" means any bona fide written proposal for an Acquisition Transaction described in clauses (i), (ii) or (iii) of the definition thereof (except that, for purposes of this definition, the thresholds identified in such clauses (i), (ii) and (iii) with respect to the portion of CCB's assets or securities (as applicable) to be acquired shall each be deemed to be 80%), by a Person: (i) on terms that the board of directors of CCB has determined in good faith, after consultation with CCB's financial advisors and legal advisors, would, if consummated, be more favorable from a financial point of view to CCB's shareholders than the New Shares Issuance or the other transactions contemplated by this Agreement (including any adjustment to the terms and conditions thereof proposed in writing by BCOM in response to any such proposal for an Acquisition Transaction) because it would result in CCB receiving cash consideration with a value per share of CCB Common Stock which is no less than five percent (5%) greater than the Share Price: (ii) which the board of directors of CCB determines in good faith, after consultation

with CCB's financial advisors and legal advisors, is reasonably capable of being consummated (taking into account all financial, regulatory, legal and other aspects of such proposal (including the ready availability of cash on hand, necessary financing and/or commitments for the same, in each case, as applicable, the likelihood that the transaction would be consummated by June 30, 2010 or, if later, the expected Closing Date, the likelihood of timely obtaining all applicable Consents from Regulatory Authorities and other Consents necessary for the transaction to be consummated (including any antitrust or competition Law approvals or non-objections) and the identity of the Person making such proposal)); (iii) which is not conditioned on the receipt of any financing; and (iv) that the board of directors of CCB, based upon the written advice of outside legal counsel, has determined in good faith that is of such a nature that they must accept such proposal for an Acquisition Transaction in order for the board of directors of CCB to comply with its fiduciary duties to CCB's shareholders under applicable Law, taking into account for this purpose, all financial, regulatory, legal and other aspects of such proposal (including the ready availability of cash on hand, the level of capital needed for CCB's continuing operations, necessary financing and/or commitments for the same, in each case, as applicable, the likelihood that the transaction would be consummated by June 30, 2010 or, if later, the expected Closing Date, the likelihood of timely obtaining all applicable Consents from Regulatory Authorities and other Consents necessary for the transaction to be consummated (including any antitrust or competition Law approvals or non-objections and the identity of the Person making such proposal).

"**Tax**" or "**Taxes**" means any federal, state, county, local, or foreign income, profits, franchise, gross receipts, payroll, sales, employment, use, property, withholding, excise, occupancy, documentary, and other taxes, assessments, charges, fares, or impositions, including interest, penalties and additions imposed thereon or with respect thereto.

"**Total Assets**" shall have the meaning assigned to such term in line item 12 of Schedule RC—Balance Sheet of the form titled Consolidated Reports of Condition and Income for A Bank With Domestic Offices Only (OMB Number 7100-036).

"**Total Loans**" shall have the meaning assigned to such term in line item 12 of Schedule RC-C—Loans and Lease Financing Receivables of the form titled Consolidated Reports of Condition and Income for A Bank With Domestic Offices Only (OMB Number 7100-036).

"**Transaction Costs**" means, with respect to either CCB or BCOM, any and all fees, costs and expenses incurred by such Party and/or its Affiliates (or any of them) in connection with the transactions contemplated hereunder, including filing, registration and application fees, mailing fees, printing fees, and fees and expenses of its own brokers, financial or other consultants, investment bankers (including any and all fees for any fairness opinions), accountants, and legal counsel.

"**Unsecured Total Aggregate Loans**" means the un-collateralized portion of the summation of (i) line item 12 of Schedule RC-C—Loans and Lease Financing Receivables of the form titled Consolidated Reports of Condition and Income for A Bank With Domestic Offices Only (OMB Number 7100-036) and (ii) all "Unused Commitments," as such term is defined in Item Number 1 of the General Instructions to Schedule RC-L—Derivatives and Off-Balance

9

Sheet Items of the form titled Consolidated Reports of Condition and Income for A Bank With Domestic Offices Only (OMB Number 7100-036).

(b)     The terms set forth below shall have the meanings ascribed thereto in the referenced sections:

| | |
|---|---|
| ALLL | Section 4.5 |
| Acquisition Transaction Fee | Section 6.3(c) |
| ATM | Section 4.16 |
| BCOM Parties | Section 7.5 |
| BCOM Representative | Section 6.1(c) |
| BCOM | Preamble |
| CCB Benefit Plans | Section 4.15(a) |
| CCB Contracts | Section 4.16 |
| CCB Pension Plan | Section 4.15(a) |
| CCB Representative | Section 6.3(a) |
| Closing | Section 2.4 |
| Condition Fulfillment Date | Section 2.4 |
| Consideration | Section 2.1 |
| Employee Stock Options | Section 2.3 |
| Existing Shareholders' Offering | Section 2.1 |
| Existing Shareholders' Offering Shares | Section 2.1 |
| Indemnification Threshold | Section 7.5 |
| Materially Adverse Distinction | Section 8.2(f) |
| New Shares | Section 2.1 |
| New Shares Issuance | Section 2.1 |
| Objection | Section 10.13(a) |
| Objection Period | Section 10.13(a) |
| Objection Resolution Period | Section 10.13(a) |
| OREO | Section 4.5 |
| Permitted Actions | Section 6.3(a) |
| Share Price | Section 2.1 |
| Takeover Laws | Section 4.21 |
| Transaction Costs | Section 9.2(c) |

## ARTICLE II.
## NEW SHARES ISSUANCE

### 2.1. New Shares Issuance.

Subject to the terms and conditions of this Agreement, at the Closing, BCOM shall purchase and acquire from CCB, and CCB shall sell and issue to BCOM, 8,108,108 newly and validly issued, fully paid and non-assessable shares of CCB Common Stock (the "New Shares Issuance"), all of which shall be free and clear of any and all Liens (the "New Shares"), in exchange for an aggregate capital contribution from BCOM to CCB in the amount of Fifteen Million and 00/100 U.S. Dollars ($15,000,000.00) (the "Consideration"), which capital contribution shall be made on the Closing Date concurrently with such New Shares Issuance by wire transfer of immediately available funds in accordance with instructions to be delivered by CCB to BCOM at least three (3) business days prior to the Closing Date. Accordingly, the per share price payable by BCOM for each New Share shall be One Dollar and Eighty-Five Cents ($1.85) (the "Share Price"). CCB hereby represents, warrants and covenants that, as of the Closing Date immediately following the New Shares Issuance, the New Shares shall represent 81.8% of the CCB Common Stock on a fully diluted basis (i.e., assuming conversion and exercise of all CCB Rights (except and only to the extent that any Employee Stock Options are actually exercised at or prior to Closing as provided in Section 2.3) and including any and all CCB Common Stock and CCB Rights owned by CCB, in each case, as of the Closing Date); provided, however, that, subject to compliance with all applicable Laws, Regulatory Consents and Contracts, CCB shall have the right to offer, sell and issue to the holders of any outstanding shares of CCB Common Stock as of the date of this Agreement, up to 177,630 shares of CCB Common Stock, or, if less, up to such number of shares of CCB Common Stock as shall not result in the New Shares representing less than 80% of the CCB Common Stock on a fully diluted basis as of the Closing Date (i.e., assuming conversion and exercise of all CCB Rights (including conversion and exercise of all Employee Stock Options) and including any and all CCB Common Stock and CCB Rights owned by CCB), at a per share purchase price that shall be no less than the Share Price (the "Existing Shareholders' Offering") (such number of shares issuable to such existing shareholders, the "Existing Shareholders' Offering Shares"). The Existing Shareholders' Offering shall terminate on the earlier of the Existing Shareholders' Offering being fully subscribed and closed or the Closing Date. The closing of the Existing Shareholders' Offering shall take place no later than the Closing Date concurrently with the New Shares Issuance. Any Existing Shareholders' Offering Shares not purchased may, in BCOM's sole discretion and without obligation, be purchased by BCOM on the Closing Date at the Share Price.

### 2.2. Anti-Dilution Provisions.

In the event that, at or prior to the Closing, CCB causes or permits a change (subject in all events to compliance with the provisions of Article VI) to the number of shares of CCB Common Stock outstanding as of the date of this Agreement or the number of CCB Rights outstanding as of the date of this Agreement (other than as a result of either: (A) the exercise and conversion of any Employee Stock Options (as such outstanding Employee Stock Options are represented in Section 4.3), which exercise or conversion occurs pursuant to and in accordance with the terms of such Employee Stock Options as of the date of this Agreement and without

CCB having taken or permitted, directly or indirectly, any action or step that results or could reasonably be expected to result in any acceleration or other modification of the exercise date, vesting, or any other terms with respect to such Employee Stock Options; or (B) the sale and issuance of Existing Shareholders' Offering Shares on the Closing Date pursuant to and in accordance with Section 2.1 and Section 7.6(a), whether such change is as a result of a stock or Rights issuance, stock split, stock combination, stock division, stock dividend, reorganization, merger, share exchange, reclassification, recapitalization or other transaction, the New Shares and the Share Price shall be proportionately and equitably adjusted to provide the Parties the same economic effect as contemplated by this Agreement prior to such issuance, stock split, stock combination, stock division, stock dividend, reorganization, merger, share exchange, reclassification, recapitalization or other transaction.

### 2.3.  Effect on Rights Holders.

At or prior to the Closing, CCB shall effectuate the termination and cancellation of any and all outstanding Rights with respect to the capital stock of CCB (including, but not limited to, CCB Common Stock) that are owned or held, beneficially, of record or otherwise, by members of the board of directors (including the chief executive officer) of CCB, which CCB hereby represents and warrants consist only of stock options granted to such directors (including the chief executive officer) that are exercisable, in the aggregate, for 93,673 shares of CCB Common Stock, as such directors' (including CCB's chief executive officer's) stock options are more particularly described on Section 4.3(a) of the CCB Disclosure Memorandum.  Upon such termination and cancellation, such directors' (including CCB's chief executive officer's) stock options shall be of no further force or effect.  With respect to the only other Rights outstanding with respect to the capital stock of CCB as of immediately prior to Closing, which CCB hereby represents, warrants and covenants shall be only stock options granted to CCB employees (but not directors or the chief executive officer of CCB) prior to the date of this Agreement that are exercisable, in the aggregate, for no greater than 30,800 shares of CCB Common Stock, as such employee stock options are more particularly described on Section 4.3(a) of the CCB Disclosure Memorandum (the "Employee Stock Options"), CCB shall cause all of such Employee Stock Options to be either fully exercised by the respective owners thereof at or prior to Closing or, if not so exercised, to be terminated and cancelled effective as of the Closing (whereupon such Employee Stock Options shall be of no further force or effect), in each case, pursuant to and in accordance with Section 14(c)(i) of the CCB Stock Option Plan, dated as of May 24th, 2005, as amended, it being acknowledged and agreed that in no event shall any of such Employee Stock Options be converted into stock options or other Rights with respect to the capital stock of BCOM.  CCB shall not at any time prior to Closing: (i) take any action or step (other than as hereinabove specifically provided with respect to Employee Stock Options) that results or could reasonably be expected to result in any acceleration or other modification of the exercise date, vesting or any other terms with respect to any Rights relating to the capital stock of CCB; (ii) make any payment to the holders of such Rights in exchange for the cancellation or termination of such Rights or otherwise take any action to effectuate such cancellation or termination (other than as hereinabove provided) or to cause the holders thereof to exercise all or any portion of such Rights; (iii) grant, award or issue, or authorize or contract with respect to the grant, award or issuance of, any new Rights; or (iv) make any other adjustments, amendments or modifications to such Rights (including the number of such Rights or the number shares of capital stock of CCB into which the same are convertible or for which the same are

exchangeable, and including the price at which the same may be exercised, converted or exchanged) or to any incentive plan or other Contract pursuant to which such Rights have been granted, awarded, contracted for or issued.

### 2.4. Time and Place of Closing.

The closing of the New Shares Issuance (the "Closing") will take place at a time and date to be specified by the Parties, which shall be no later than five (5) business days following the Condition Fulfillment Date, or at such other time and date as the Parties hereto agree in writing. The Closing shall be held at the Hogan Law Firm, Brooksville Offices, 20 S. Broad Street, Brooksville, Florida 34605. The last of the following events to occur shall be referred to herein as the "Condition Fulfillment Date": (i) the effective date (including expiration of any applicable waiting period) of the last required Regulatory Consent; (ii) the date on which the shareholders of CCB approve all amendments to the Articles of Incorporation and Bylaws of CCB contemplated hereby and the New Shares Issuance, and the other transactions contemplated by this Agreement, as required by applicable Law; and (iii) the date on which all other conditions precedent to each Party's obligations hereunder shall have been satisfied or waived (to the extent waivable by such Party).

### ARTICLE III.
### PRE-CLOSING AMENDMENTS

### 3.1. Articles of Incorporation.

Prior to the Closing, the Articles of Incorporation of CCB shall be amended such that the Articles of Incorporation under which CCB will operate as of the Closing Date until duly further amended or repealed shall reflect the amendment in the form attached hereto as Schedule 3.1, which amendment shall include a change to the authorized capital stock of CCB so that the authorized capital stock of CCB on the Closing Date shall consist exclusively of 35,000,000 shares of common stock, $1.00 par value per share, the limitations, rights, preferences, or other special terms of which, if any, shall be as set forth in the form of Articles of Incorporation attached hereto as Schedule 3.1.

### 3.2. Bylaws.

Prior to the Closing, the Bylaws of CCB shall be amended and restated such that the Bylaws under which CCB will operate as of the Closing Date until duly further amended or repealed shall be in the form attached hereto as Schedule 3.2.

### ARTICLE IV.
### REPRESENTATIONS AND WARRANTIES OF CCB

Except as otherwise specifically set forth in the CCB Disclosure Memorandum, CCB hereby represents and warrants to BCOM as of the date of this Agreement, and as of the Closing Date (unless a specific representation and warranty specifically provides that it speaks as of a different date), as follows:

### 4.1. Organization, Standing, and Power.

CCB is a corporation duly organized, validly existing, and in good standing under the Laws of the State of Florida, and has the corporate power and authority to carry on its business as now conducted and to own, lease, and operate its Assets. CCB is duly qualified or licensed to transact business as a foreign corporation in good standing in the States of the United States and foreign jurisdictions where the character of its Assets or the nature or conduct of its business requires it to be so qualified or licensed, except for such jurisdictions in which the failure to be so qualified or licensed is not reasonably likely to have, individually or in the aggregate, a Material Adverse Effect on CCB. The minutes of the meetings of the board of directors and shareholders of CCB, as made available to BCOM (including the BCOM Representative) for its review are true and complete in all Material respects as in effect as of the date such minutes are made available and accurately reflect in all Material respects all amendments thereto and all proceedings of the board of directors of CCB (including any and all committees thereof) and the shareholders of CCB, respectively.

### 4.2. Authority; No Breach By Agreement.

(a)     CCB has the corporate power and authority necessary to execute, deliver, and perform its obligations under this Agreement and (subject to the required shareholder and Regulatory Consents referred to in Sections 8.1(a) and (b) of this Agreement) to consummate the transactions contemplated hereby. The execution, delivery, and performance of this Agreement and, subject to the approval of the amendment to the CCB Articles of Incorporation contemplated by Section 3.1 by the holders of a majority of the outstanding shares of CCB Common Stock as contemplated by Section 8.1(a) of this Agreement, which is the only vote of CCB's shareholders required for approval of this Agreement and consummation of the New Shares Issuance and the other transactions contemplated by this Agreement (including all amendments to the Articles of Incorporation and Bylaws of CCB contemplated hereby), have been duly and validly authorized by all necessary corporate action in respect thereof on the part of CCB.   This Agreement represents the legal, valid, and binding obligations of CCB, enforceable against CCB in accordance with its terms (except in all cases as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, receivership, conservatorship, moratorium, or similar Laws affecting the enforcement of creditors' rights generally and except that the availability of the equitable remedy of specific performance or injunctive relief is subject to the discretion of the court before which any proceeding may be brought and subject to 12 U.S.C. Section 1818(b)(6)(D) and similar bank regulatory powers).

(b)     Except as disclosed in Section 4.2(b) of the CCB Disclosure Memorandum, neither the execution and delivery of this Agreement by CCB, nor (subject to the required shareholder Consent referred to in Section 8.1(a)) the consummation by CCB of the transactions contemplated hereby, nor compliance by CCB with any of the provisions hereof, will: (i) conflict with or result in a breach of any provision of CCB's Articles of Incorporation or Bylaws or any resolution adopted by the board of directors or shareholders of CCB; or, (ii) constitute or result in a Default under, or require any Consent pursuant to, or result in the creation of any Lien on any Material Asset of CCB under, any Contract or Permit of CCB, or (iii) subject to receipt of the requisite Consents referred to in Section 8.1(b) of this Agreement, violate any Law or Order applicable to CCB or any of its Material Assets.

(c)     Except as disclosed in Section 4.2(b) of the CCB Disclosure Memorandum, other than in connection or compliance with the provisions of the Securities Laws, applicable state corporate and/or securities Laws, and other than Regulatory Consents required as contemplated by Section 8.1(b) of this Agreement, no Consent of or with respect to any public body or authority or other third party is necessary for the execution and delivery of this Agreement, the performance of CCB's obligations hereunder and/or the consummation by CCB of the New Shares Issuance and/or the other transactions contemplated by this Agreement (including all amendments to the Articles of Incorporation and Bylaws of CCB contemplated hereby).

### 4.3.  Capital Stock.

(a)     The authorized capital stock of CCB as of the date of this Agreement consists of 5,000,000 authorized shares of CCB Common Stock, of which amount, 1,804,990 shares are outstanding as of the date of this Agreement without taking into account the conversion or exercise of any outstanding CCB Rights, and 1,929,463 shares are outstanding as of the date of this Agreement on a fully diluted basis (i.e., assuming conversion and exercise of all outstanding CCB Rights and including any and all CCB Common Stock and CCB Rights owned by CCB, in each case, as of the date hereof).  Upon approval of the amendment to the Articles of Incorporation of CCB contemplated hereby, the authorized capital stock of CCB as of the Closing will consist of 35,000,000 authorized shares of CCB Common Stock, of which amount, 9,913,098 shares (including the New Shares) will be outstanding as of the Closing on a fully diluted basis (i.e., after giving effect to the termination and cancellation of stock options held by the members of the CCB board of directors (including CCB's chief executive officer) required pursuant to Section 2.3 and assuming termination and cancellation of all Employee Stock Options as provided in Section 2.3 and including any and all CCB Common Stock and CCB Rights then owned by CCB) but without taking into account any Existing Shareholders' Offering Shares which may be issued pursuant to and in accordance with Section 2.1.  Section 4.3(a) of the CCB Disclosure Memorandum sets forth a true, complete, accurate, and up to date list of all of the holders of capital stock of CCB (including all holders of CCB Common Stock and all holders of CCB Rights) and their respective holdings thereof (including in the case of CCB Rights, the exercise price, term, vesting terms (including any acceleration of vesting rights thereunder), exercise schedule and any other Material terms thereof).  All of the outstanding shares of capital stock of CCB are duly and validly issued and outstanding and are fully paid and nonassessable under the FBCA and the Act.  None of the outstanding shares of capital stock of CCB has been issued in violation of the Securities Laws, any applicable state corporate and/or securities Laws, or any other Laws or of any preemptive rights of the current or past equityholders of CCB.

(b)     Except as set forth in Section 4.3(a) of this Agreement or in Section 4.3(a) of the CCB Disclosure Memorandum, there is no capital stock (including CCB Common Stock and CCB Rights) of CCB authorized or outstanding.  Except for this Agreement and as set forth in Section 4.3(a) of this Agreement or in Section 4.3(a) of the CCB Disclosure Memorandum, no Person has any Contract or Right, or any right or privilege (whether preemptive or contractual) capable of becoming a Contract or Right, relating to any capital stock (including CCB Common Stock and CCB Rights) of CCB, including: (i) any agreement, subscription, warrant, call, put, buy/sell, preemptive right, option, claim, subscription, tag along right, drag along right, right of

first offer or refusal, convertible or exchangeable security or other arrangement of any kind pursuant to which CCB is or may become, or pursuant to which BCOM may become upon consummation of the transactions contemplated hereby, obligated to issue, acquire, sell, transfer, otherwise dispose of, register, purchase, return or redeem or otherwise take any action with respect to the capital stock of CCB (including CCB Common Stock and CCB Rights); and (ii) with respect to the direct or indirect voting or control of any capital stock of CCB (including CCB Common Stock and CCB Rights), including any shareholder agreements, voting trusts, proxies, voting agreements or other similar Contracts of any kind, that are or may become binding on CCB or upon BCOM upon the consummation of the transactions contemplated hereby.

### 4.4. CCB Subsidiaries.

CCB has no, and has never had any, Subsidiaries or any "subsidiaries" or "affiliates" (as such terms are defined in 12 C.F.R. Section 223.2) or any direct or indirect record or beneficial equity or other ownership interest in any Person.

### 4.5. CCB Financial Statements.

CCB has delivered to BCOM (or will deliver, when available, with respect to financial statements for dates or periods not available as of the date of this Agreement) true, correct and complete copies of: (i) the statements of financial position (including related notes and schedules, if any) of CCB as of October 31, 2009, and as of December 31, 2009, December 31, 2008, December 31, 2007 and December 31, 2006, and the related statements of operations, stockholders' equity, cash flows (including related notes and schedules, if any) for the ten and twelve months ended October 31, 2009 and December 31, 2009, respectively, and for each of the three fiscal years ended December 31, 2008, December 31, 2007 and December 31, 2006; (ii) the statements of financial position of CCB (including related notes and schedules, if any) and related statements of operations, stockholders' equity, and cash flows (including related notes and schedules, if any) with respect to each period ending subsequent to December 31, 2009 and prior to the Closing; and, (iii) all Call Reports including any amendments thereto filed with any Regulatory Authorities by CCB for the years ended December 31, 2008, December 31, 2007 and December 31, 2006 and for the periods ending September 30, 2009 and December 31, 2009, and for each period ending subsequent to December 31, 2009 and prior to the Closing, together with any correspondence with any Regulatory Authorities concerning any of the aforesaid financial statements and Reports (collectively, the "CCB Financial Statements"). All CCB Financial Statements: (i) were (or will be) prepared from and in accordance with the records of CCB; (ii) were (or will be) prepared in accordance with GAAP (or, where applicable, regulatory accounting principles) consistently applied throughout the periods involved; (iii) accurately and fairly present (or, when prepared, will accurately and fairly present) CCB's financial condition and the results of its operation, changes in stockholders' equity and cash flows at the relevant dates thereof and for the periods covered thereby, except that the unaudited interim CCB Financial Statements were or are subject to normal and recurring year-end adjustments which were not or were not expected to be Material in amount or effect; (iv) do contain or reflect (or, when prepared, will contain and reflect) all necessary adjustments and accruals for an accurate presentation of CCB's financial condition and the results of CCB's operations and cash flows for the periods covered by such Financial Statements; and (v) do contain and reflect (or, when

prepared, will contain and reflect) adequate provisions or Allowances for Loan and Lease Losses ("ALLL"), for all Other Real Estate Owned ("OREO") reserves and for all reasonably anticipated obligations, Liabilities and Taxes, with respect to the periods then ended.

### 4.6.  Absence of Undisclosed Liabilities.

CCB does not have any Liabilities except: (i) Liabilities which are accrued or reserved against in the CCB Financial Statements delivered prior to the date of this Agreement that have not been paid or discharged since the date thereof and; (ii) Liabilities incurred or paid (A) in the Ordinary Course of Business since the date of the last CCB Financial Statement delivered prior to the date of this Agreement and which are not reasonably likely to have, individually or in the aggregate, a Material Adverse Effect (none of which is a Material Liability for breach of contract, breach of warranty, tort, infringement, violation of Law, claim or lawsuit); or (B) constituting Transaction Costs.

### 4.7.  Absence of Certain Changes or Events.

Except as disclosed in Section 4.7 of the CCB Disclosure Memorandum, since December 31, 2008 (or such later date as noted below):

(a)     CCB has conducted its business only in the Ordinary Course of Business;

(b)     there has not been any event or occurrence that has had, or could reasonably expected to have, a Material Adverse Effect;

(c)     CCB has not declared, paid or set aside any dividends or distributions with respect to the CCB Common Stock;

(d)     except for supplies or equipment purchased in the Ordinary Course of Business, CCB has not made any capital expenditures exceeding, individually or in the aggregate, $20,000 since December 31, 2008;

(e)     there has not been any write-down or specific reserve established by CCB in excess of $50,000 with respect to any of its loans or other real estate owned;

(f)     there has not been any sale, assignment or transfer of any Assets by CCB in excess of $40,000 other than in the Ordinary Course of Business;

(g)     CCB has not taken any action, or failed to take any action which action or failure, if taken prior to or after the date of this Agreement, would represent or result in a Material breach or violation of any of the covenants and agreements of CCB contained in this Agreement;

(h)     there has been no increase in the salary, bonus, compensation, pension or other benefits or remuneration payable or to become payable by CCB to any of their respective directors, officers or employees, other than in conformity with the policies and practices of such entity in the Ordinary Course of Business; and

(i)      there has been no change in any accounting principles, practices or methods of CCB other than as required by GAAP.

**4.8.  Tax Matters.**

(a)      CCB has timely filed with the appropriate taxing authorities all Tax returns in all jurisdictions in which Tax returns are required to be filed, and such Tax returns are correct and complete in all respects. CCB is not the beneficiary of any extension of time within which to file any Tax return. All Taxes of CCB (whether or not shown on any Tax return) have been fully and timely paid. CCB has not received any notice of assessment or proposed assessment in connection with any Taxes and there is no pending or threatened audit, dispute, claim, examination, deficiency, or refund Litigation with respect to any Taxes applicable to CCB. No officer or employee of CCB expects any Regulatory Authority to assess any additional Taxes for any period for which Tax returns have been filed. There are no Liens with respect to Taxes upon any of the Assets of CCB. No claim has ever been made by an authority in a jurisdiction where CCB does not file a Tax return that CCB may be subject to Taxes in that jurisdiction.

(b)      CCB has not in any way waived any statute of limitations in respect of any Taxes or agreed to a Tax assessment or deficiency. CCB has complied with all applicable Laws, rules and regulations relating to the withholding of Taxes and the payment thereof to appropriate authorities, including Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee or independent contractor, and Taxes required to be withheld and paid pursuant to Sections 1441 and 1442 of the Internal Revenue Code or similar provisions under foreign Law.

(c)      Adequate provision for any Taxes due or to become due for CCB for the period or periods through and including the date of the CCB Financial Statements has been made and is reflected on such CCB Financial Statements.

(d)      Deferred Taxes of CCB have been provided for in accordance with GAAP.

(e)      The unpaid Taxes of CCB: (i) did not, as of the most recent fiscal month end, exceed the reserve for Tax Liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the most recent balance sheet (rather than in any notes thereto) for CCB; and (ii) do not exceed that reserve as adjusted for the passage of time throughout the Closing Date in accordance with past custom and practice of CCB filing its Tax returns.

(f)      CCB has not made any payments, is not obligated to make any payments, and is not a party to any Contract that could obligate it to make any payments that would be disallowed as a deduction under Section 280G or 162(m) of the Internal Revenue Code.

(g)      CCB is not a party to any Tax allocation or sharing agreement and CCB has not been a member of an affiliated group filing a consolidated federal income tax return, and has no Liability for Taxes of any Person (other than CCB) under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local, or foreign Law) as a transferee or successor or

by Contract or otherwise. CCB does not have and has not had in any foreign country a permanent establishment, as defined in any applicable Tax treaty or convention between the United States and such foreign country.

**4.9. Loan Portfolio; ALLL.**

(a)    The ALLL for possible loan or credit losses shown on the balance sheets of CCB included in the most recent CCB Financial Statements dated prior to the date of this Agreement was, and the ALLL shown on the balance sheets of CCB included in the CCB Financial Statements as of dates subsequent to the execution of this Agreement will be, as of the dates thereof, (i) adequate (within the meaning of GAAP and applicable regulatory requirements or guidelines) in the reasonable opinion of management to provide for all known and reasonably anticipated losses relating to or inherent in the loan and lease portfolios (including accrued interest receivables) of CCB and other extensions of credit (including letters of credit and commitments to make loans or extend credit) by CCB as of the dates thereof; and (ii) in accordance with all applicable regulatory and other banking requirements.

(b)    With respect to each loan owned by CCB in whole or in part:

(i)    The note and the related security documents are each legal, valid and binding obligations of the maker or obligor thereof, enforceable against such maker or obligor in accordance with their terms;

(ii)    Neither CCB, nor any prior holder of a loan, has modified the note or any of the related security documents in any material respect or satisfied, canceled or subordinated the note or any of the related security documents except as otherwise disclosed by documents in the applicable loan file;

(iii)    CCB is the sole holder of legal and beneficial title to each loan (or CCB's applicable participation interest, as applicable);

(iv)    Except as to loans held in the form of a participation, as set forth in Section 4.9(b)(iv) of the CCB Disclosure Memorandum, the original note and the related security documents are included in the loan files, and copies of any documents in the loan files, all of which have been made available to BCOM, are true and correct copies of the documents they purport to be and have not been suspended, amended, modified, canceled or otherwise changed except as otherwise disclosed by documents in the applicable loan file; and

(v)    with respect to a loan held in the form of a participation, the participation documentation is legal, valid, binding and enforceable in accordance with its terms, subject to bankruptcy, insolvency, fraudulent conveyance and other laws of general applicability relating to or affecting creditors' rights and to general equity principles, and the copies of such documentation contained in the loan files, all of which have been made available to BCOM, are true and correct copies of the documents they purport to be and have not been suspended, amended, modified, canceled or otherwise changed except as otherwise disclosed by documents in the applicable loan file.

(c)      Neither the terms of any loan, any of the documentation for any loan, the manner in which any loans have been administered and serviced, nor CCB's practices of approving or rejecting loan applications, violate any federal, state, or local Law applicable thereto, including the Truth In Lending Act, Regulations O and Z of the Federal Reserve Board, the CRA, the Equal Credit Opportunity Act, and any state Laws relating to consumer protection, installment sales and/or usury.

**4.10.  Assets.**

(a)      CCB has good and marketable title, free and clear of all Liens, to all of its Assets.  All real properties owned or leased by CCB, a true, correct and complete list and description of which (each identified as owned or leased) is set forth in Section 4.10 of the CCB Disclosure Memorandum: (i) have access to a public road; (ii) have electricity, water and sewage or septic connections each sufficient to conduct its operations as conducted immediately prior to Closing; (iii) are in a good state of maintenance and repair (normal wear and tear excepted); (iv) conform with all applicable Laws and Orders; (v) are considered by CCB to be adequate for the current business of CCB; (vi) are not subject to any special assessment, condemnation or eminent domain proceeding of which CCB has received notice; and (vii) are not subject to any agreement that prohibits or Materially restricts the transactions contemplated by this Agreement (including the New Shares Issuance and the other transactions contemplated by this Agreement (including all amendments to the Articles of Incorporation and Bylaws of CCB contemplated hereby) and the change of control of CCB) or the continued ownership and/or operations by CCB thereon in the Ordinary Course of Business.  All improvements constructed on any of the real properties owned or leased by CCB are within the boundaries of property as depicted on the most recent ALTA survey thereof (a true, correct and complete copy of which has been provided to BCOM), do not encroach on any other parcel of adjacent real estate and, where appropriate, are set back from the boundaries to comply, in all Material respects, with all applicable Laws and Orders covering such real property.  To CCB's Knowledge, no structure primarily located on another parcel of real property encroaches on any of the real properties owned or leased by CCB.

(b)      All tangible properties owned and/or used by CCB in its respective businesses and operations are in good condition, reasonable wear and tear excepted, and are usable in the Ordinary Course of Business.  All Assets which are Material to CCB's business, held under leases or subleases by CCB, are held under valid Contracts enforceable in accordance with their respective terms (except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or other Laws affecting the enforcement of creditors' rights generally and except that the availability of the equitable remedy of specific performance or injunctive relief is subject to the discretion of the court before which any proceedings may be brought), and each such Contract is in full force and effect.  CCB currently maintains insurance similar in amounts, scope, and coverage to that maintained by other peer banking organizations having Assets and operations similar to CCB's, all of which insurance is set forth in Section 4.10 of the CCB Disclosure Memorandum.  CCB has not received notice from any insurance carrier that: (i) such insurance will be canceled or that coverage thereunder will be reduced or eliminated; or (ii) premium costs with respect to such policies of insurance will be substantially increased. There are presently no claims pending under any such policies of insurance and no notices have been given by CCB under such policies, except for routine claims, none of which is

Material. CCB's Assets include all Assets required to operate the business of CCB as presently conducted.

### 4.11. Intellectual Property.

All of the Intellectual Property rights of CCB are in full force and effect and constitute legal, valid, and binding obligations of the respective parties thereto, and there have not been, and there currently are not, any Defaults thereunder by CCB. CCB owns and has good and exclusive title to, or is the valid licensee of (sufficient for the conduct of its business as currently conducted and as proposed to be conducted), each item of Intellectual Property used by CCB in the conduct of its business free and clear of all Liens or claims of infringement. CCB and each of its respective predecessors has not misused the Intellectual Property rights of others and, to the Knowledge of CCB, none of the Intellectual Property rights as used in the business conducted by CCB infringes upon or otherwise violates the rights of any Person, nor has any Person asserted or threatened a claim of such infringement. CCB is not obligated to pay any royalties to any Person with respect to any such Intellectual Property. CCB has taken all reasonable steps to protect the rights of CCB in its confidential information and trade secrets that it wished to protect or any trade secrets or confidential information of third parties provided to CCB, and, without limiting the foregoing, CCB has and enforces a privacy policy that adequately safeguards and protects all consumer information to the fullest extent required by applicable Law, but in all events, at least to the same extent that is consistent with industry practice. Other than "shrink-wrap" and other commercially available (i.e., not developed specifically for CCB) software licenses, set forth in Section 4.11 of the CCB Disclosure Memorandum is a detailed list of all of the Intellectual Property rights of CCB.

### 4.12. Environmental Matters.

(a)     CCB, its Participation Facilities, and its Operating Properties are, and have at all times been, in compliance with all Environmental Laws;

(b)     There is no Litigation pending, or, to the Knowledge of CCB, threatened before any court, governmental agency or authority or other forum in which CCB or any of its Operating Properties or Participation Facilities (or CCB in respect of such Operating Property or Participation Facility) has been or, with respect to threatened Litigation, may be named as a defendant: (i) for alleged noncompliance (including by any predecessor) with any Environmental Law; or (ii) relating to the release into the environment of any Hazardous Material, whether or not occurring at, on, under, adjacent to, or affecting (or potentially affecting) a site owned, leased, or operated by CCB or any of its Operating Properties or Participation Facilities, nor to the Knowledge of CCB is there any reasonable basis for any Litigation of a type described in this sentence; and

(c)     During the period of: (i) CCB's ownership or operation of any of its current properties; (ii) CCB's participation in the management of any Participation Facility; or (iii) CCB's holding of a security or leasehold interest in any Operating Property, there have been no releases of Hazardous Material in, on, under, adjacent to, or affecting (or potentially affecting) any of such properties. Prior to the period of: (1) CCB's ownership or operation of any of its current properties; (2) CCB's participation in the management of any Participation Facility;

or (3) CCB's holding of a security or leasehold interest in any Operating Property, to the Knowledge of CCB, there were no releases of Hazardous Material in, on, under, or affecting any such property, Participation Facility or Operating Property.

### 4.13. Compliance with Laws.

CCB: (i) is duly licensed as a state bank by the Office of Financial Regulation of the State of Florida; (ii) holds a current and validly issued FDIC certificate and Bank Charter; and (iii) has fully complied with all requirements set forth in all Commercial Bank Reports of Examinations issued by the FDIC during the past five years. CCB has in effect all Permits necessary for it to own, lease, or operate its Assets and to carry on its business as now conducted, and no Default has occurred under any such Permit. Except as described in Section 4.13 of the CCB Disclosure Memorandum, CCB:

      (a)    is not in Default under any of the provisions of its Articles of Incorporation or Bylaws (or other governing instruments) or any Laws, Orders or Permits applicable to its business or employees conducting its business;

      (b)    has not been denied the issuance of any Permits, or had any of its Permits revoked, suspended or cancelled during the past five (5) years; and

      (c)    has not received any notification or communication from any agency or department of federal, state, or local government or any Regulatory Authority or the staff thereof (i) asserting that CCB is not or may not be in compliance with any of the Laws or Orders which such governmental authority or Regulatory Authority enforces, or (ii) threatening to revoke any Permits.

### 4.14. Labor Relations.

      (a)    CCB is not the subject of any Litigation, and to the Knowledge of CCB, no such Litigation has been threatened, asserting that it has committed an unfair labor practice (within the meaning of the National Labor Relations Act or comparable state Law) or seeking to compel CCB to bargain with any labor organization as to wages or conditions of employment, nor is CCB a party to any collective bargaining agreement or subject to any bargaining order, injunction or other Order relating to CCB's relationship or dealings with its employees, any labor organization or any other employee representatives. There is no strike, slowdown, lockout or other labor dispute involving CCB, pending or threatened, nor, to the Knowledge of CCB, is there any activity involving CCB's employees seeking to certify a collective bargaining unit or engaging in any other organization activity. Section 4.14 of the CCB Disclosure Memorandum sets forth the name and current annual rates of compensation paid (including bonus (cash and non-cash) compensation) by CCB to each employee (including employees on temporary or permanent disability leave) and each consultant of CCB that receives over $25,000 in annual compensation from CCB. Except for Mr. Donald R. Page and as otherwise described in Section 4.14 of the CCB Disclosure Memorandum, the employment of each CCB employee and the engagement of each CCB independent contractor is terminable at will by CCB without any penalty, Liability, severance or statutory termination obligation required to be incurred by CCB. CCB will not owe any bonus, contract notice periods, change of control payments, severance,

acceleration of options vesting or other benefits, payments or statutory termination obligations to any of its employees or independent contractors as of the Closing Date or otherwise in connection with the execution and delivery of this Agreement, the performance of the Parties' obligations hereunder and/or consummation of the New Shares Issuance and/or the other transactions contemplated by this Agreement (including all amendments to the Articles of Incorporation and Bylaws of CCB contemplated hereby) and/or the change of control of CCB.

      (b)    All of CCB's employees are United States citizens or are legally entitled to work in the United States under the Immigration Reform Control Act of 1986, as amended, other United States immigration Laws and the Laws of Florida related to the employment of non-United States citizens. CCB has not been the subject of any inspection or investigation relating to its compliance with or violation of any immigration laws, nor has it been warned, fined or otherwise penalized by reason of any failure to comply with the immigration Laws, nor is any such proceeding pending or threatened.

      (c)    CCB has never had any Equal Employment Opportunity Commission or state fair employment practice agency charges or other claims of employment discrimination, harassment or wrongful discharge made against it or any of its employees. No state or federal Wage and Hour Department investigations have ever been made of CCB and no claims or charges relating to wage and hour issues have been filed or threatened. No Occupational Safety and Health Administration investigations have been made of CCB.

**4.15. Employee Benefit Plans.**

      (a)    CCB has disclosed in Section 4.15 of the CCB Disclosure Memorandum, and has delivered or made available to BCOM prior to the execution of this Agreement copies in each case of, all pension, retirement, profit-sharing, deferred compensation, stock option, employee stock ownership, severance pay, vacation, bonus, or other incentive plan, all other written employee programs or arrangements or employment agreements, all medical, vision, dental, or other health plans, all life insurance plans, and all other employee benefit plans or fringe benefit plans, including "employee benefit plans" as that term is defined in Section 3(3) of ERISA, currently adopted, maintained by, sponsored in whole or in part by, entered into by, or contributed to by CCB or any ERISA Affiliate thereof for the benefit of employees, former employees, retirees, dependents, spouses, families, directors or independent contractors or any of the foregoing or other beneficiaries (or any of them) and under which employees, former employees, retirees, dependents, spouses, families, directors, independent contractors or any of the foregoing, or any other beneficiaries are eligible to participate or as to which CCB is obligated (collectively, the "CCB Benefit Plans"). Any of the CCB Benefit Plans which is an "employee pension benefit plan," as that term is defined in Section 3(2) of ERISA, is referred to herein as a "CCB ERISA Plan." There is no CCB ERISA Plan which is also a "defined benefit plan" (as defined in Section 414(j) of the Internal Revenue Code) (a "CCB Pension Plan"). No CCB Pension Plan is or has been a multiemployer plan within the meaning of Section 3(37) of ERISA.

      (b)    All CCB Benefit Plans are and at all times have been in compliance with the applicable terms of ERISA, the Internal Revenue Code, and any other applicable Laws. Each CCB ERISA Plan which is intended to be qualified under Section 401(a) of the Internal Revenue

Code has received a favorable determination letter from the Internal Revenue Service that is still in effect and applies to the CCB ERISA Plan, and CCB is not aware of any circumstances likely to result in revocation of any such favorable determination letter. CCB has never engaged in a transaction with respect to any CCB Benefit Plan that, assuming the taxable period of such transaction expired as of the date hereof, would subject CCB to a Tax imposed by either Section 4975 of the Internal Revenue Code or Section 502(i) of ERISA.

(c)     CCB does not provide for retiree health and life benefits except as may be required by ERISA or the Internal Revenue Code under any of the CCB Benefit Plans and there are no restrictions on the rights of CCB to amend or terminate any such retiree health or benefit plan without incurring Liability thereunder.

(d)     Except as otherwise described in Section 4.15 of the CCB Disclosure Memorandum, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) result in any payment (including severance, unemployment compensation, golden parachute, or otherwise) becoming due to any director or any employee or consultant of CCB under any CCB Benefit Plan or otherwise, (ii) increase any benefits otherwise payable under any CCB Benefit Plan or otherwise, or (iii) result in any acceleration of the time of payment or vesting of, or any other change to, any such benefit.

(e)     The actuarial present values of all accrued deferred compensation entitlements (including entitlements under any executive compensation, supplemental retirement, or employment agreement) of employees and former employees of CCB and their respective beneficiaries, if any, other than entitlements accrued pursuant to funded retirement plans subject to the provisions of Section 412 of the Internal Revenue Code or Section 302 of ERISA, have been fully reflected on the CCB Financial Statements to the extent required by and in accordance with GAAP.

### 4.16. Material Contracts.

Except as described in Section 4.16 of the CCB Disclosure Memorandum, neither CCB, nor any of its respective Assets, businesses, or operations, is a party to, or is bound or affected by, or receives benefits under: (i) any employment, confidentiality, non-disclosure, referral, non-competition, commission, non-solicitation, management, severance, termination, indemnification, consulting, partnership, joint venture, operating, shareholders', retirement, sale, purchase, distribution, marketing, agency advertising or outsourcing Contracts; (ii) any Contract providing for aggregate payments or potential payments in excess of $12,000 to any Person or by any Person to CCB in any calendar year or not terminable by CCB without penalty or charge on thirty (30) days notice; (iii) any Contract relating to the borrowing of money by CCB or the guarantee by CCB of any such obligation or any other Liability of any third party (other than Contracts evidencing deposit liabilities, purchases of federal funds, and trade payables); (iv) any Contracts which prohibit or restrict CCB from engaging in any business activities in any geographic area, line of business, or otherwise in competition with any other Person; (v) any Contracts between or among CCB and/or any of its shareholders (other than Contracts for bank deposits made with CCB by such shareholders) or other Affiliates; (vi) any exchange-traded or over-the-counter swap, forward, future, option, cap, floor, or collar financial Contract, or any other interest rate or foreign currency protection Contract which is a financial derivative Contract

(including various combinations thereof); (vii) any joint venture, limited liability company, partnership or similar agreements; (viii) any Contract relating to Intellectual Property; (ix) any leases of real or personal property; (x) any Contracts related to the issuance of credit cards, correspondent banking relationships, ownership of or participation in the operation of automated teller machines ("ATM") or ATM related systems, the sale and distribution of securities or insurance products and/or secondary mortgage market operations; (xi) any Contract for the acquisition of Assets or a business or pursuant to which such rights are granted; (xii) any Contract relating to registration, preemptive, buy-sell, co-sale, voting or other rights regarding CCB's securities or involving any officers, directors, shareholders or other Affiliates (if any) of CCB; and (xiii) any and all other Material Contracts (together with all Contracts to which CCB is a party which are referred to in Sections 4.10 and 4.15(a) of this Agreement, the "CCB Contracts"). With respect to each CCB Contract: (1) the Contract is in full force and effect; (2) CCB is not in Default thereunder; (3) CCB has not repudiated or waived any Material provision of any such Contract; and (4) no other party to any such Contract is, to the Knowledge of CCB, in Default in any respect or has repudiated or waived any Material provision thereunder. True, correct and complete copies of any and all Material Contracts have been provided to BCOM prior to the date of this Agreement. All of the indebtedness of CCB for money borrowed is prepayable at any time by CCB without penalty, charge or premium.

### 4.17. Litigation.

There is no Litigation instituted or pending, or, to the Knowledge CCB, threatened (or unasserted but considered probable of assertion and which if asserted would have at least a reasonable probability of an unfavorable outcome) against CCB, or against any Asset, employee benefit plan, interest, or right of any of them, nor are there any Orders of any Regulatory Authorities, other governmental authorities, or arbitrators outstanding against CCB. Section 4.17 of the CCB Disclosure Memorandum discloses all Litigation to which CCB is a party and which names CCB as a defendant or cross-defendant or for which CCB has any potential Liability. Section 4.17 of the CCB Disclosure Memorandum contains a summary of all Orders to which CCB is subject.

### 4.18. Reports.

Since the date of its incorporation or organization, as applicable, CCB has timely filed all reports and statements, together with any amendments required to be made with respect thereto, that it was required to file with any Regulatory Authorities and any applicable state securities or banking authorities (except, in the case of state securities authorities, failures to file which are not reasonably likely to have, individually or in the aggregate, a Material Adverse Effect). As of their respective dates, or as subsequently amended for minor corrections, each of such reports and documents, including the financial statements, exhibits, and schedules thereto, complied in all Material respects with all applicable Laws. As of its respective date, each such report and document did not, in any Material respects, contain any untrue statement of a Material fact or omit to state a Material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading.

### 4.19. Statements True and Correct.

None of the representations or warranties of CCB in this Agreement or in any related documents, none of the information contained in the CCB Disclosure Memorandum, and none of the other information or documents furnished to BCOM or any of its representatives by CCB or its representatives pursuant to the terms of this Agreement, including information and documents provided to BCOM during BCOM's due diligence investigation prior to execution of this Agreement, is false or misleading or contains or will contain (at the time furnished) any untrue statement of Material fact or omits or will omit (at the time furnished) to state a Material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. None of the information supplied or to be supplied by CCB for inclusion in the Proxy Statement to be mailed to CCB's shareholders in connection with the Shareholders' Meeting, or in any other documents to be filed by CCB with any Regulatory Authority in connection with the transactions contemplated hereby, will, at the respective time such documents are filed, and with respect to the Proxy Statement, when first mailed to the shareholders of CCB, be false or misleading with respect to any Material fact, or omit to state any Material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, or, in the case of the Proxy Statement or any amendment thereof or supplement thereto, at the time of the Shareholders' Meeting, be false or misleading with respect to any Material fact, or omit to state any Material fact or fact necessary to correct any statement in any earlier communication with respect to the solicitation of any proxy for the Shareholders' Meeting. All documents that CCB is responsible for filing with any Regulatory Authority in connection with the transactions contemplated hereby will comply as to form in all Material respects with the provisions of applicable Law.

### 4.20. Regulatory Matters.

Except as disclosed in Section 4.20 of the CCB Disclosure Memorandum, since the date of CCB's incorporation, CCB has not been a party to any cease and desist order, written agreement, directive, commitment letter or memorandum of understanding with, or has been subject to any Litigation or Order by, or has adopted any board resolutions or similar undertaking at the request of, any Regulatory Authority, or has been advised by any Regulatory Authority that it is or is contemplating issuing, instituting or requesting (or is considering the appropriateness of issuing, instituting or requesting) any such order, written agreement, directive, commitment letter, memorandum of understanding, Litigation or Order, board resolutions or similar undertaking (including, in each case, which restricts the conduct of its business, or in any manner relates to its capital adequacy, its Assets and/or Liabilities, its credit or reserve policies, its management, or the payment of dividends). There are no unresolved violations, criticisms or exceptions by any Regulatory Authority with respect to any report or statement relating to any examinations of CCB. CCB has neither taken any action, nor has any Knowledge, of any fact or circumstance relating to CCB that is reasonably likely to Materially impede or delay the receipt or giving of any Regulatory Consents referred to in Section 8.1(b) of this Agreement or result in the imposition of a condition or restriction of the type referred to in the last sentence of such Section.

### 4.21. Takeover Laws.

CCB has taken all necessary action to exempt the transactions contemplated by this Agreement from any applicable "moratorium," "fair price," "business combination," "control share," or other anti-takeover Laws (collectively, "Takeover Laws"), including applicable sections of the FBCA and the Act.

### 4.22. Charter Provisions.

CCB has taken all action so that the entering into of this Agreement and the consummation of the New Shares Issuance and the other transactions contemplated by this Agreement (including all amendments to the Articles of Incorporation and Bylaws of CCB contemplated hereby) do not and will not result in the grant of any rights to any Person under the Articles of Incorporation, Bylaws, Bank Charter or other governing instruments of CCB or restrict or impair the ability of BCOM or any of its Subsidiaries to vote, or otherwise to exercise the rights of a shareholder with respect to, shares of CCB that may be directly or indirectly acquired or controlled by it.

### 4.23. Corporate Documents and Books and Records.

True and correct copies of the Articles of Incorporation and Bylaws of CCB, as amended to date, have been provided to BCOM, and each are in full force and effect. The minute books and stock record books, books of account and other records of CCB, all of which have been made available to BCOM, are complete and correct in all Material respects and have been maintained in accordance with applicable Law and sound business and banking practices, and, with respect to the books of accounts of CCB, such books fairly and accurately reflect, in all material respects, its transactions, and accounting controls exist sufficient to provide reasonable assurances that such transactions are, in all material respects: (i) executed in accordance with management's general or specific authorization; and, (ii) recorded as necessary to permit the preparation of true, accurate and complete financial statements in accordance with GAAP.

### 4.24. Internal Controls.

CCB has devised and maintained a system of internal accounting controls sufficient to provide reasonable assurance that: (A) all material transactions are executed in accordance with general or specific authorization of the board of directors and the duly authorized executive officers of CCB; (B) all material transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP consistently applied; and (C) access to the Material Assets of CCB is permitted only in accordance with general or specific authorization of the board of directors and the duly authorized executive officers of CCB. CCB has implemented and maintains disclosure controls and procedures to ensure that material information relating to CCB is made known to the chief executive officer and the chief financial officer of CCB.

### 4.25. Transaction with Affiliates.

(a)     All "covered transactions" between CCB and an "affiliate" within the meaning of Sections 23A and 23B of the Federal Reserve Act and the regulations thereunder have been in compliance with such provisions.

(b)       Section 4.25 of the CCB Disclosure Memorandum lists any transaction (including any loan or other credit accommodation) between CCB and any shareholder, officer, director or other Affiliate of CCB or any Insider of CCB. All such transactions set forth in the CCB Disclosure Memorandum: (i) were made in the Ordinary Course of Business; (ii) were made on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with other Persons; and (iii) did not involve more than the normal risk of collectability or present other unfavorable features. No loan or credit accommodation to any shareholder, officer, director or other Affiliate of CCB, or any Insider of CCB, is presently in default or, during the three-year period prior to the date of this Agreement, has been in default or has been restructured, modified or extended. CCB has not been notified that principal and interest with respect to any such loan or other credit accommodation will not be paid when due or that the loan grade classification accorded such loan or credit accommodation by CCB is inappropriate.

### 4.26. Investment Securities; Derivatives.

Except for restrictions that exist for securities that are classified as "held to maturity," none of the investment securities held by CCB is subject to any restriction (contractual or statutory) that would materially impair the ability of the entity holding such investment freely to dispose of such investment at any time. Except as listed on Section 4.26 of the CCB Disclosure Memorandum, CCB is not a party to or has agreed to enter into an exchange-traded or over-the-counter equity, interest rate, foreign exchange or other swap, forward, future, option, cap, floor or collar or any other contract that is a derivative contract (including various combinations thereof) or owns securities that: (A) are referred to generically as "structured notes," "CDOs," "CMBS," "RMBS," "high risk mortgage derivatives," "capped floating rate notes," "capped floating rate mortgage derivatives" or other similar asset backed securities; or, (B) are likely to have changes in value as a result of interest or exchange rate changes that significantly exceed normal changes in value attributable to interest or exchange rate changes.

### 4.27. CRA, Anti-Money Laundering, OFAC and Customer Information Security.

CCB has received a rating of "Satisfactory" in its most recent examination or interim review with respect to CRA. CCB has no Knowledge of, has not been advised of, and has no reason to believe that any facts or circumstances exist that would cause CCB: (i) to be deemed not to be in satisfactory compliance in any material respect with CRA, and the regulations promulgated thereunder, or to be assigned a rating for CRA purposes by federal or state bank regulators of lower than "satisfactory"; or (ii) to be deemed to be operating in violation in any Material respect of the Bank Secrecy Act, the Patriot Act, any order issued with respect to anti-money laundering by the U.S. Department of the Treasury's Office of Foreign Assets Control, or any other applicable anti-money laundering Law; or (iii) to be deemed not to be in satisfactory compliance in any Material respect with the applicable privacy of customer information requirements contained in any federal and state privacy laws and regulations, including without limitation, in Title V of the Gramm-Leach-Bliley Act of 1999 and the regulations promulgated thereunder, as well as the provisions of the information security program adopted by CCB. CCB has no Knowledge of any facts or circumstances that would cause it to believe that any non-public customer information has been disclosed to or accessed by an unauthorized third party in a manner which would cause CCB to undertake any remedial action. The board of directors of

CCB has adopted, and CCB has implemented, an anti-money laundering program that contains adequate and appropriate customer identification verification procedures that comply with Section 326 of the Patriot Act and such anti-money laundering program meets the requirements in all Material respects of Section 352 of the Patriot Act and the regulations thereunder, and CCB has complied in all Material respects with any requirements to file reports and other necessary documents as required by the Patriot Act and the regulations thereunder.

### 4.28. Authorization of New Shares.

The New Shares, when issued to BCOM at Closing in accordance with this Agreement, will be duly authorized, validly issued, fully paid and nonassessable. Upon issuance to BCOM at Closing in accordance with this Agreement, BCOM will acquire good and valid title to the New Shares as of immediately following the Closing, free and clear of all Liens.

### 4.29. Board Recommendation.

The board of directors of CCB, at a meeting duly called and held, has (i) determined that this Agreement and the transactions contemplated hereby, including, but not limited to, the New Shares Issuance and the other transactions contemplated by this Agreement (including all amendments to the Articles of Incorporation and Bylaws of CCB contemplated hereby), taken together, are advisable and fair and in the best interests of the CCB shareholders and (ii) resolved to recommend that the holders of the shares of CCB Common Stock approve and adopt all amendments to the Articles of Incorporation and Bylaws of CCB contemplated hereby and the New Shares Issuance and the other transactions contemplated by this Agreement.

### 4.30. Fairness Opinions.

True, correct and complete copies of any and all fairness opinions relating to the transactions contemplated by this Agreement (including any and all amendments, restatements, supplements and modifications thereof) prepared for or at the direction of CCB, have been provided to BCOM (if prepared on or prior to the date of this Agreement and including that certain fairness opinion dated as of February 17, 2010, issued by Kendrick Pierce & Co.) or, upon the preparation thereof (if prepared after the date of this Agreement), will immediately following delivery to CCB be provided to BCOM.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES OF BCOM

Except as otherwise set forth in the BCOM Disclosure Memorandum, BCOM hereby represents and warrants to CCB as of the date of this Agreement and as of the Closing Date (unless a specific representation and warranty specifically provides that it speaks as of a different date) as follows:

### 5.1. Organization, Standing, and Power.

BCOM is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of Delaware. BCOM has the limited liability company power and authority to carry on its business as now conducted and to own, lease and operate its

Assets. BCOM is duly qualified or licensed to transact business as a foreign corporation in good standing in the States of the United States and foreign jurisdictions where the character of its Assets or the nature or conduct of its business requires it to be so qualified or licensed, except for such jurisdictions in which the failure to be so qualified or licensed is not reasonably likely to have, individually or in the aggregate, a Material Adverse Effect.

### 5.2. Authority; No Breach By Agreement.

(a)    BCOM has the limited liability company power and authority necessary to execute, deliver and perform its obligations under this Agreement and to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein, including the New Shares Issuance, have been duly and validly authorized by all necessary corporate action in respect thereof on the part of BCOM. This Agreement represents a legal, valid, and binding obligation of BCOM, enforceable against BCOM in accordance with its terms (except in all cases as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar Laws affecting the enforcement of creditors' rights generally and except that the availability of the equitable remedy of specific performance or injunctive relief is subject to the discretion of the court before which any proceeding may be brought).

(b)    Neither the execution and delivery of this Agreement by BCOM, nor the consummation by BCOM of the transactions contemplated hereby, nor compliance by BCOM with any of the provisions hereof, will (i) conflict with or result in a breach of any provision of BCOM's Certificate of Formation or Limited Liability Company Agreement, or (ii) constitute or result in a Default under, or require any Consent pursuant to, or result in the creation of any Lien on any Asset of any BCOM Company under, any Contract or Permit of any BCOM Company, or (iii) subject to receipt of the requisite approvals referred to in Section 8.1(b) of this Agreement, violate any Law or Order applicable to any BCOM Company or any of their respective Material Assets.

(c)    Other than in connection or compliance with the provisions of the Securities Laws, applicable state corporate and securities Laws, and other than Regulatory Consents, and other than notices to or filings with the Internal Revenue Service or the Pension Benefit Guaranty Corporation with respect to any employee benefit plans, and other than Consents which, if not obtained or made, are not reasonably likely to have, individually or in the aggregate, a Material Adverse Effect on BCOM, no Consent from or with respect to any public body or authority is necessary for the consummation by BCOM of the New Shares Issuance or the other transactions contemplated by this Agreement.

### 5.3. Compliance with Laws.

Each BCOM Company has in effect all Permits necessary for it to own, lease, or operate its Material Assets and to carry on its business as now conducted, subject to receipt of the requisite regulatory approvals referred to in Section 8.1(b), and there has occurred no Default under any such Permit. No BCOM Company:

(a)    is in Material violation of any Laws, Orders or Permits applicable to its business or employees conducting its business; and

(b)    has received as of the date hereof any notification or communication from any agency or department of federal, state, or local government or any Regulatory Authority or the staff thereof: (i) asserting that any BCOM Company is not in compliance with any of the Laws or Orders which such governmental authority or Regulatory Authority enforces; (ii) threatening to revoke any Permits; or, (iii) requiring any BCOM Company to enter into or consent to the issuance of a cease and desist order, formal agreement, directive, commitment or memorandum of understanding, or to adopt any board resolution or similar undertaking, which restricts Materially the conduct of its business, or in any manner relates to its capital adequacy, its Assets and/or Liabilities, its credit or reserve policies, its management, or the payment of dividends.

### 5.4. Investment.

BCOM: (i) understands that the New Shares have not been registered under any Securities Laws, and are being offered and sold in reliance upon federal and state exemptions for transactions not involving any public offering; (ii) is acquiring the New Shares solely for BCOM's own account for investment purposes, and not with a view to the distribution thereof; and (iii) is an Accredited Investor.

### 5.5. Litigation.

There is no Litigation pending or, to the Knowledge of BCOM, threatened against BCOM that seeks to delay, limit or enjoin the transactions contemplated by this Agreement.

### 5.6. Statements True and Correct.

None of the representations or warranties of BCOM in this Agreement or in any related documents, and none of the information contained in the BCOM Disclosure Memorandum, is false or misleading or contains or will contain (at the time furnished) any untrue statement of Material fact or omits or will omit (at the time furnished) to state a Material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. None of the information supplied or to be supplied by BCOM for inclusion in any documents to be filed by BCOM with any Regulatory Authority in connection with the transactions contemplated hereby, will, at the respective time such documents are filed, be false or misleading with respect to any Material fact, or omit to state any Material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. All documents that BCOM is responsible for filing with any Regulatory Authority in connection with the transactions contemplated hereby will comply as to form in all Material respects with the provisions of applicable Law.

### 5.7. Regulatory Matters.

BCOM has not been a party to any cease and desist order, written agreement or memorandum of understanding with, or any commitment letter or similar undertaking to, or has been subject to any Litigation or Order by any Regulatory Authority, or has adopted any

member, manager or executive committee resolutions at the request of any Regulatory Authority, or has been advised by any Regulatory Authority that it is contemplating issuing or requesting (or is considering the appropriateness of issuing or requesting) any such action, proceeding, order, directive, written agreement, memorandum of understanding, commitment letter, board resolutions or similar undertaking. BCOM has neither taken any action, nor has any Knowledge, of any fact or circumstance relating to BCOM that is reasonably likely to Materially impede or delay the receipt or giving of any Regulatory Consents referred to in Section 8.1(b) of this Agreement.

**ARTICLE VI.**
**CONDUCT OF BUSINESS PENDING CONSUMMATION**

**6.1. Affirmative Covenants of CCB.**

(a)     Unless the prior written consent of BCOM shall have been obtained, and except as otherwise expressly contemplated herein, from the date of this Agreement until the earlier of (i) the Closing or (ii) the termination of this Agreement, CCB shall:

(i)     operate its business only in the Ordinary Course of Business;

(ii)     preserve intact its business organization, Assets, employees and customers and fully maintain and keep current at all times its rights, Permits and franchises except as such Assets, employees and customers that are not Material to CCB's business and operations are not preserved in the Ordinary Course of Business;

(iii)     take no action or omit to take any action which action or omission would: (A) Materially adversely affect the ability of any Party to obtain any Regulatory Consent and/or other Consents required for the transactions contemplated hereby without imposition of any condition or waiting period, other than any waiting period mandated by applicable Law; (B) Materially adversely affect the ability of CCB to perform its covenants and agreements under this Agreement, or any other Contract to which CCB is a party, or cause any representation or warranty of CCB to be inaccurate or false; or, (C) adversely affect the ability of CCB to be duly licensed as a state bank by the Office of Financial Regulation of the State of Florida;

(iv)     hold, fully maintain and keep current at all times without interruption a validly issued FDIC certificate and Bank Charter;

(v)     continue with CCB's current loan and asset sale process consistent with the Ordinary Course of Business in which it is undertaking such process as of the date of this Agreement and previously disclosed to BCOM and its Affiliates, provided, however, that no offer or sale of any of CCB's loans or assets shall be effectuated (a) other than offers and/or sales of the loans and assets identified on Section 6.1(a)(v) of the CCB Disclosure Memorandum and for no less than the sales proceeds set forth therein with respect to such loans and/or assets, and (b) without, in each instance, the prior consultation with BCOM;

(vi)     fully comply with all requirements set forth in, and promptly (and in all events prior to Closing) cure any and all violations of, all Commercial Bank Reports of Examinations issued by the FDIC and/or any Orders (including any consents, cease and desist

orders, written agreements, directives, commitment letters or memorandums of understanding issued by or entered into with any Regulatory Authorities) or any board resolutions or similar undertakings adopted by CCB at the request of any Regulatory Authorities, including fully complying with and promptly (and in all events prior to Closing) curing any and all violations of the Report of Examination issued by the FDIC, dated August 24, 2009, and that certain board resolution adopted by CCB's board of directors on May 28th, 2009 pursuant to the FDIC's visitation of CCB on April 17, 2009, including as such examination reports, Orders, board resolutions and/or violations may be disclosed in the CCB Disclosure Memorandum;

(vii)    hold and maintain at all times, on a Monthly Average Basis, each of the following amounts: (A) a ratio of Total Loans to Total Assets equal to or less than 80%, (B) a ratio of Unsecured Total Aggregate Loans to Total Loans equal to or less than 1.5%, (C) a ratio of OREO to Total Assets equal to or less than 11%, (D) a ratio of Brokered Deposits to total deposits equal to or less than 32%, and (E) total Book Value of not less than the greater of Nine Million Dollars ($9,000,000) or the minimum Book Value as required by the FDIC and/or any other federal or state Regulatory Authority.

(viii)   hold, fully maintain and keep current at all times without interruption, at a minimum, such insurance, with responsible and reputable insurance companies or associations, in such amounts and covering such risks, as is/are usually carried by other peer banking organizations with Assets and/or operations similar to CCB's, including all such insurance policies as are set forth in Section 4.10 of the CCB Disclosure Memorandum;

(ix)    furnish to BCOM:

(1) as soon as practicable, but in any event, no later than twenty (20) calendar days following the end of each calendar month, a report duly certified by the Chief Financial Officer of CCB and containing each of the following: (A) unaudited monthly financial statements (including breakdown of operating expenses, balance sheet statement and income statement and statement of cash flows, and all notes thereto (if any)), prepared in accordance with GAAP; (B) loan portfolio breakdown (including contingencies) by type of loan (including name of the borrower, maturity date, interest rate and guarantees); (C) breakdown of all past due and non-performing loans (including name of the borrower, maturity date, interest rate and guarantees, and the number of days past due); (D) statement of the ALLL; (E) investment portfolio breakdown (including type of security, maturity date, book value and market value); (F) true, complete and correct copies of any and all proxy statements, information statements, annual reports, and other information delivered (if any) by and/or on behalf of CCB to the respective shareholders of CCB, together with true, correct and complete copies of any and all minutes, agendas and documentation respecting the annual and any and all special meetings of such shareholders; (G) true, correct and complete copies of any and all minutes, agendas and documentation

respecting the annual and any and all special meetings of the boards of directors (or other governing body) of CCB, and all committees thereof; and (H) a schedule of all Material loan agreements (short and long-term) and other Contracts memorializing any indebtedness of CCB (including credit agreements, indentures, mortgages, promissory notes, letters of credit, reimbursement agreements, installment purchases or other debt instruments or evidences of debt and all related documents and any and all amendments and/or modifications thereto);

(2) as soon as practicable, but in any event, no later than forty-five (45) calendar days following the end of each of fiscal quarter, a report duly certified by the Chief Financial Officer of CCB and containing each of the following: (A) unaudited interim financial statements for such period (including a breakdown of operating expenses, balance sheet statement and income statement and statement of cash flows and shareholders' equity, and all notes thereto), prepared in accordance with GAAP; and (B) a true, complete and correct copy of the Call Report submitted to the Regulatory Authorities for such period (including the FDIC and the Office of Financial Regulation of the State of Florida);

(3) as soon as practicable, but in any event, no later than one hundred twenty (120) calendar days following the end of each of fiscal year, a report duly certified by the Chief Financial Officer of CCB and containing each of the following: (A) audited financial statements for such fiscal year (including a breakdown of operating expenses, balance sheet statement, income statement, statement of shareholders' equity and statement of cash flows, and all notes thereto), prepared in accordance with GAAP; and (B) a true, complete and correct copy of the annual audit report for such year delivered to CCB by its independent public accountants (including the independent auditors' opinion); and

(4) promptly after the transmittal or filing thereof, true, complete and correct copies of any and all reports, correspondence, and other documents, instruments and other written or electronic information that CCB sends to or receives from any Regulatory Authorities (including the FDIC and the Office of Financial Regulation of the State of Florida).

(b)    CCB shall, concurrently with the execution of this Agreement, deliver to BCOM true, correct and complete copies, certified by the President of CCB, of each of the following documents:

(i)    the articles of incorporation of CCB, as amended to date;

(ii)     the resolutions of the board of directors of CCB authorizing, approving, declaring advisable, adopting and (as applicable) recommending to the shareholders of CCB (A) the performance of CCB's obligations and agreements under, and the consummation of, the transactions contemplated by this Agreement (including the amendment of the Articles of Incorporation and Bylaws of CCB contemplated hereby) and (B) this Agreement and the execution and delivery thereof by the President of CCB on behalf of CCB.

(iii)    the Bylaws of CCB, as amended to date.

(c)     Observation Rights. A representative of BCOM designated by BCOM from time to time in its sole discretion (the "BCOM Representative") shall be entitled to attend as an observer all meetings of the board of directors of CCB and committees thereof (including telephonic meetings), subject to any limitations prescribed by Regulatory Authorities and/or the Act; provided, however, that CCB's board of directors may require that the BCOM Representative not attend any particular meeting of CCB's board of directors or a committee thereof or be excused from any portions of such meetings that involve matters or business that CCB's board of directors or applicable committee determines in good faith are matters or business that must be considered by CCB's board of directors without the BCOM Representative being in attendance; provided, however, that the BCOM Representative shall not be excluded from any two (2) consecutive meetings of CCB's board of directors or any committee thereof. Except with respect to matters or business as to which CCB's board of directors or applicable committee thereof has determined that must be considered by the board of directors or a committee thereof without the BCOM Representative being in attendance, the BCOM Representative shall be provided with the same meeting notices, agendas and materials as the members of CCB's board of directors, including copies of all proposed and final resolutions, minutes and written consents.

**6.2. Negative Covenants of CCB.**

(a)     Except as otherwise expressly contemplated herein, from the date of this Agreement until the earlier of (A) the Closing; or (B) the termination of this Agreement, CCB covenants and agrees that it will not do or agree, commit or undertake to do, any of the following without the prior written consent of the chief executive officer, president or chief financial officer of BCOM:

(i)     amend the Articles of Incorporation, Bylaws, Bank Charter or other governing instruments of CCB except as provided in Section 3.1; or

(ii)     incur any debt obligation or other obligation for borrowed money except in the Ordinary Course of Business of CCB (which shall include, creation of deposit liabilities, purchases of federal funds, advances from the Federal Reserve Bank or Federal Home Loan Bank, and entry into repurchase agreements fully secured by U.S. government or agency securities), or impose, or suffer the imposition, on any Asset of CCB of any Lien or permit any such Lien to exist (other than in connection with deposits, repurchase agreements, bankers acceptances, advances from the Federal Reserve Board or Federal Home Loan Bank, "treasury tax and loan" accounts established in the Ordinary Course of Business, and the satisfaction of legal requirements in the exercise of trust powers, if any); or

(iii)     change the number of members of the Board of Directors or appoint any new directors or officers of CCB; or

(iv)     repurchase, redeem, or otherwise acquire or exchange, directly or indirectly, any shares, or any securities convertible into any shares (including any Rights), of the capital stock of CCB, or declare or pay any dividend or make any other distribution in respect of CCB's capital stock; or

(v)     issue, sell, lease, mortgage, pledge, dispose of, encumber or cause or permit to become outstanding any capital stock of CCB (including any CCB Common Stock or CCB Rights), or authorize or enter into any Contract with respect to any of the foregoing, or otherwise cause or permit any change to occur between the date of this Agreement and the Closing Date with respect to the amount of capital stock of CCB (including any CCB Common Stock and CCB Rights) outstanding as of the date of this Agreement as represented in Section 4.3 (whether as a result of a stock or Rights issuance, stock split, stock combination, stock division, stock dividend, reorganization, merger, share exchange, reclassification, recapitalization, or other transaction), other than as a result of either (A) the exercise or conversion of any stock options outstanding as of the date of this Agreement (as such outstanding stock options are represented in Section 4.3), which exercise or conversion occurs pursuant to and in accordance with the terms of such stock options as of the date of this Agreement and without CCB having taken or permitted, directly or indirectly, any action or step that results or could reasonably be expected to result in any acceleration or other modification of the exercise date, vesting or any other terms with respect to such stock options, or (B) the offer, sale and issuance of Existing Shareholders' Offering Shares pursuant to and in accordance with Section 2.1 and Section 7.6(a); or

(vi)     sell, lease, mortgage or otherwise dispose of or otherwise encumber any Asset having a fair market value in excess of Twenty Thousand Dollars ($20,000) other than in the Ordinary Course of Business for reasonable and adequate consideration and, in all events, not offer for sale or sell any of CCB's loans or assets other than (a) offers and/or sales of the loans and assets identified on Section 6.1(a)(v) of the CCB Disclosure Memorandum and for no less than the sales proceeds set forth therein with respect to such loans and/or assets, and (b) with, in each instance, the prior consultation with BCOM; or

(vii)     except for purchases of U.S. Treasury securities having maturities of three (3) years or less and U.S. Government agency securities having durations of three (3) years or less, which purchases are consistent with past practices, purchase any securities or make any investment, either by purchase of stock of securities, contributions to capital, Asset transfers, or purchase of any Assets, in any Person, or otherwise acquire direct or indirect control over any Person, other than in connection with foreclosures in the Ordinary Course of Business; or

(viii)     grant any increase in compensation or benefits to any of the employees or officers of CCB, except in accordance with the Ordinary Course of Business consistent with written policies or written Contracts in effect on the date of this Agreement and disclosed in Section 6.2(a)(viii) of the CCB Disclosure Memorandum or as required by Law; pay any severance or termination pay or any bonus other than pursuant to the Ordinary Course of Business consistent with written policies or written Contracts in effect on the date of this

Agreement and disclosed in Section 6.2(a)(viii) of the CCB Disclosure Memorandum; or enter into or amend any severance or other agreements with officers or employees of CCB; grant any increase in fees or other increases in compensation or other benefits to directors of CCB except in accordance with the Ordinary Course of Business specifically disclosed in Section 6.2(a)(viii) of the CCB Disclosure Memorandum; or voluntarily accelerate the vesting of any stock options or other stock-based compensation or employee benefits, bonuses, compensation or other remuneration; or

(ix)    enter into, terminate or amend any employment Contract between CCB and any Person (unless such amendment is required by Law); or

(x)    adopt any new employee benefit plan or policy of CCB or terminate or withdraw from, or make any Material amendment or change in or to, any existing employee benefit plans or policies of CCB other than any such change that is required by Law or that, in the opinion of counsel, is necessary or advisable to maintain the tax qualified status of any such plan, or make any distributions from such employee benefit plans, except as required by Law, the terms of such plans or consistent with past practice; or

(xi)    make any change in any Tax or accounting methods or systems of internal accounting controls, except as may be appropriate to conform to changes in Tax Laws or regulatory accounting requirements or GAAP; or

(xii)    commence any Litigation other than in accordance with the Ordinary Course of Business, or settle any Litigation involving any Liability on the part of CCB for money damages in excess of Twenty Thousand Dollars ($20,000) or restrictions upon the operations of CCB; or

(xiii)    other than in the Ordinary Course of Business, enter into, modify, amend, or terminate any Material Contract or waive, release, compromise, or assign any Material rights or claims; or

(xiv)    enter into, modify, amend or terminate any Contract with any officer, director, employee, shareholder or other Affiliate of CCB.

**6.3.  Acquisition Transactions.**

Except to the extent necessary to consummate the transactions specifically contemplated by this Agreement:

(a)    CCB shall not and shall cause its Affiliates, directors, officers, employees, agents and advisors (each, a "CCB Representative") not to, directly or indirectly: (i) solicit, initiate or encourage (including by way of furnishing information or assistance), or take any other action to facilitate, any inquiry or indication of interest in connection with or the making of any proposal from any Person that constitutes, or may reasonably be expected to lead to, an Acquisition Transaction; (ii) enter into, explore, maintain, participate in or continue any discussion or negotiation with any Person (other than BCOM or its Affiliates) regarding an Acquisition Transaction, or furnish to any Person (other than BCOM or its Affiliates) any non-public information or otherwise assist or participate in, facilitate or encourage, any known effort

or attempt by any other Person (other than BCOM or its Affiliates) to make or effect an Acquisition Transaction; (iii) enter into any letter of intent, term sheet, memorandum of understanding, agreement in principle, letter agreement, definitive agreement or other similar arrangement (whether or not considered binding, non-binding, conditional or unconditional) with respect to, or otherwise endorse, any Acquisition Transaction; or (iv) authorize or permit any CCB Representative to take any such action; provided, however, that the board of directors of CCB and the CCB Representatives shall not be restricted, except as hereinafter provided, prior to approval of the transactions contemplated by this Agreement by the shareholders of CCB at the Shareholders' Meeting, from furnishing information to, or engaging in discussions or negotiations with, any Person that has made an unsolicited bona fide written proposal for an Acquisition Transaction which did not result from a breach of this Section 6.3(a) (hereinafter, "Permitted Actions") if, prior to engaging in such Permitted Actions: (A) the board of directors has made a formal determination in good faith, after consultation with its outside financial and legal advisors, that such bona fide written proposal for an Acquisition Transaction constitutes a Superior Proposal; and, (B) CCB receives from such Person an executed confidentiality agreement (which agreement shall be provided to BCOM for information purposes) with customary terms and conditions covering the confidential information of CCB and such proposal for an Acquisition Transaction. In the event of any such determination by the board of directors that such bona fide written proposal for an Acquisition Transaction constitutes a Superior Proposal, the board of directors of CCB shall immediately (and in all events prior to engaging in any Permitted Actions) notify BCOM of such determination and BCOM shall thereupon have the right, in its sole and absolute discretion, to immediately or at any time thereafter terminate this Agreement and the transactions contemplated hereby by delivering written notice of such termination to CCB. In the event that, following such formal determination that such a bona fide written proposal for an Acquisition Transaction constitutes a Superior Proposal, the board of directors of CCB shall make a determination to commence engaging in any Permitted Actions, CCB shall thereupon have the right, in its sole and absolute discretion, to immediately (and in all events prior to engaging in any Permitted Actions) terminate this Agreement and the transactions contemplated hereby by delivering written notice of such termination to BCOM. CCB hereby represents and warrants to BCOM that: (1) neither CCB nor any of CCB Representative has, at any time since December 11, 2009, directly or indirectly, received or made any inquiries, indications of interest or proposals to or from, or engaged in discussions or negotiations of any kind with, any Person(s) (other than BCOM or its Affiliates) concerning or relating to any Acquisition Transaction; and (2) CCB's Regulatory Authorities have not, at any time, in any way required or requested that CCB take any action(s) that are in any way inconsistent with the preceding clause (1) or any other provision(s) of this Section 6.3.

(b)     CCB: (i) will promptly (but in any event within two (2) business days) notify BCOM orally and in writing of the receipt of any written, oral or other proposal for an Acquisition Transaction or any inquiry by which a third party expresses an interest or intention to make such a proposal, including any request for non-public information, the terms and conditions of such inquiry, proposal for an Acquisition Transaction or request and the identity of the Person making such inquiry, proposal for an Acquisition Transaction or request; and, (ii) will keep BCOM fully informed (including on a daily basis to the extent of any Material developments) of the status and details (including amendments and proposed amendments) of any such inquiry, proposal for an Acquisition Transaction or request. Prior to the board of directors of CCB making a formal determination that a proposal for an Acquisition Transaction

constitutes a Superior Proposal as provided in Section 6.3(a), the CCB board of directors shall promptly (but in any event at least five (5) business days prior to making such formal determination) notify BCOM orally and in writing of any determination it proposes to make with respect to such proposal for an Acquisition Transaction and, during such five (5) business day period, the board of directors of CCB shall negotiate in good faith with BCOM with respect to any revised proposal to acquire any portion of the CCB Common Stock that BCOM may make prior to the expiration of such five (5) business day period.

(c)      In the event that, at any time during (i) the one (1) year period following a termination of this Agreement by BCOM pursuant to Section 9.1(b) as a result of the failure of the conditions set forth in Section 8.1(a), but not as a result of the failure of the conditions set forth in Section 8.1(c) (with respect to Consents required to be obtained by CCB) or Sections 8.2(a) 8.2(b) or 8.2(e), or (ii) the four (4) month period following a termination of this Agreement by BCOM pursuant to Section 9.1(b) as a result of the failure of the conditions set forth in Section 8.1(c) (with respect to Consents required to be obtained by CCB) or Sections 8.2(a) 8.2(b) or 8.2(e), but not as a result of the failure of the conditions set forth in Section 8.1(a), CCB directly or indirectly enters into, agrees to enter into or consummates any Acquisition Transaction that does not constitute a Superior Proposal, BCOM shall be entitled to recover from CCB, and CCB shall pay to BCOM within five (5) business days following any such entry, agreement to enter into or consummation (whichever is earlier), the full amount of liquidated damages that would be due to BCOM under Section 9.2(c) in the event of a termination by BCOM as a result of the knowing, intentional, fraudulent or willful breach or violation by CCB of this Agreement, less any amounts previously paid to BCOM pursuant to such Section 9.2(c), if any (such net amount, the "Acquisition Transaction Fee"); provided, however, that such Acquisition Transaction Fee shall not be due and payable if and only to the extent that such Acquisition Transaction is entered into, agreed to be entered into or consummated (as applicable) pursuant to the issuance of an order that is binding on CCB and issued by a Regulatory Authority of competent jurisdiction (a true, correct and complete copy of which shall be provided by CCB to BCOM within three (3) business days of such issuance) specifically directing CCB to enter into, agree to enter into or consummate (as applicable) such Acquisition Transaction, in each case, within such one (1) year period or four (4) month period, as applicable.   The obligations of CCB under this Section 6.3(c) shall survive any such termination of this Agreement.

**6.4.  Covenants of BCOM.**

(a)      From the date of this Agreement until the earlier of the Closing or the termination of this Agreement, BCOM covenants and agrees that it shall take no action or omit to take any action which action or omission would: (A) Materially adversely affect the ability of any Party to obtain any Regulatory Consent and/or other Consents required for the transactions contemplated hereby without imposition of any condition or waiting period, other than any waiting period mandated by applicable Law; or (B) Materially adversely affect the ability of BCOM to perform its covenants and agreements under this Agreement, or cause any representation or warranty of BCOM in this Agreement to be inaccurate or false;

(b)      BCOM shall, concurrently with the execution of this Agreement, deliver to CCB true, correct and complete copies, certified by the CEO or President of BCOM, of each

of the resolutions of the member(s), manager(s) or executive committee (as applicable) of BCOM authorizing, approving, declaring advisable and adopting: (1) the performance of BCOM's obligations and agreements under, and the consummation of, the transactions contemplated by this Agreement; and (2) this Agreement and the execution and delivery thereof by the CEO or President of BCOM on behalf of BCOM.

(c)     From the date of this Agreement until the earlier of the Closing or the termination of this Agreement, BCOM covenants and agrees that it shall not, directly or indirectly, file an application with the applicable Regulatory Authorities with respect to the proposed acquisition (whether by direct purchase, tender offer, by merger or otherwise) by BCOM of 10% or more of the equity securities of any financial institution whose deposits are insured by the FDIC other than CCB, or make any public announcement with respect to any such acquisition (except as and only to the extent such a public announcement is required by applicable Law in the case of any such financial institution that is a publicly held entity).

### 6.5. Adverse Changes in Condition.

Each Party agrees to give written notice promptly to the other Party upon becoming aware of the occurrence or impending occurrence of any event or circumstance relating to it or any of its Subsidiaries which: (i) is reasonably likely to have, individually or in the aggregate, a Material Adverse Effect on it; or (ii) would cause or constitute a Material breach of any of its representations, warranties, or covenants contained herein, and to use its reasonable efforts to prevent or promptly to remedy the same.

### 6.6. Reports.

CCB shall timely file all reports required to be filed by it with Regulatory Authorities between the date of this Agreement and the Closing and shall deliver to BCOM copies of all such reports promptly after the same are filed. Any financial statements contained in any other CCB reports to any Regulatory Authority shall be prepared in accordance with Laws applicable to such reports.

### ARTICLE VII.
### ADDITIONAL AGREEMENTS

### 7.1. Inspection.

BCOM shall have the right, on its own behalf and/or through one or more representatives, at any time and from time to time hereafter upon reasonable notice during regular business hours to audit, examine and/or inspect and make copies of and abstracts from the financial and other books and records of CCB, and to visit the properties of CCB, and CCB shall make available its officers, directors, employees, attorneys, consultants, and/or accountants to BCOM to discuss the affairs, finances and accounts of CCB.

### 7.2. Proxy Statement and Shareholder Approval.

CCB shall call a Shareholders' Meeting, to be held as soon as reasonably practicable after the date of this Agreement but in no event more than seventy-five (75) days hereafter, for the

purpose of voting upon approval of all amendments to the Articles of Incorporation and Bylaws of CCB contemplated hereby and the New Shares Issuance and the other transactions contemplated by this Agreement, and such other related matters as it deems appropriate. In connection with the Shareholders' Meeting: (i) CCB shall prepare a Proxy Statement and mail such Proxy Statement to its shareholders, all in accordance with applicable Law; (ii) the Parties shall furnish to each other all information concerning them that they may reasonably request in connection with such Proxy Statement; (iii) the board of directors of CCB shall recommend to its shareholders the approval of the matters submitted for approval and shall take no action to withdraw, amend or modify, or propose or resolve to withdraw, amend or modify, such recommendation (in each case, subject to compliance with their fiduciary duties as advised in writing by legal counsel); and (iv) the board of directors and officers of CCB shall (subject to compliance with their fiduciary duties as advised in writing by legal counsel) use their best efforts to obtain such shareholders' approvals. At least seven (7) calendar days prior to the mailing of the Proxy Statement, CCB will provide to BCOM a draft of such Proxy Statement for its review and consideration.

### 7.3. Applications.

Each of BCOM, on the one hand, and CCB, on the other hand, shall prepare and file on behalf of themselves, and each of them shall fully in good faith cooperate and use their best efforts in the preparation and, where appropriate, timely and expeditious filing of, all applications and other necessary and appropriate documents with all Regulatory Authorities having jurisdiction over the transactions contemplated by this Agreement seeking the requisite Regulatory Consents within forty-five (45) calendar days from the signing of this Agreement; provided, that nothing herein shall preclude either Party from exercising its rights under this Agreement. The Parties shall deliver to each other copies of all filings, correspondence and orders to and from all Regulatory Authorities and all of the Persons with respect to which Consents are required to be obtained or given in connection with the transactions contemplated hereby as soon as practicable upon their becoming available. Without limiting the foregoing, CCB shall deliver to BCOM for its review as soon as available CCB's Consolidated Reports of Condition and Income for A Bank With Domestic Offices Only, together with all exhibits and schedules thereto, in the form required by the FDIC to be included in BCOM's submissions to the FDIC and/or the Office of Financial Regulation of the State of Florida in connection with the New Shares Issuance.

### 7.4. Agreement as to Efforts to Consummate.

Subject to the terms and conditions of this Agreement, each Party agrees to use, and to cause its Subsidiaries to use, its best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper, or advisable under applicable Laws to consummate and make effective, as soon as practicable after the date of this Agreement, the transactions contemplated by this Agreement, including using its best efforts to lift or rescind any Order adversely affecting its ability to consummate the transactions contemplated herein and to cause to be satisfied all of the conditions referred to in Article VIII of this Agreement; provided, that nothing herein shall preclude either Party from exercising its rights under this Agreement. Each Party shall use, and shall cause each of its Subsidiaries to use, its best efforts to obtain and provide all Consents (including all Regulatory Consents) necessary or desirable for

the consummation of the transactions contemplated by this Agreement; provided that nothing herein shall preclude either Party from exercising its rights under this Agreement.

### 7.5. Right to Indemnity Adjusted Shares.

From and after the Closing, CCB shall compensate BCOM for any and all Indemnifiable Losses (as hereinafter defined) by issuing to BCOM, as and when directed by BCOM by written notice to CCB with a copy to the Seller Representative, for no additional consideration, such number of newly and validly issued, fully paid and non-assessable shares of CCB Common Stock, which shall in all events be free and clear of all Liens (such newly issued shares, the "Indemnity Adjusted Shares") as shall equal the difference of: (i) the Adjusted Share Number minus; (ii) the aggregate number of New Shares plus any Indemnity Adjusted Shares previously issued pursuant to this Section 7.5. As used in this Agreement, the following terms have the following meanings: (A) "Indemnifiable Losses" means any and all liabilities, damages, lost profits, diminution in value of the CCB Common Stock, losses, claims, Taxes, deficiencies, demands, settlements, costs or expenses (including interest, fines, penalties, reasonable attorneys' and paralegals' fees and expenses (whether before or at trial or at any and all appellate levels), investigation expenses, court costs and fees of expert witnesses), including arising from or in connection with any Litigation, that BCOM and/or its Affiliates (including through or as a result of BCOM's ownership of CCB after the Closing), members, managers, officers, directors, employees, agents, partners, representatives, successors and assigns (collectively, the "BCOM Parties") shall suffer or incur connected with, arising out of or otherwise relating to: (i) any breach or violation by CCB of any representation or warranty contained in Article IV hereof or in any other section of this Agreement or in any certificate or other document or instrument delivered by CCB to BCOM pursuant to this Agreement, (ii) any breach or violation by CCB of any obligation, agreement or covenant made by CCB herein or in any other agreement, document or instrument delivered by CCB to BCOM pursuant to this Agreement; and/or (iii) any untrue statement (or alleged untrue statement) of a Material fact contained in the Proxy Statement or any regulatory filing or application prepared in connection with the New Shares Issuance or the other transactions contemplated by this Agreement, or any omission (or alleged omission) to state therein a Material fact required to be stated therein or necessary to make the statements therein not misleading, or any violation by CCB of the Securities Laws and/or any state corporation and/or securities laws applicable to CCB in connection with the Proxy Statement or any of the transactions contemplated hereunder; provided, however, that with respect to item (iii) above, Indemnifiable Losses shall not be deemed to have been suffered or incurred to the extent arising solely out of or based solely on any untrue statement or omission or alleged untrue statement or omission made in reliance upon and in conformity with information furnished in writing by or on behalf of BCOM to CCB; (B) "Adjusted Share Number" means the number of shares of CCB Common Stock obtained by dividing the Consideration by the Indemnity Adjusted Share Price; (C) "Indemnity Adjusted Share Price" means the per share price equal to the difference of the Share Price (or the Indemnity Adjusted Share Price last used to compute Indemnity Adjusted Shares previously issued, if any) minus the Per Share Loss; and (D) "Per Share Loss" means the quotient obtained by dividing the aggregate amount of Indemnifiable Losses suffered or incurred by the BCOM Parties (less any Indemnifiable Losses with respect to which Indemnity Adjusted Shares have been previously issued), by the aggregate number of New Shares plus any Indemnity Adjusted Shares previously issued pursuant to this Section 7.5. Notwithstanding the foregoing, BCOM shall not be entitled to any Indemnity Adjusted Shares

hereunder unless and until the aggregate amount of Indemnifiable Losses exceed Five Hundred Thousand Dollars ($500,000.00) (the "Indemnification Threshold"). Once the Indemnification Threshold is exceeded, all Indemnity Adjusted Shares shall be computed by using the amount of Indemnifiable Losses from the first dollar, including the amount of the Indemnification Threshold. However, such Indemnity Adjusted Shares will not be available to BCOM to the extent such Indemnifiable Losses arise as a result of BCOM's (i) breach or violation of any representation or warranty contained in Article V hereof or in any other section of this Agreement or in any certificate or other document or instrument delivered by BCOM to CCB pursuant to this Agreement; or (ii) breach or violation of any obligation, agreement or covenant made by BCOM herein or in any other agreement, document or instrument delivered by BCOM to CCB pursuant to this Agreement.

### 7.6. Investigation and Confidentiality.

Prior to the Closing, each Party shall keep the other Party advised of all Material developments relevant to its business and to consummation of the New Shares Issuance and the other transactions contemplated hereby (including, in the case of CCB, keeping BCOM fully and regularly informed regarding each proposed or actual effectuation of any and all offers and/or sales of Existing Shareholders' Offering Shares (including providing BCOM with copies of all offering and other documents and instruments relating thereto sufficiently in advance of their use and/or distribution so as to afford BCOM an opportunity to review them and provide comments to CCB with respect thereto)). In addition, prior to the Closing, CCB shall permit BCOM to make or cause to be made such investigation of the businesses, Assets, Liabilities and/or operations of CCB and of its respective financial and legal conditions as the BCOM reasonably requests, provided that such investigation shall be reasonably related to the transactions contemplated hereby and shall not interfere unnecessarily with normal operations. No investigation by a Party shall affect the representations and warranties of the other Party. Each Party shall immediately inform the other Party upon becoming aware of any breaches or violations of any of such informing Party's representations, warranties, covenants and/or agreements hereunder or in any certificate or other document entered into pursuant hereto, as well as of the occurrence of any event(s) which would reasonably be expected to result in any such breach or violation.

(a)     Each Party shall, and shall cause its advisers and agents to, maintain the confidentiality of all confidential information furnished to it by the other Party concerning its and its Subsidiaries' Assets, Liabilities, businesses, operations and financial positions and shall not use such information for any purpose except in furtherance of the transactions contemplated by this Agreement. If this Agreement is terminated prior to the Closing, each Party shall promptly return or certify the destruction of all documents and copies thereof, and all work papers containing confidential information received from the other Party.

(b)     CCB shall use its best efforts to exercise its rights under confidentiality agreements entered into with Persons which were considering, prior to the date hereof, an Acquisition Transaction with respect to CCB to preserve the confidentiality of the information relating to CCB provided to such Persons and their Affiliates and Representatives.

### 7.7. Press Releases.

Prior to the Closing, CCB and BCOM shall consult with each other as to the form and substance of any press release or other public disclosure Materially related to this Agreement or any other transaction contemplated hereby; provided, that nothing in this Section 7.7 shall be deemed to prohibit any Party from making any disclosure which its legal counsel deems necessary or advisable in order to satisfy such Party's disclosure obligations imposed by Law; provided, however, that such Party has given the other Party a reasonable opportunity to review such disclosure before its release.

### 7.8. Takeover Laws.

CCB shall take all necessary steps to exempt the transactions contemplated by this Agreement from, or if necessary challenge the validity or applicability of, any applicable Takeover Law.

### 7.9. Directorship.

Subject to compliance with applicable Laws and all necessary and appropriate Regulatory Consents, as promptly as practicable following the Closing, BCOM shall cause (to the extent not already elected to serve prior to Closing) Thomas Hogan, Jr., R. Victor Taglia and Donald R. Page to be elected to serve as members of the board of directors of CCB until the one year anniversary of the Closing Date or, with respect to each such individual, such individual's earlier death, incapacity, resignation or removal for cause, with the balance of CCB's board of directors, which BCOM currently expects (but is not obligated) to fix at up to eleven total directors, to be filled as determined by and in the sole discretion of BCOM.

## ARTICLE VIII.
## CONDITIONS PRECEDENT TO OBLIGATIONS TO CONSUMMATE

### 8.1. Conditions to Obligations of Each Party.

The respective obligations of each Party to perform this Agreement and consummate the New Shares Issuance and the other transactions contemplated hereby are subject to the satisfaction of the following conditions, unless waived by both Parties pursuant to Section 10.5 of this Agreement, except that the conditions set forth in Section 8.1(c) as to any Consents need only be waived by the Party not required to obtain such Consent:

(a)     Shareholder Approval. The shareholders of CCB shall have approved all amendments to the Articles of Incorporation and Bylaws of CCB contemplated hereby and the New Shares Issuance and the other transactions contemplated by this Agreement, as and to the extent required by Law, and by the provisions of any governing instruments.

(b)     Regulatory Consents.     All Regulatory Consents (including the full approval and consent of all applicable Regulatory Authorities without being subject to any requirements for contribution of additional capital by BCOM (other than the Consideration) or other non-standard conditions and including the non-objection by all applicable Regulatory Authorities of a business plan which will include moving CCB's main office to Miami-Dade

County, Florida, and establishing at least one new branch of CCB in Miami-Dade County within two years following the Closing Date) shall have been obtained or made and shall be in full force and effect; provided, however, that non-objection to the part of the business plan contemplating the move of CCB's main office to, and the establishment of at least one new branch in, Miami-Dade County shall only be a condition to BCOM's obligations to perform this Agreement and consummate the other transactions contemplated hereby and not CCB's. BCOM hereby represents and warrants to CCB that the Regulatory Consents required under this Section 8.1(b) with respect to it are as listed in Section 8.1(b) of its respective Disclosure Memorandum. CCB hereby represents and warrants to BCOM that the Regulatory Consents required under this Section 8.1(b) with respect to it are as listed in Section 8.1(b) of its respective Disclosure Memorandum.

(c)     *Consents and Approvals.* Each Party shall have obtained (or given, as applicable) any and all Consents required for consummation of the New Shares Issuance and the other transactions contemplated by this Agreement (including all amendments to the Articles of Incorporation and Bylaws of CCB contemplated hereby) (other than those referred to in Section 8.1(b) of this Agreement) or for the preventing of any Default under any Contract or Permit of such Party which, if not obtained or made, is reasonably likely to have, individually or in the aggregate, a Material Adverse Effect on such Party, including, in the case of CCB, those Consents set forth in Section 4.2(b) of the CCB Disclosure Memorandum.

## 8.2. Conditions to Obligations of BCOM.

The obligations of BCOM to perform this Agreement and consummate the New Shares Issuance and the other transactions contemplated hereby are subject to the satisfaction of the following additional conditions, unless waived by BCOM pursuant to Section 10.5 of this Agreement:

(a)     *Representations and Warranties.* For purposes of this Section 8.2(a), the accuracy of the representations and warranties of CCB set forth in this Agreement shall be assessed as of the date of this Agreement and as of the Closing with the same effect as though all such representations and warranties had been made on and as of the Closing (provided that representations and warranties which are confined to a specified date shall speak only as of such date). All representations and warranties of CCB or any officer thereof contained in this Agreement or in any certificate or other document or instrument executed and delivered in connection with the transactions contemplated hereby shall be true and correct in all Material respects; provided that, for purposes of this sentence only, those representations and warranties which are qualified by references to "Material" or "Material Adverse Effect" shall be deemed not to include such qualifications.

(b)     *Performance of Agreements and Covenants.* Each and all of the agreements and covenants of CCB to be performed and complied with pursuant to this Agreement and the other certificates and other documents and instruments contemplated hereby prior to the Closing shall have been duly performed and complied with in all Material respects, or, in the case of any non-performance or non-compliance which is curable, such breach has been cured to BCOM's reasonable satisfaction within ten (10) days after written notification thereof by BCOM to CCB.

(c)     <u>Material Adverse Effect</u>.  There shall not have occurred since the date of this Agreement any Material Adverse Effect with respect to CCB.

(d)     <u>Maximum Level of Certain Loans</u>. At the time of Closing, the maximum aggregate amount of Substandard Loans, together with loans that, to the Knowledge of CCB, are likely to, within the thirty (30) day period immediately following Closing, (i) go into default and/or (ii) become Substandard Loans, as such aggregate amount shall be certified pursuant to Section 8.2(e)(ii) below, shall be no greater than Eighteen Million Dollars ($18,000,000).

(e)     <u>Closing Documents and Deliveries</u>.   The following documents and instruments shall have been delivered to BCOM:

(i)     certificate(s) representing the New Shares, as may be necessary to effectuate the issuance of all of such shares to BCOM;

(ii)     CCB shall have delivered to BCOM: (i) a certificate, dated as of the Closing and signed on its behalf by its chief executive officer and its chief financial officer: (A) to the effect that the conditions to BCOM's obligations set forth in Sections 8.2(a), 8.2(b), 8.2(c), 8.2(d), 8.2(e) and 8.2(f) of this Agreement have been satisfied; (B) certifying the number of outstanding shares of the capital stock of CCB (including all CCB Common Stock and all CCB Rights); (C) certifying the amounts of the financial ratios and other metrics identified in Section 6.1(a)(vii), in each case, as of the Condition Fulfillment Date; and (D) certifying as of the Condition Fulfillment Date a reasonably detailed schedule of all Substandard Loans, together with loans that, to the Knowledge of CCB, are likely to, within the thirty (30) day period immediately following Closing, (x) go into default and/or (y) become Substandard Loans; (ii) certified copies of (1) CCB's articles of incorporation; (2) CCB's corporate bylaws; (3) a certificate of active status from the Department of State of the State of Florida with respect to CCB, dated as of a recent date; and (4) resolutions duly adopted by CCB's board of directors and shareholders evidencing the taking of all corporate action necessary to authorize the execution, delivery, and performance of this Agreement, and the consummation of the transactions contemplated hereby (including all amendments to the Articles of Incorporation and Bylaws of CCB contemplated hereby), all in such reasonable detail as BCOM and its counsel shall request; (iii) a schedule duly certified by the chief executive officer and the chief financial officer of CCB as being a true, accurate, up to date and complete list of the names and addresses of all of the holders of record of the capital stock of CCB (including all CCB Common Stock and all CCB Rights) and their respective holdings thereof, and (iv) a certificate of incumbency of CCB's designated signatories and officers (as applicable);

(iii)     an opinion of Igler & Dougherty, P.A., counsel to CCB, substantially in the form of <u>Exhibit 8.2(e)(iii)</u>;

(iv)     subject to Section 7.9, separate letters of resignation signed by each director of CCB (in their capacity as such) as designated by BCOM, to be effective as of immediately following the Closing;

(v)     evidence (in form and substance reasonably satisfactory to BCOM) that all Transaction Costs incurred or required to be incurred by CCB have been paid in full and

CCB has no liability with respect thereto or, to the extent being paid by CCB at Closing, delivered to BCOM payoff letters from all applicable parties with respect to all unpaid Transaction Costs (on terms and conditions reasonably satisfactory to BCOM);

        (vi)    evidence (in form and substance reasonably satisfactory to BCOM) of the cancellation and termination of all stock options that are owned or held, beneficially, of record or otherwise, by members of the board of directors (including the chief executive officer) of CCB, and the exercise in full or cancellation and termination of all Employee Stock Options, in each case, as required by Section 2.3;

        (vii)    a license agreement duly executed and delivered by CCB and Donald R. Page, in form and substance acceptable to BCOM, providing for a perpetual, worldwide, irrevocable, non-exclusive and royalty-free license from Donald R. Page to CCB with respect to the budgeting software owned by Mr. Page and used by CCB (as disclosed in Section 4.11 of the CCB Disclosure Memorandum); and

        (viii)    all corporate books and records and other property of CCB shall be made available, if any.

        (f)    <u>Modifications to Draft Consent Order</u>. The FDIC shall not have issued or proposed prior to Closing, or provided prior to the Closing Date any indication that it intends to issue or propose following Closing, either (i) an Order that contains a Materially Adverse Distinction or (ii) any amendment or modification to the Draft Consent Order or to any Order that is issued on after the date hereof, in each case, that contains a Materially Adverse Distinction. "Materially Adverse Distinction" means, with respect to any Order or any modification or amendment to any Order (including the Draft Consent Order), any restriction, limitation, obligation or other provision set forth therein that is materially more onerous or otherwise provides for any additional material restriction, limitation or obligation on CCB (including with respect to increasing the amount of classified loans and/or accelerating the timing for the reduction of same) as compared to the Draft Consent Order.

### 8.3. Conditions to Obligations of CCB.

        The obligations of CCB to perform this Agreement and consummate the New Shares Issuance and the other transactions contemplated by this Agreement are subject to the satisfaction of the following additional conditions, unless waived by CCB pursuant to Section 10.5(b) of this Agreement:

        (a)    <u>Representations and Warranties</u>. For purposes of this Section 8.3(a), the accuracy of the representations and warranties of BCOM set forth in this Agreement shall be assessed as of the date of this Agreement and as of the Closing with the same effect as though all such representations and warranties had been made on and as of the Closing (provided that representations and warranties which are confined to a specified date shall speak only as of such date). All representations and warranties of BCOM or any officer thereof contained in this Agreement or in any certificate or other document or instrument executed and delivered in connection with the transactions contemplated hereby shall be true and correct in all Material respects; provided that, for purposes of this sentence only, those representations and warranties

which are qualified by references to "Material" or "Material Adverse Effect" shall be deemed not to include such qualifications.

(b) <u>Performance of Agreements and Covenants</u>. Each and all of the agreements and covenants of BCOM to be performed and complied with pursuant to this Agreement and the other certificates and other documents and instruments contemplated hereby prior to the Closing shall have been duly performed and complied with in all Material respects, or, in the case of any non-performance or non-compliance which is curable, such breach has been cured to CCB's reasonable satisfaction within ten (10) days after written notification thereof by CCB to BCOM.

(c) <u>Consideration</u>. BCOM shall have delivered the Consideration to CCB as provided in Section 2.1.

(d) <u>Closing Documents and Deliveries</u>. The following documents and instruments shall have been delivered to CCB: BCOM shall have delivered to CCB: (i) a certificate, dated as of the Closing and signed on its behalf by its chief executive officer, to the effect that the conditions to CCB's obligations set forth in Sections 8.3(a), 8.3(b), and 8.3(c) of this Agreement have been satisfied; (ii) certified copies of: (1) BCOM's certificate of formation; (2) BCOM's limited liability company agreement; (3) a certificate of good standing from the Secretary of State of the State of Delaware with respect to BCOM, dated as of a recent date; and (4) resolutions duly adopted by the applicable member(s), manager(s), executive(s) or management committee of BCOM evidencing the taking of all limited liability company action necessary to authorize the execution, delivery, and performance of this Agreement and the New Shares Issuance and the other transactions contemplated by this Agreement, all in such reasonable detail as CCB and its counsel shall request; and (iii) a certificate of incumbency of BCOM's designated signatories or officers (as applicable).

## ARTICLE IX.
## TERMINATION

**9.1. Termination.**

Notwithstanding any other provision of this Agreement, and notwithstanding the approval of this Agreement by the shareholders of CCB, this Agreement may be terminated and the New Shares Issuance and the other transactions contemplated by this Agreement (including all amendments to the Articles of Incorporation and Bylaws of CCB contemplated hereby) abandoned at any time prior to the Closing:

(a) By mutual consent of BCOM and CCB; or

(b) By BCOM (provided that BCOM is not then in breach of any representation or warranty contained in this Agreement under the applicable standard set forth in Section 8.3(a) or in Material breach of any covenant or other agreement contained in this Agreement) if there has occurred any event constituting or which would, at the Closing, constitute a failure of the conditions set forth in, Sections 8.1(a), 8.1(c) (with respect to Consents required to be obtained by CCB), 8.2(a), 8.2(b) or 8.2(e); or

(c)     By BCOM (provided that BCOM is not then in breach of any representation or warranty contained in this Agreement under the applicable standard set forth in Section 8.3(a) or in Material breach of any covenant or other agreement contained in this Agreement) if there has occurred any event constituting or which would, at the Closing, constitute a failure of the conditions set forth in Sections 8.2(c), 8.2(d) or 8.2(f); or

(d)     By CCB (provided that CCB is not then in breach of any representation or warranty contained in this Agreement under the applicable standard set forth in Section 8.2(a) or in Material breach of any covenant or other agreement contained in this Agreement) if there has occurred any event constituting or which would, at the Closing, constitute a failure of the conditions set forth in Sections 8.1(c) (with respect to Consents required to be obtained by BCOM), 8.3(a), 8.3(b), 8.3(c) or 8.3(d); or

(e)     By either Party in the event any Regulatory Consent described in Section 8.1(b) shall have been denied by final nonappealable action of the applicable Regulatory Authority or if any action taken by such Regulatory Authority is not appealed within the time limit for appeal, unless such denial of a Regulatory Consent or non-appealed action taken by a Regulatory Authority is the result of a breach or violation of a Party's obligations under this Agreement, in which case, only the other Party shall have the right, but not the obligation, to terminate under this Section 9.1(e); provided, however, that the non-objection referred to in Section 8.1(b) with respect to the part of the business plan contemplating the move of CCB's main office to, and the establishment of at least one new branch in, Miami-Dade County, shall only give BCOM, and not CCB, the right to terminate this Agreement; or

(f)     By either Party in the event that the New Shares Issuance shall not have been consummated on or prior to September 30, 2010; provided, however, that, if the failure to consummate the transactions contemplated hereby on or before such date is caused by any breach or violation of this Agreement by a Party, then the right of termination under this Section 9.1(f) shall only be available to the other Party.

**9.2.   Effect of Termination.**

(a)     In the event of the termination of this Agreement for any reason, this Agreement shall become void and have no effect, except that: (i) the provisions of this Section 9.2, Article X and Section 6.3 of this Agreement shall survive any such termination; and (ii) a termination pursuant to Sections 6.3, 9.1(b) or 9.1(d) shall not relieve the non-terminating Party from Liability, or the terminating Party from its rights, under Sections 9.2(b), 9.2(c) and 9.2(e) below, respectively.   The Parties acknowledge and agree that, notwithstanding any other provision in this Agreement to the contrary or otherwise, prior to the Closing, each Party's sole and exclusive remedy with respect to any breaches or violations of any representations, warranties, covenants and/or agreements set forth in this Agreement or in any certificate or other document or instrument executed and delivered in connection with the transactions contemplated hereby shall be termination under Sections 9.1(b) or 9.1(d), as applicable, and payment of the amounts set forth in Sections 9.2(c) or 9.2(e) (as applicable), or (solely in the case of BCOM) specific performance under Section 10.12.

(b)    In the event that this Agreement is terminated by either Party pursuant to Section 6.3(a), then as BCOM's sole and exclusive remedy in connection with such termination and the reasons and events leading up to such termination, BCOM shall be entitled to a termination fee in the amount of Four Hundred Thousand Dollars ($400,000), which CCB shall, within ten (10) calendar days after the effective date of such termination (or immediately upon such termination in the event of a termination by CCB pursuant to Section 6.3(a)), pay to BCOM by wire transfer of immediately available funds, it being acknowledged and agreed that it would be impracticable or extremely difficult for any Party to determine the actual damages resulting from the reasons and events leading up to such termination and, therefore, the Parties have agreed upon the foregoing remedy as liquidated damages which shall not be deemed to be in the nature of a penalty.

(c)    In the event that this Agreement is terminated by BCOM pursuant to Section 9.1(b) (including as a result of the failure of the conditions set forth in Sections 8.1(a), 8.1(c) (with respect to Consents required to be obtained by CCB), 8.2(a), 8.2(b) or 8.2(e)), then BCOM shall be entitled to recover from CCB any and all reasonable Transaction Costs incurred by the BCOM Companies, including any such Transaction Costs that may be required to be paid after the effective date of such termination, which Transaction Costs shall be paid by CCB to BCOM within ten (10) calendar days after the effective date of such termination by wire transfer of immediately available funds; provided, however, that, if BCOM's termination pursuant to Section 9.1(b) is effectuated as a result of or in connection with any knowing, intentional, fraudulent or willful breach or violation by CCB of any representations, warranties, covenants and/or agreements hereunder or in any certificate or other document or instrument executed and delivered in connection with the transactions contemplated hereby, then as BCOM's sole and exclusive remedy in connection with such termination and the reasons and events leading up to such termination, BCOM shall be entitled to a termination fee in the amount of Four Hundred Thousand Dollars ($400,000), which CCB shall, within ten (10) calendar days after the effective date of such termination, pay to BCOM by wire transfer of immediately available funds, it being acknowledged and agreed that it would be impracticable or extremely difficult for any Party to determine the actual damages resulting from the reasons and events leading up to such termination and, therefore, the Parties have agreed upon the foregoing remedy as liquidated damages which shall not be deemed to be in the nature of a penalty.

(d)    In the event that this Agreement is terminated by BCOM pursuant to Section 9.1(c) (including as a result of the failure of the conditions set forth in Sections 8.2(c), 8.2(d) or 8.2(f)), or by either Party under Section 9.1(e) or 9.1(f), neither Party shall be entitled to any remedies as a result of such termination.

(e)    In the event that this Agreement is terminated by CCB pursuant to Section 9.1(d) (including as a result of the failure of the conditions set forth in Sections 8.1(c) (with respect to Consents required to be obtained by BCOM), 8.3(a), 8.3(b), 8.3(c) or 8.3(d)), then CCB shall be entitled to recover from BCOM any and all reasonable Transaction Costs incurred by the CCB Companies, or any of them, which Transaction Costs shall be paid by BCOM to CCB within ten (10) calendar days after the effective date of such termination by wire transfer of immediately available funds; provided, however, that, if CCB's termination pursuant to Section 9.1(d) is effectuated as a result of or in connection with any knowing, intentional, fraudulent or willful breach or violation by BCOM of any representations, warranties, covenants and/or

agreements hereunder or in any certificate or other document or instrument executed and delivered in connection with the transactions contemplated hereby, then as CCB's sole and exclusive remedy in connection with such termination and the reasons and events leading up to such termination, CCB shall be entitled to a termination fee in the amount of Four Hundred Thousand Dollars ($400,000), which BCOM shall, within ten (10) calendar days after the effective date of such termination, pay to CCB by wire transfer of immediately available funds, it being acknowledged and agreed that it would be impracticable or extremely difficult for any Party to determine the actual damages resulting from the reasons and events leading up to such termination and, therefore, the Parties have agreed upon the foregoing remedy as liquidated damages which shall not be deemed to be in the nature of a penalty.

## ARTICLE X.
## MISCELLANEOUS

### 10.1. Expenses.

In the event that the Closing is not consummated, except as provided in Section 9.2, each of the Parties shall bear and pay any and all Transaction Costs incurred by it or its Affiliates or on its or their behalf. In the event that the Closing is consummated, all Transaction Costs incurred by or on behalf of each of the Parties and their respective Affiliates shall be borne and paid or reimbursed by CCB.

### 10.2. Brokers and Finders.

Each of the Parties represents and warrants, as of the date hereof and as of the Closing, that (except for Kendrick Pierce & Co.) neither it nor any of its officers, directors, employees, or Affiliates has employed any broker or finder or incurred any Liability for any financial advisory fees, investment bankers' fees, brokerage fees, commissions, or finders' fees in connection with this Agreement or the transactions contemplated hereby. In the event of a claim by any other broker or finder based upon his or its representing or being retained by or allegedly representing or being retained by CCB or BCOM, each of CCB and BCOM, as the case may be, agrees to indemnify and hold the other Party harmless of and from any Liability in respect of any such claim.

### 10.3. Entire Agreement.

Except as otherwise expressly provided herein, this Agreement (including the other documents and instruments referred to herein or executed in connection with this Agreement) constitutes the entire agreement between the Parties with respect to the transactions contemplated hereunder and supersedes all prior arrangements or understandings with respect thereto, written or oral. Nothing in this Agreement expressed or implied, is intended to confer upon any Person, other than the Parties or their respective successors, any rights, remedies, obligations, or Liabilities under or by reason of this Agreement.

### 10.4. Amendments.

To the extent permitted by Law, this Agreement may be amended by a subsequent writing signed by each of the Parties upon the approval of the boards of directors (or other

applicable governing body in the case of BCOM) of each of the Parties, whether before or after shareholder approval of the amendment of the Articles of Incorporation contemplated by Section 3.1 has been obtained; provided, that, after any such approval by the holders of CCB Common Stock, there shall be made no amendment that adversely modifies in any Material respect the Consideration without the further approval of such shareholders.

### 10.5. Waivers.

(a)   Prior to or at the Closing, BCOM shall have the right to waive any Default in the performance of any term of this Agreement by CCB, to waive or extend the time for the compliance or fulfillment by CCB of any and all of its obligations under this Agreement, and to waive any or all of the conditions precedent to the obligations of BCOM under this Agreement, except any condition which, if not satisfied, would result in the violation of any Law. No such waiver shall be effective unless in writing signed by a duly authorized officer of BCOM.

(b)   Prior to or at the Closing, CCB shall have the right to waive any Default in the performance of any term of this Agreement by BCOM, to waive or extend the time for the compliance or fulfillment by BCOM of any and all of its obligations under this Agreement, and to waive any or all of the conditions precedent to the obligations of CCB under this Agreement, except any condition which, if not satisfied, would result in the violation of any Law. No such waiver shall be effective unless in writing signed by a duly authorized officer of CCB.

(c)   The failure of any Party at any time or times to require performance of any provision hereof shall in no manner affect the right of such Party at a later time to enforce the same or any other provision of this Agreement. No waiver of any condition or of the breach of any term contained in this Agreement in one or more instances shall be deemed to be or construed as a further or continuing waiver of such condition or breach or a waiver of any other condition or of the breach of any other term of this Agreement.

### 10.6. Assignment.

Except as expressly contemplated hereby, neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any Party hereto (whether by operation of Law or otherwise) without the prior written consent of the other Party, except that BCOM may assign its rights and obligations under this Agreement to a wholly-owned and controlled Affiliate thereof. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns.

### 10.7. Notices.

Any notices, requests, demands or other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally, or on the next business day if sent by reputable overnight courier (with written confirmation of delivery from the courier), or on the date that receipt of such notice, request, demand or communication is refused by a Party, or on the date sent by telephone facsimile or e-mail transmission (provided that the sender of a telephone facsimile or e-mail transmission has received a written or electronic confirmation of successful transmission

and has also sent such notice, request, demand or communication by one of the other methods described herein), or upon the fifth business day after mailing, if mailed to the party to whom such notice, request, demand or communication is to be given, by first-class mail, registered or certified, postage prepaid, return receipt requested, and properly addressed as follows:

| | |
|---|---|
| CCB: | c/o: Cortez Community Bank<br>1000 South Broad Street<br>Brooksville, FL 34601<br>Fax Number:(352) 799-9500<br>e-mail: dpage@cortezcommunitybank.com<br>Attention:  Donald R. Page<br>President, Chief Executive Officer |
| Shareholders<br>Representative: | 20 South Broad Street<br>Brooksville, FL 34601<br>Attention (as applicable): Thomas Hogan, Jr.<br>e-mail: tom@hoganlawfirm.com<br>Fax Number:(352) 799-8294<br>or<br>Attention (as applicable): R. Victor Taglia<br>e-mail: vic@victaglia.com<br>Fax Number:(352) 796-1171 |
| In each case,<br>Copy to Counsel: | c/o Igler & Dougherty, P.A.<br>2457 Care Drive<br>Tallahassee, Florida 32308<br>Fax: (850) 878-1230<br>e-mail: aei@idhlaw.com<br>Attention: A. George Igler, Esq.<br>Attorney at Law |
| BCOM: | 19950 W. Country Club Drive<br>8th Floor<br>Aventura, Florida 33180<br>Fax No. (305) 375-8183<br>e-mail: dstromain@bcominc.com<br>Attention: Denny St. Romain |

| Copy to Counsel: | Bilzin Sumberg Baena Price & Axelrod LLP |
|---|---|
| | 200 South Biscayne Boulevard, Ste. 2500 |
| | Miami, Florida 33131-5340 |
| | Fax No.  (305) 351-2205 |
| | (305) 351-2290 |
| | e-mail:   aaxelrod@bilzin.com |
| | cjunco@bilzin.com |
| | Attention:  Alan D. Axelrod, Esq. |
| | Carlos F. Junco, Esq. |

| Copy to Counsel: | Stroock & Stroock & Lavan LLP |
|---|---|
| | 200 South Biscayne Blvd., Suite 3300 |
| | Miami, Florida 33131 |
| | Fax No. (305) 789-9350 |
| | e-mail: mbasile@stroock.com |
| | Attention: Michael Basile, Esq. |

### 10.8. Governing Law.

This Agreement shall be governed by and construed in accordance with the Laws of the State of Florida, without regard to any applicable conflicts of Laws.

### 10.9. Counterparts.

This Agreement may be executed in two or more counterparts or counterpart signature pages and delivered by facsimile or PDF e-mail transmission, all of which counterparts or counterpart signature pages shall be deemed originals and considered one and the same agreement, it being understood that all Parties need not sign the same counterpart or counterpart signature pages.

### 10.10. Captions.

The captions contained in this Agreement are for reference purposes only and are not part of this Agreement.

### 10.11. Interpretations.

Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against any party, whether under any rule of construction or otherwise. No party to this Agreement shall be considered the draftsman. The Parties acknowledge and agree that this Agreement has been reviewed, negotiated, and accepted by all Parties and their attorneys and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly to accomplish the purposes and intentions of the Parties. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.   In this Agreement, unless a clear contrary intention appears:

(a)     references in this Agreement to Sections, Exhibits, Schedules, Preamble or Recitals refer to the sections, exhibits, schedules, preamble or recitals, respectively, of this Agreement;

(b)     the words "include," "includes" and "including" when used herein shall be deemed in each case (unless already stated) to be followed by the words "without limitation";

(c)     when a reference is made in this Agreement to a certain number of days, such reference shall be deemed to refer to "calendar" days unless the reference expressly indicates that the reference is being made with respect to business days;

(d)     the phrases "the date of this Agreement," "the date hereof," and terms of similar import, unless the context otherwise requires, shall be deemed to refer to the date set forth in the introductory paragraph on the first page of this Agreement;

(e)     the masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires;

(f)     words such as "herein," "hereinafter," "hereof," "hereby" and "hereunder" and the words of like import refer to this Agreement as a whole and not to any particular Section or other provision hereof;

(g)     references to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules, modifications or amendments thereto;

(h)     with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding"; and

(i)     reference to any Person includes such Person's permitted successors and assigns, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

**10.12. Enforcement of Agreement.**

The Parties agree that irreparable damage would be suffered by the BCOM Parties in the event that any of the provisions of this Agreement was not performed by CCB in accordance with its specific terms or was otherwise breached by CCB. It is accordingly agreed that BCOM shall be entitled to an injunction or injunctions to prevent breaches or violations of this Agreement or any certificate or other document or instrument executed, delivered or entered into in connection with the transactions contemplated hereby and to enforce specifically the terms and provisions hereof and thereof (including the performance thereof) in any court of the United States or any state having jurisdiction, this being, except as otherwise provided in Section 9.2, in addition to any other remedy to which BCOM is entitled hereunder, at law or in equity.

**10.13. Dispute Resolution.**

(a)     The Shareholder Representative and CCB shall be deemed to accept a claim by BCOM for Indemnity Adjusted Shares pursuant to Section 7.5 above, and the contents

thereof, unless, within five (5) business days (in the case of such an Indemnity Adjusted Shares claim) after the delivery of such claim by BCOM (the "Objection Period"), the Shareholder Representative or all of the then independent directors of CCB deliver to BCOM a written objection to the contents thereof (an "Objection"), which shall state the specific sections of the Indemnity Adjusted Shares claim that are objected to and the specific basis for such Objection. Within ten (10) business days after delivery of the Objection, BCOM, the independent directors of CCB (acting on behalf of CCB if CCB is delivering an Objection) and the Shareholder Representative (if he or she is delivering an Objection) shall meet and negotiate in good faith to resolve the issues raised in the Objection(s). If such agreement is reached, then it shall be binding on the Parties, the Shareholder Representative, the then independent directors of CCB and the shareholders of CCB, as applicable. If such agreement is not reached within thirty (30) days (the "Objection Resolution Period"), then BCOM, the independent directors of CCB (acting on behalf of CCB if CCB is delivering an Objection) and the Shareholder Representative (if he or she is delivering an Objection) shall address the matter in accordance with the procedures set forth in Section 10.13(b) below.

(b)     If the parties identified in Section 10.13(a) are unable to reach an agreement on the resolution of an Objection within the Objection Resolution Period, then the dispute shall be settled by arbitration conducted in Miami, Florida before a single arbitrator selected by either the independent directors of CCB (acting on behalf of CCB if CCB is delivering an Objection) and the Shareholder Representative (if he or she is delivering an Objection), on the one hand, and BCOM, on the other hand, which, except as otherwise provided herein, shall be in accordance with the rules and procedures of the American Arbitration Association then in effect with respect to commercial disputes. If such parties cannot mutually agree on an individual to serve as arbitrator within ten (10) business days after the expiration of the Objection Resolution Period, the arbitrator shall be selected by the American Arbitration Association. The arbitration of a dispute pursuant to this Section shall be final and binding upon the Parties, the Shareholder Representative, the then independent directors of CCB and the shareholders of CCB, as applicable. Except as provided in Section 10.13(c), each party shall bear its own expenses (including, without limitation, the fees and expenses of legal counsel and accountants) in connection with such arbitration, and CCB (on behalf of the Shareholder Representative and/or the then independent directors of CCB, as applicable), on the one hand, and BCOM, on the other hand, shall each bear one half (1/2) of the cost of such arbitration (including, without limitation, the arbitrator's fees and expenses). The parties shall instruct the arbitrator to render his or her decision no later than ten (10) business days after the completion of the submission of the dispute to the arbitrator.

(c)     The prevailing party in any dispute shall be entitled to recover from the other party all of its costs and expenses incurred in connection with the enforcement of its rights hereunder or thereunder, including reasonable attorneys' and paralegals' fees and costs incurred before and at arbitration, at any other proceeding, at all tribunal levels and whether or not suit or any other proceeding is brought.

**10.14. Jurisdiction; Jury Trial Waiver; Prevailing Party.**

Except as set forth in Section 10.13 with respect to disputes regarding Indemnity Adjusted Shares, each of the Parties irrevocably consents to the exclusive jurisdiction and venue

of any federal or state court located within Miami-Dade County in the State of Florida in connection with any matter based upon or arising out of this Agreement or the matters contemplated herein, agrees that process may be served upon them in any manner authorized by the laws of the State of Florida for such Persons and waives and covenants not to assert or plead any objection that they might otherwise have to such jurisdiction and venue and such process. The Parties hereby irrevocably waive any and all right to trial by jury in any legal proceeding arising out of or related to this Agreement or the transactions contemplated hereby, whether now existing or hereafter arising, and whether sounding in contract, tort or otherwise.  The Parties agree that any of them may file a copy of this paragraph with any court of competent jurisdiction as written evidence of the knowing, voluntary and bargained-for agreement among the Parties irrevocably to waive trial by jury and that any action or proceeding whatsoever between them relating to this Agreement or the transactions contemplated hereby shall instead be tried in a court of competent jurisdiction by a judge sitting without a jury.  The prevailing party in any dispute shall be entitled to recover from the other party all of its costs and expenses incurred in connection with the enforcement of its rights hereunder or thereunder, including reasonable attorneys' and paralegals' fees and costs incurred before and at trial and at all appellate levels.

### 10.15.  Time is of the Essence.

Time is of the essence with respect to all provisions of this Agreement that specify a time for performance; provided, however, that the foregoing shall not be construed to limit or deprive a Party of the benefits of any grace or cure period allowed in this Agreement.

### 10.16.  Severability.

Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.

[Signatures on next page.]

**IN WITNESS WHEREOF,** each of the Parties has caused this Agreement to be executed on its behalf by its respective duly authorized principal executive officer as of the day and year first above written.

CORTEZ COMMUNITY BANK

By:_____

    Donald R. Page, President and CEO


BCOM CCB HOLDINGS, LLC


By:_____
Name:_____
Title:_____

*[Signature Page to Stock Purchase Agreement.]*

**IN WITNESS WHEREOF,** each of the Parties has caused this Agreement to be executed on its behalf by its respective duly authorized principal executive officer as of the day and year first above written.

CORTEZ COMMUNITY BANK

By:_____
    Donald R. Page, President and CEO

BCOM CCB HOLDINGS, LLC

By:_____
Name:_____
Title:_____

*[Signature Page to Stock Purchase Agreement.]*

**EXHIBIT A**

## VOTING AGREEMENT

This **VOTING AGREEMENT** (this "Agreement") is hereby made and entered into effective as of February 22, 2010, by and among BCOM CCB HOLDINGS, LLC, a Delaware limited liability company ("BCOM"), each of the persons and entities (as applicable) listed on **Schedule A** attached hereto (each, a "Shareholder," and any two or more of them, collectively, the "Shareholders"), and Cortez Community Bank, a Florida banking corporation (the "CCB"). Capitalized terms used herein without being defined herein shall have the respective meanings ascribed thereto in the Purchase Agreement (defined below).

### Recitals:

**WHEREAS,** BCOM and CCB have entered into a Stock Purchase Agreement, dated as of the date hereof (the "Purchase Agreement"), pursuant to which, among other things, BCOM will acquire from CCB, and CCB will issue to BCOM, up to approximately 81.8% and no less than 80% (in each case, on a fully diluted basis) of the common stock of CCB ("CCB Common Stock"), all as more particularly described in the Purchase Agreement (the "New Shares Issuance"), a copy of which has been provided to and been reviewed by each Shareholder;

**WHEREAS,** as of the date of this Agreement, each Shareholder owned of record and beneficially and was entitled to vote the number of shares of CCB Common Stock set forth beside such Shareholder's name on **Schedule A** hereto (such shares of CCB Common Stock, together with any and all other shares of capital stock of CCB (or any successor thereto) that may be acquired by such Shareholder after the date hereof, whether acquired directly or indirectly, by purchase, stock dividend, distribution, split-up, recapitalization, combination, merger, exchange of shares or other transaction, or upon the exercise of stock options or conversion of any other securities, in each case from the date of this Agreement through the term of this Agreement, are collectively referred to herein as such Shareholder's respective "Subject Shares"); and

**WHEREAS,** each of the Shareholders deems it advisable and in his/her/its best interests (i) for the New Shares Issuance to be consummated pursuant to and in accordance with the provisions of the Purchase Agreement and (ii) for each of the Shareholders to enter into an agreement pursuant to Section 607.0731 of the Florida Statutes, as amended, in order to provide for the manner in which each and all of the Shareholders will vote their respective Subject Shares with respect to all matters relating to the New Shares Issuance and to provide for certain additional representations, warranties, covenants and agreements relating thereto.

### Agreement:

**NOW, THEREFORE,** in consideration of the foregoing Recitals, which all of the parties hereto acknowledge and agree are true and correct and constitute a substantive part hereof, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I
## VOTING AGREEMENT

Section 1.1.    <u>Agreement to Vote.</u>

(a)    Each Shareholder hereby irrevocably agrees and covenants for the benefit of BCOM, CCB and each of the other Shareholders that, from and after the date hereof and until this Agreement terminates pursuant to the terms hereof, at the shareholders' meeting or any other meeting of the shareholders of CCB, however called, and at every adjournment or postponement thereof, or in connection with any written consent of the shareholders of CCB, relating to any proposed action by the shareholders of CCB with respect to the matters set forth in **Section 1.1(a)(ii)** below, such Shareholder shall:

(i)    appear at each such meeting or otherwise cause his/her/its respective Subject Shares to be counted as present thereat for purposes of establishing a quorum; and

(ii)    vote or consent (or cause to be voted or consented), in person or by proxy, all of his/her/its respective Subject Shares (A) in favor of approval of all amendments to the Articles of Incorporation and Bylaws of CCB contemplated by the Purchase Agreement and the New Shares Issuance and any and all other transactions contemplated by the Purchase Agreement and any and all other actions on the part of CCB's shareholders requested in furtherance thereof; (B) against any action or agreement submitted for approval of the shareholders of CCB that would reasonably be expected to result in a breach of any covenant, representation or warranty or any other obligation or agreement of CCB contained in the Purchase Agreement or this Agreement or of such Shareholder contained in this Agreement; (C) against any amendment of CCB's articles of incorporation or bylaws, or other proposal, action or transaction involving CCB, which amendment, proposal, action or transaction would reasonably be expected to (1) nullify, interfere with or be inconsistent with the Purchase Agreement or the transactions contemplated thereby, or (2) otherwise impede, delay, postpone, prevent, discourage or materially and adversely affect the timely consummation of the transactions contemplated by the Purchase Agreement; and (D) against any other action, agreement or transaction submitted for approval to the shareholders of CCB that would constitute an Acquisition Transaction (as defined in the Purchase Agreement).

(b)    Any such vote shall be cast or consent shall be given in accordance with the procedures applicable thereto so as to ensure that it is duly counted for purposes of determining that a quorum is present and for purposes of effectuating and recording the results of such vote or consent.  The obligations of each Shareholder set forth in this **Section 1.1** shall apply whether or not CCB breaches or threatens to breach any of its covenants, representations, warranties, obligations or agreements set forth in the Purchase Agreement or this Agreement and whether or not any other Shareholder breaches or threatens to breach any of his/her/its respective covenants, representations, warranties, obligations or agreements set forth in this Agreement. Notwithstanding the foregoing, the obligations of the Shareholders set forth in this **Section 1.1** shall terminate upon termination of this Agreement in accordance with its terms.

2

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF THE SHAREHOLDERS

Each Shareholder hereby represents and warrants to BCOM, CCB and each of the other Shareholders that:

Section 2.1.    Authorization.  Such Shareholder has full power and authority to execute and deliver this Agreement and to perform his/her/its obligations and consummate the transactions contemplated hereby.  Each of the Persons executing this Agreement on behalf of such Shareholder, if any, has full power and authority to execute and deliver this Agreement on behalf of such Shareholder and to thereby bind such Shareholder.  The execution and delivery of this Agreement and the performance of the obligations and consummation of the transactions contemplated hereby have been duly authorized by all necessary action (corporate, partnership, limited liability company or otherwise) on the part of such Shareholder.  This Agreement has been duly executed and delivered by such Shareholder and constitutes a valid and binding obligation of such Shareholder, enforceable in accordance with its terms.  If such Shareholder is married and his/her respective Subject Shares constitute community property or otherwise need spousal or other approval for this Agreement to be legal, valid and binding, such Shareholder has caused his/her spouse to execute and deliver to BCOM and CCB a Consent of Spouse in the form attached hereto as **Schedule B**, such that this Agreement has been duly authorized, executed and delivered by, and constitutes a valid and binding agreement of, such Shareholder's spouse, enforceable against such spouse in accordance with its terms.  No trust of which such Shareholder is a trustee requires the consent of any beneficiary to the execution and delivery of this Agreement or to the consummation of the transactions contemplated hereby.

Section 2.2.    Non-Contravention.  The execution and delivery of this Agreement by such Shareholder does not, and the performance by such Shareholder of his/her/its obligations under this Agreement will not, (a) conflict with or violate any Law applicable to such Shareholder or by which any of his/her/its assets or properties is bound or (b) conflict with, result in any breach of or constitute a default (or an event that with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, or require payment under, or result in the creation of any Lien on the properties or assets of such Shareholder pursuant to, any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument or obligation to which such Shareholder is a party or by which such Shareholder or any of his/her/its assets or properties (including any of his/her/its respective Subject Shares) is bound.  The execution and delivery of this Agreement by such Shareholder does not, and the performance by such Shareholder of his/her/its obligations under this Agreement will not, require any consent, approval, authorization or permit of, or filing with or notification to, any (i) United States federal, state or local or foreign governmental or regulatory agency, commission, court, body, entity or authority or (ii) third party (including with respect to individuals, any spouse, and with respect to trusts, any co-trustee or beneficiary).

Section 2.3.    Ownership of the Subject Shares.  Such Shareholder is the sole, direct, record and beneficial owner of the Subject Shares set forth beside his/her/its name on **Schedule A** hereto, free and clear of any Lien (including any restriction on the right or power to vote,

3

consent with respect to, or otherwise dispose of his/her/its respective Subject Shares, other than pursuant to this Agreement), and such Shareholder has good and valid title to his/her/its respective Subject Shares. The Subject Shares and the stock options listed on **Schedule A** hereto are the only shares of capital stock of CCB that are owned or held, directly or indirectly, beneficially, of record or otherwise by any executive officers of CCB or any members of the board of directors of CCB. Except for this Agreement, none of such Shareholder's respective Subject Shares are subject to any voting trust, shareholder or other agreement, arrangement or instrument with respect to the voting of, exercise of voting power with respect to, or consent with respect to, such shares. Such Shareholder has and (except as otherwise expressly permitted by this Agreement) will have at all times until this Agreement is terminated, sole voting power, sole power to consent, sole power of disposition, sole power to issue instructions with respect to the matters set forth in **Article I** or **Section 4.1** hereof, and the sole right, power and authority to agree to all of the matters set forth in this Agreement, in each case with respect to all of his/her/its respective Subject Shares, with no limitations, qualifications or restrictions on such rights, subject to applicable federal securities laws and the terms of this Agreement.

Section 2.4.   Total Subject Shares. Except for his/her/its respective Subject Shares and stock options set forth beside the Shareholder's name on **Schedule A** hereto, such Shareholder does not, directly or indirectly, of record, beneficially or otherwise, own or hold any (a) capital stock or other voting securities of CCB, (b) securities of CCB convertible into or exchangeable for shares of capital stock or voting securities of CCB or (c) options, warrants or other rights to acquire from CCB any capital stock, voting securities or securities convertible into or exchangeable for shares of capital stock or voting securities of CCB.

Section 2.5.   Information Supplied.   None of the information provided by such Shareholder to be included in the Proxy Statement or any regulatory filing or application in connection with the transactions contemplated by the Purchase Agreement will, (a) in the case of the Proxy Statement, (i) at the time of the mailing of the Proxy Statement or any amendments or supplements thereto and (ii) at the time of the Shareholders' Meeting, and (b) in the case of any such regulatory filing or application, as of the date of its filing and of each amendment or supplement thereto, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

Section 2.6.   Reliance by BCOM, CCB and Other Shareholders. Such Shareholder understands and acknowledges that BCOM and CCB are entering into the Purchase Agreement, and each of the other Shareholders and CCB are entering into this Agreement, in reliance upon such Shareholder's and each of the other Shareholders' execution, delivery and performance of this Agreement and such Shareholder acknowledges, agrees, represents and warrants that BCOM's entry into the Purchase Agreement, and CCB's and each of the other Shareholders' entry into this Agreement, constitute a material benefit to such Shareholder and adequate and sufficient consideration for such Shareholder's agreements, representations, warranties and covenants set forth herein and for the performance of his/its/her obligations hereunder.

4

Section 2.7.   Additional Representations.   Such Shareholder has received from CCB and carefully reviewed this Agreement and the Purchase Agreement and all exhibits, schedules, disclosure memoranda and other attachments thereto.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF BCOM AND CCB

Section 3.1.   Representations and Warranties of BCOM.   BCOM hereby represents and warrants to CCB and to each of the Shareholders that: (i) BCOM has full power and authority to execute and deliver this Agreement and to perform its respective obligations and consummate the transactions contemplated hereby; (ii) each of the Persons executing this Agreement on behalf of BCOM has full power and authority to execute and deliver this Agreement on behalf of BCOM and to thereby bind BCOM; (iii) the execution and delivery of this Agreement and the performance of the obligations and consummation of the transactions contemplated hereby have been duly authorized by all necessary limited liability company action on the part of BCOM; and (iv) this Agreement has been duly executed and delivered by BCOM and constitutes a valid and binding obligation of BCOM, enforceable in accordance with its terms.

Section 3.3.   Representations and Warranties of CCB.   CCB hereby represents and warrants to BCOM and to each of the Shareholders that: (i) CCB has full power and authority to execute and deliver this Agreement and to perform its respective obligations and consummate the transactions contemplated hereby; (ii) each of the Persons executing this Agreement on behalf of CCB has full power and authority to execute and deliver this Agreement on behalf of CCB and to thereby bind CCB; (iii) the execution and delivery of this Agreement and the performance of the obligations and consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of CCB; and (iv) this Agreement has been duly executed and delivered by CCB and constitutes a valid and binding obligation of CCB, enforceable in accordance with its terms.  The Subject Shares and the stock options listed on **Schedule A** hereto are the only shares of capital stock of CCB that are owned or held, directly or indirectly, beneficially, of record or otherwise by any executive officers of CCB or any members of the board of directors of CCB.  CCB has provided to each Shareholder a true, correct and complete copy of the Purchase Agreement and all exhibits, schedules, disclosure memoranda and other attachments thereto.

## ARTICLE IV
## ADDITIONAL COVENANTS OF THE SHAREHOLDERS

Each Shareholder hereby covenants and agrees for the benefit of CCB, BCOM and each of the other Shareholders that:

Section 4.1.   No Interference; No Transfers.

(a)   Except pursuant to the terms of this Agreement, such Shareholder shall not, without the prior written consent of BCOM and CCB, which may be withheld in their respective sole discretion, directly or indirectly, (i) grant any proxies or enter into any voting trust, shareholder or other agreement,  arrangement or instrument with respect to the voting of,

5

exercise of voting power with respect to, or consent with respect to, any of his/her/its respective Subject Shares, (ii) voluntarily take any action that would or is reasonably likely to (x) make any representation or warranty contained herein untrue or incorrect or (y) have the effect of preventing such Shareholder from performing its obligations under this Agreement, or (iii) voluntarily sell, assign, transfer, pledge, encumber, distribute, gift or otherwise dispose of (including by merger or otherwise by operation of law) (collectively , a "Transfer") or enter into any contract, option or other agreement, arrangement, understanding or instrument with respect to any Transfer of any of his/her/its respective Subject Shares during the term of this Agreement, except for Transfers (A) to another Shareholder or to any other Person that has agreed in writing to be bound by the terms and conditions of this Agreement or that becomes bound hereby as a Shareholder by operation of law, (B) solely for estate planning purposes, to any Person who becomes a party to and bound by the terms of this Agreement, or (C) upon the death of such Shareholder (if an individual), pursuant to the terms of any trust or will of such Shareholder or by the laws of intestate succession, provided that such Shareholder's respective Subject Shares shall remain subject to the terms of this Agreement and the Transferee(s)' of such Shareholder's respective Subject Shares pursuant to such trust, will or laws shall agree to be bound by the terms and conditions of this Agreement. For purposes of this **Section 4.1**, the term "sell" or "sale" or any derivatives thereof shall include a sale, Transfer or disposition of record or beneficial ownership, or both. Any Transfer or purported Transfer of Subject Shares in violation of this Agreement shall be void and of no force or effect.

(b)     While this Agreement is in effect, such Shareholder shall notify BCOM and CCB promptly in writing of the number of additional shares of capital stock of CCB (or any successor thereto), including any CCB Common Stock, and the number of additional stock options and other securities granting him/her/it the right to acquire, or that are convertible into or otherwise exchangeable for, additional shares of capital stock of CCB acquired by such Shareholder after the date hereof, if any, whereupon, CCB shall prepare an updated **Schedule A** hereto reflecting such additional capital stock and circulate such Schedule to BCOM and each of the other Shareholders.

Section 4.2.    Other Transactions.    Such Shareholder shall not, and shall cause his/her/its respective Affiliates, agents, advisors and representatives (collectively, "Representatives") not to, directly or indirectly: (i) solicit, initiate or encourage (including by way of furnishing information or assistance), or take any other action to facilitate, any inquiry or indication of interest in connection with or the making of any proposal from any Person that constitutes, or may reasonably be expected to lead to, an Acquisition Transaction; (ii) enter into, explore, maintain, participate in or continue any discussion or negotiation with any Person (other than BCOM or its Affiliates) regarding an Acquisition Transaction, or furnish to any Person (other than BCOM or its Affiliates) any non-public information or otherwise assist or participate in, facilitate or encourage, any known effort or attempt by any other Person (other than BCOM or its Affiliates) to make or effect an Acquisition Transaction; (iii) enter into any letter of intent, term sheet, memorandum of understanding, agreement in principle, letter agreement, definitive agreement or other similar arrangement (whether or not considered binding, non-binding, conditional or unconditional) with respect to, or otherwise endorse, any Acquisition Transaction; or (iv) authorize any CCB officer, employee, agent or advisor to take any such action; provided, however, that such Shareholder may engage in Permitted Actions (as defined in the Purchase

6

Agreement) if and only to the extent that at such time CCB is permitted under the terms of Section 6.3 of the Purchase Agreement to engage in, and is actually engaged in, such Permitted Actions. Such Shareholder shall, and shall cause his/her/its Representatives to, immediately cease and cause to be terminated any discussions or negotiations with any parties (other than BCOM and its Representatives) that may be ongoing as of the date hereof with respect to or which could reasonably be expected to lead to an Acquisition Transaction or any proposal with respect thereto. Such Shareholder shall also promptly (but in any event within two (2) business days) advise BCOM and in writing of the receipt of any written, oral or other proposal for an Acquisition Transaction or any inquiry by which a third party expresses an interest or intention to make such a proposal, including any request for non-public information, the terms and conditions of such inquiry, proposal for an Acquisition Transaction or request and the identity of the Person making such inquiry, proposal for an Acquisition Transaction or request, and provide to BCOM a copy of any such proposal, inquiry and/or request, if made in writing, and shall keep BCOM fully informed (including on a daily basis to the extent of any Material developments) of the status and details (including amendments and proposed amendments) of any such inquiry, proposal for an Acquisition Transaction or request.

Section 4.3.   Further Assurances.   Such Shareholder shall execute and deliver, or cause to be executed and delivered, all further agreements, instruments and documents, use its best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations, to consummate and make effective the agreements and transactions contemplated by this Agreement. In addition, such Shareholder shall support, and shall grant all approvals, and take all actions as are necessary or requested by CCB or BCOM to ensure that any and all "fair price," "affiliated transactions," "moratorium," "control share acquisitions" and other form of anti-takeover statute, provision or regulation shall not apply to, or adversely affect, the terms and provisions of this Agreement and the transactions contemplated by the Purchase Agreement.

**ARTICLE V**
**MISCELLANEOUS**

Section 5.1.   Termination; Amendments.   This Agreement shall terminate automatically, without any action on the part of any party hereto, upon the earlier to occur of (a) the Closing and (b) the termination of the Purchase Agreement pursuant to its terms. Upon such termination, no party shall have any further obligations or liabilities hereunder except that (i) the obligations of each party under **Section 4.3** and this **Article V** shall survive the Closing and (in the case of Article V) any termination of the Purchase Agreement and (ii) such termination shall not relieve any party from liability for any willful breach of this Agreement prior to such termination. Any provision of this Agreement may be amended if, but only if, such amendment is in writing and signed by each party to this Agreement.

Section 5.2.   Costs and Expenses.   All costs and expenses incurred in connection with this Agreement shall be paid by the party incurring such cost or expense.

Section 5.3.   Successors and Assigns; No Third Party Beneficiaries.   The provisions of this Agreement shall be binding upon and inure solely to the benefit of the parties hereto and

7

their respective heirs, legal representatives, successors and assigns; provided that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of the other parties hereto, except that BCOM may transfer or assign its rights and obligations under this Agreement to any Affiliate of BCOM; and provided further that no such transfer or assignment shall relieve BCOM of its obligations hereunder. Any purported assignment, delegation or other transfer without such consent shall be void. Each Shareholder agrees that this Agreement and his/her/its obligations hereunder shall attach to his/her/its respective Subject Shares and shall be binding upon any Person to whom legal or beneficial ownership of such Subject Shares shall pass, whether by operation of law or otherwise, including such Shareholder's heirs, guardians, administrators, successors or assigns, and such Shareholder shall do all things and take all steps necessary, desirable and/or appropriate in order to provide to any such Person that acquires legal or beneficial ownership, in advance of acquiring such legal or beneficial ownership, proper, complete and legally effective notice of all of the restrictions, obligations and agreements relating to such Subject Shares arising hereunder.

Section 5.4.   Governing Law; Consent to Jurisdiction.  This Agreement, and the rights and obligations of the parties and all actions arising in whole or in part under or in connection herewith, shall be governed by and construed and enforced in accordance with the laws of the State of Florida, without giving effect to any choice or conflict of law provision or rule (whether of the State of Florida or any other jurisdiction) that would cause the laws of any jurisdiction other than the State of Florida to be applicable. Each of the parties hereto irrevocably agrees that any legal action or proceeding with respect to this Agreement and the rights and obligations arising hereunder, or for recognition and enforcement of any judgment in respect of this Agreement and the rights and obligations arising hereunder brought by the other party hereto or his/her/its successors or assigns, shall be brought and determined exclusively in the United States District Court for the Southern District of Florida or any court of the State of Florida located in Miami-Dade County, Florida to the exclusion of any other forum or court. Each of the parties hereto hereby irrevocably submits with regard to any such action or proceeding for itself and in respect of his/her/its property, generally and unconditionally, to the personal jurisdiction of the aforesaid courts and agrees that he/she/it will not bring any action relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the aforesaid courts. Each of the parties hereto hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Agreement, (a) any claim that he/she/it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure to serve in accordance with this **Section 5.4**, (b) any claim that he/she/it or his/her/its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) to the fullest extent permitted by the applicable Law, any claim that (i) the suit, action or proceeding in such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject matter of this Agreement, may not be enforced in or by such courts.

Section 5.5.   Counterparts.  This Agreement may be executed in two or more counterparts or counterpart signature pages and delivered by facsimile or PDF e-mail transmission, all of which counterparts or counterpart signature pages shall be deemed originals

8

and considered one and the same agreement, it being understood that all parties need not sign the same counterpart or counterpart signature pages.

Section 5.6.   Severability.   The parties intend this Agreement to be enforced as written. If any term or provision of this Agreement is held or found to be invalid, illegal or incapable of being enforced by any rule of law or public policy or order or ruling of any court of competent jurisdiction, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party.   Upon such determination that any term or provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

Section 5.7.   Notices.   All notices, requests, demands and/or other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally, or on the next business day if sent by reputable overnight courier (with written confirmation of delivery from the courier), or on the date that receipt of such notice, request, demand or communication is refused by a party, or on the date sent by telephone facsimile or e-mail transmission (provided that the sender of a telephone facsimile or e-mail transmission has received a written or electronic confirmation of successful transmission and has also sent such notice, request, demand or communication by one of the other methods described herein), or upon the fifth business day after mailing, if mailed to the party to whom such notice, request, demand or communication is to be given, by first-class mail, registered or certified, postage prepaid, return receipt requested, and properly addressed as follows:

(a)      If to BCOM:

19950 W. Country Club Drive
8th Floor
Aventura, Florida 33180
Fax No. (305) 375-8183
e-mail: dstromain@bcominc.com
Attention: Denny St. Romain

with copies (which shall not constitute notice) to:

Bilzin Sumberg Baena Price & Axelrod LLP
200 South Biscayne Boulevard, Ste. 2500
Miami, Florida 33131-5340
Fax No.       (305) 351-2205
              (305) 351-2290
e-mail: aaxelrod@bilzin.com
        cjunco@bilzin.com

9

Attention:  Alan D. Axelrod, Esq.
      Carlos F. Junco, Esq.

(b)  If to CCB:

   c/o: Cortez Community Bank
   1000 South Broad Street
   Brooksville, FL 34601
   Fax Number:(352) 799-9500
   e-mail: dpage@cortezcommunitybank.com
   Attention: Donald R. Page
   President, Chief Executive Officer

   with copies (which shall not constitute notice) to:

   c/o Igler & Dougherty, P.A.
   2457 Care Drive
   Tallahassee, Florida 32308
   Fax: (850) 878-1230
   e-mail: agi@idhlaw.com
   Attention: A. George Igler, Esq.
   Attorney at Law

(c)  If to a Shareholder, to the address shown beneath such Shareholder's name on the signature page attached hereto.

Section 5.8. <u>Interpretation.</u> As used in this Agreement (including schedules and amendments), the masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires. When reference is made in this Agreement to a Section, such reference shall be to a Section of this Agreement unless otherwise indicated. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The words "hereof," "herein," "hereby" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The word "or" shall not be exclusive. The words "beneficial ownership" and "owned beneficially" and words of similar import when used in this Agreement shall be deemed to mean "beneficial ownership" as determined in accordance with Rule 13d-3 promulgated under the Securities Exchange Act of 1934, as amended, and interpretations thereunder by the Staff of the U.S. Securities and Exchange Commission. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting or causing any instrument to be drafted.

Section 5.9. <u>Specific Performance.</u> Each party hereto acknowledges and agrees that in the event any of the provisions of this Agreement are not performed in accordance with their

10

specific terms or are otherwise breached, the other party or parties would suffer immediate and irreparable harm for which payment of money would not compensate them. Accordingly, it is agreed that each party shall be entitled to an injunction or injunctions, restraining order or other equitable relief to prevent breaches of the provisions of this Agreement and to enforce specifically the terms and provisions hereof, without proof of actual damages or the posting of bond or other security, in addition to any other remedy to which they may be entitled at law or in equity.

Section 5.10. <u>Enforcement; Time of the Essence</u>. CCB and each and all of the Shareholders hereby covenant and agree to do, or cause to be done, all things necessary, proper and/or advisable in order to enforce all of their respective rights and, in connection therewith, the full and timely performance by each and all of the Shareholders of their respective duties, covenants, agreements and obligations, under this Agreement. Time is of the essence with respect to all provisions of this Agreement that specify a time for performance.

Section 5.12. <u>No Waiver</u>. The terms and provisions hereof may not be waived except by an instrument signed by or on behalf of the party waiving compliance. The failure of any party to exercise any right, power or remedy provided under this Agreement or otherwise available in respect of this Agreement at law or in equity, or to insist upon compliance by any other party with his/her/its obligations under this Agreement, and any custom or practice of the parties at variance with the terms of this Agreement, shall not constitute a waiver by such party of such party's right to exercise any such or other right, power or remedy or demand such compliance.

**Section 5.13. <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.**

[Signatures on next page.]

11

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

BCOM:

**BCOM CCB HOLDINGS, LLC**, a
Delaware limited liability company

By:_____
Name:
Title:

CCB:

**CORTEZ COMMUNITY BANK**, a
Florida banking corporation

By:_____
Name: Donald R. Page
Title: President and CEO

**SHAREHOLDERS:**

Print Name: Thomas S. Hogan, Jr.          Print Name: Derrill S. McAteer
Address:_____          Address:_____
_____          _____
_____          _____

Print Name: Donald R. Page               Print Name: Terry G. Bickel
Address:_____          Address:_____
_____          _____
_____          _____

*[First Signature Page to Voting Agreement.*
*Signatures Continue on the Next Page.]*

Print Name: Mary Beth Gary
Address:_____

_____
_____

Print Name: Dr. Mukesh Mehta
Address:_____

_____
_____

Print Name: Jo Ann Perry
Address:_____

_____
_____

Print Name: Max Register
Address:_____

_____
_____

Print Name: R. Victor Taglia
Address:_____

_____
_____

Print Name: Nick Sessa
Address:_____

_____
_____

Print Name: Dr. Barry Weber
Address:_____

_____
_____

Print Name: Dr. Lingappa Amarchand
Address:_____

_____
_____

*[Second Signature Page to Voting Agreement.*
*Signatures Continue on the Next Page.]*

Print Name: Scott Mellecker
Address:_____

_____
_____
_____

Print Name: Karen Smith
Address:_____

_____
_____
_____

Print Name: Kathy Vidal
Address:_____

_____
_____
_____

Print Name: Judy Mamo
Address:_____

_____
_____
_____

Print Name:
Address:_____

_____
_____
_____

Print Name:
Address:_____

_____
_____
_____

Print Name:
Address:_____

_____
_____
_____

*[Third and Final Signature Page to Voting Agreement.]*

Print Name: Thomas S. Hogan, Jr.
As Managing Member of
The Hogan Family, LLC
20 S Broad St
Brooksville, FL 34601

Print Name: Terry G. Bickel
President of Marion City Investment Corp
P O Box 1104
Brooksville, FL 34605

*[Fourth and Final Signature Page to Voting Agreement.]*

## Schedule A

| Shareholder Name | CCB Common Stock | CCB Stock Options |
|---|---|---|
| Thomas S. Hogan, Jr. | 83,150 | 13,191 |
| Derrill S. McAteer | 13,000 | 12,136 |
| Donald R. Page | 9,000 | 13,995 |
| Terry G. Bickel | * | 7,660 |
| Mary Beth Gary | 12,500 | 7,599 |
| Dr. Mukesh Mehta | ** | 7,305 |
| Jo Ann Perry | 12,250 | 5,030 |
| Max Register | 500 | 1,181 |
| R. Victor Taglia | *** | 11,857 |
| Nick Sessa | 0 | 0 |
| Dr. Barry Weber | 21,000 | 6,906 |
| Dr. Lingappa Amarchand | 20,000 | 6,813 |
| Scott Mellecker | 5,000 | 10,000 |
| Karen Smith | 400 | 6,500 |
| Kathy Vidal | 2,450 | 6,500 |
| Judy Mamo | 2,200 | 6,500 |
| Ray Heter | 0 | 1,000 |
| Amanda McCullers | 0 | 100 |
| Michelle Turney | 0 | 200 |

* TERRY G. BICKEL

10,000 shares under Bickel Rev Intervivos Trust UAD 04/01/2008
 4,925 shares under Marion City Investment Corporation

** DR. MUKESH MEHTA

15,000 shares owned individually
 5,000 shares under IRA

*** R. VICTOR TAGLIA

47,600 shares under R. Victor Taglia Rev Intervivos Trust UAD 05/21/2001
   207 shares under IRA
15,000 shares under 628 Investments LLC

## SCHEDULE B

## CONSENT OF SPOUSE

I, the undersigned, hereby acknowledge that I have read the foregoing Support and Voting Agreement (the "Agreement") and that I understand its contents. I agree that my spouse's interest in the common stock of Cortez Community Bank is subject to the Agreement and any interest I may have in such common stock shall also be irrevocably bound by the Agreement and, further, that my community property interest in such common stock, if any, shall be similarly bound by the Agreement.

I am aware that the legal, financial and other matters contained in the Agreement are complex and that I am encouraged to seek advice with respect thereto from independent legal counsel and/or financial advisors. I have either sought such advice or determined after carefully reviewing the Agreement that I hereby waive such right.

Acknowledged and agreed this _____ day of _____, 2010.


_____

Print Name:_____


_____
Witness

**Schedule 3.1**

ARTICLES OF AMENDMENT

TO

AMENDED AND RESTATED

ARTICLES OF INCORPORATION

OF

**CORTEZ COMMUNITY BANK**

1.      The name of the corporation is Cortez Community Bank (the "Corporation").

2.      The date of filing with the Department of State (the "Department") of the State of Florida was July 7, 2003, as amended and restated on January 15, 2004, as further amended on December 11, 2007, under filing number P03000074470.

3.      These Articles of Amendment have been duly authorized and adopted at a meeting of the board of directors of the Corporation duly called and held on February 17, 2010, and by the shareholders of the Corporation at a special meeting duly called and held on _____, 2010, where the number of votes cast for the amendment was sufficient for approval.

4.      Pursuant to Fla. Stat. 607.1007(4), the Amended and Restated Articles of Incorporation of the Corporation, as amended, are hereby further amended as follows:

4.1      The first two sentences of Article III are deleted in their entirety and replaced with the following:

"The total number of shares authorized to be issued by the corporation shall be Thirty-Five Million (35,000,000). Such shares shall be of a single class and shall have a par value of $1.00 per share."

4.2      The first two sentences of Article V are deleted in their entirety and replaced with the following:

"The number of members of the board of directors of the Corporation shall be no fewer than five (5), with the exact number of directors to be fixed from time to time by the shareholders of the Corporation at the annual meeting of the shareholders or at any special meeting thereof, but in the absence of an affirmative determination, the number of directors shall be the same as the number last previously determined by the shareholders; provided, however, that a majority of the full board of directors may, at any time during the year following the

annual meeting of shareholders, increase the number of directors of the Corporation by not more than two (2) and appoint persons to fill the resulting vacancies."

5.      All other provisions of the Amended and Restated Articles of Incorporation of the Corporation, as amended, shall remain in full force and effect without any modification thereof.

CORTEZ COMMUNITY BANK

By: _____

Name: _____

Title: _____

**Schedule 3.2**

**SECOND AMENDED AND RESTATED**

**BYLAWS**

of

**CORTEZ COMMUNITY BANK**

Adopted on _____, 2010

a Florida Commercial Banking Corporation

**ARTICLE I - OFFICES**

Section 1.    **Business Offices.**    CORTEZ COMMUNITY BANK (the "Corporation"), shall maintain one principal office within the State of Florida, and may, with the approval of the Office of Financial Regulation of the State of Florida (the "**Office**") and as the board of directors of the Corporation (the "**Board of Directors**") may designate from time to time, maintain additional offices within or outside the State of Florida. Each office shall be open for the transaction of banking business in accordance with the requirements of Section 655.89, Florida Statutes, as amended or any successor law thereto.

Section 2.    **Registered Office.**    The address of the initial registered office in the State of Florida and the name of the initial registered agent of the Corporation at such address are set forth in the Amended and Restated Articles of Incorporation of the Corporation, as amended (the "**Articles**").

**ARTICLE II - SHAREHOLDERS**

Section 1.    **Annual Meeting.**    The annual meeting of shareholders of the Corporation shall be held on such date occurring within the first four months following expiration of each operating year of the Corporation, either calendar or fiscal, and convening at such time, as the Board of Directors shall annually determine.

Section 2.    **Special Meeting.**    Special meetings of the shareholders of the Corporation may be called by the Board of Directors, the Chairman of the Board of Directors of the Corporation or by the holders of not less than 10% of the shares entitled to be voted at the meeting, in each case, by delivering a notice to the Secretary of the Corporation specifying the time, place and purpose(s) of such meeting (in each case, subject to compliance with Sections 3 and 4 below of this Article II). No business shall be transacted at any special meeting unless such business is stated in the notice of the meeting as one of the purposes of that special meeting.

Section 3.    **Place of Meetings.**    Meetings of the shareholders shall be held at the principal office of the Corporation unless another place is designated in the notice of the meeting.

Section 4.    **Notice of Meeting.**    Notice of the meeting, stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) calendar days nor more than sixty (60)

calendar days before the date of the meeting, by written or any other means of communication permitted by Section 607.0141 Florida Statutes, as amended or any successor law thereto, by or at the direction of the Board of Directors, the Chairman of the Board of Directors of the Corporation or the other person(s) calling the meeting, to each shareholder of record entitled to vote at such meeting.  If mailed, such notice shall be deemed to be delivered when deposited in the United States mail, addressed to the shareholder at his/her/its address as it appears on the stock transfer books of the Corporation, with postage thereon prepaid.

Section 5.   **Notice of Adjourned Meeting**.  When a meeting is adjourned to another date, time or place, it shall not be necessary to give any notice of the adjourned meeting if the date, time and place to which the meeting is adjourned are announced at the meeting at which the adjournment is taken. If, however, the adjournment is for more than thirty (30) calendar days, or if, after the adjournment, the Board of Directors fixes a new record date for the adjourned meeting, a notice of the adjourned meeting shall then be given to each shareholder of record entitled to vote at the meeting as provided in Section 4 above. At an adjourned meeting, any business may be transacted that might have been transacted on the original date of the meeting.

Section 6.   **Waiver of Notice of Meeting of Shareholders**.  Whenever any notice is required to be given to any shareholder of the Corporation under the provisions of any statute, or under the provisions of the Articles or these Bylaws, a waiver thereof signed by the person(s) entitled to such notice, whether before or after the time stated therein, shall be equivalent to the giving of such notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends the meeting for the expressed purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any annual or special meeting of the shareholders need be specified in any written waiver of notice.

Section 7.   **Fixing of Record Date**.  For the purpose of determining the holders of shares entitled to notice of and/or to vote at a shareholders' meeting, to demand a special meeting, to act by written consent without a meeting, or for the purpose of determining the shareholders entitled to receive payment of any dividend or allotment of any right, or in order to make a determination of shareholders for any other proper purpose, the Board of Directors may fix in advance a date as the record date for any such determination of shareholders. Such date in any case shall be not more than sixty (60) days nor, in the case of a shareholders' meeting, less than ten (10) days, prior to the date on which the particular action requiring such determination of shareholders is to be taken. In no event may a record date fixed by the Board of Directors be a date preceding the date upon which the resolution fixing the record date is adopted. If no record date is fixed for the determination of shareholders entitled to demand a special meeting, the record date shall be the date the first shareholder delivers his or her demand to the Corporation. If no prior action is required by the Board of Directors pursuant to applicable law, the record date for determining shareholders entitled to take action by written consent without a meeting shall be the date the first signed written consent is delivered to the Corporation under Section 607.0704, Florida Statutes, as amended or any successor law thereto.  If not otherwise fixed, and prior action is required by the Board of Directors pursuant to applicable law, the record date for determining shareholders entitled to take action by written consent without a meeting is at the close of business on the day on which the Board of Directors adopts the resolution taking such

prior action. If no record date is fixed for the determination of shareholders entitled to notice of or to vote at a shareholders' meeting, then the record date shall be the close of business on the day next preceding the day on which notice of the meeting is given, or, if no notice is given, the day next preceding the day on which the meeting is held. A determination of the record date for a shareholders' meeting is effective for any adjournment of the meeting, unless the Board of Directors fixes a new record date for such adjourned meeting, which it must do if the meeting is adjourned to a date more than one hundred and twenty (120) days after the date fixed for the original meeting.

Section 8.    **Shareholder Quorum and Action**.  A majority of the votes entitled to be cast on a matter, represented in person or by proxy, shall constitute a quorum for action on that matter at a meeting of shareholders. If a quorum is not present or represented at a meeting of shareholders, the holders of a majority of the shares present or represented, and who would be entitled to vote at the meeting if a quorum were present or represented, may adjourn the meeting from time to time without further notice, other than announcement at the meeting. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notified. Once a quorum has been established at a shareholders' meeting, the subsequent withdrawal of shareholders or their proxies, so as to reduce the number of shares represented and entitled to vote at the meeting below the number required for a quorum, shall not affect the validity of any action taken at the meeting or any adjournment thereof.

Section 9.    **List of Shareholders**.  If the Corporation shall have more than ten (10) shareholders, the officer or agent having charge of the stock transfer books for shares of the Corporation shall make, at least ten (10) days before each meeting of shareholders, a complete list of the shareholders entitled to vote at such meeting or any adjournment thereof, with the address of, and the number and class and series, if any, of shares held by, each. The list, for a period of ten (10) days prior to such meeting, shall be kept on file at the registered office of the Corporation, at the principal place of business of the Corporation, or at the office of the transfer agent or registrar of the Corporation; and any shareholder shall be entitled to inspect the list at any time during usual business hours. The list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any shareholder at any time during the meeting. If the requirements of this section have not been substantially complied with, then on demand of any shareholder in person or by proxy, the meeting shall be adjourned until there has been compliance with the requirements. If no such demand is made, failure to comply with the requirements of this section shall not affect the validity of any action taken at such meeting.

Section 10.    **Voting**.  Each outstanding share entitled to vote shall be entitled to one vote upon each matter submitted to a vote at a meeting of shareholders. If a quorum is present at a properly held meeting of the shareholders, whenever any action, other than the election of members of the Board of Directors, is to be taken by vote of the shareholders, the affirmative vote of the holders of a majority of the shares represented in person or by proxy at the meeting and entitled to vote on the subject matter under consideration shall be the act of the shareholders, unless the vote of a greater number is required by or under the Articles or applicable Florida law.

Section 11.    **Proxies**.  Every shareholder entitled to vote at a meeting of shareholders, or to express consent or dissent to corporate action in writing without a meeting, or a shareholder's duly authorized attorney-in-fact, may authorize any other person(s) to act for that shareholder by proxy in accordance with the provisions of Section 607.0722 of the Florida Statutes, as amended or any successor law thereto.

Section 12.    **Organization**.  Meetings of the shareholders shall be presided over by the individual occupying one of the following executive positions, in the following order of priority: Chairman of the Board of Directors, Vice Chairman of the Board of Directors, if any, Chief Executive Officer, President, any Vice President or, in their absence, by a chairman to be chosen by the holders of a majority of the shares represented in person or by proxy at the meeting and entitled to vote at the meeting. The Secretary, an Assistant Secretary or, in their absence, any person appointed by the chairman of the meeting, shall act as secretary of the meeting.

Section 13.    **Action by Shareholders Without a Meeting**.  Any action required or permitted by applicable law, the Articles or these Bylaws to be taken at an annual or special meeting of shareholders may be taken without a meeting, without prior notice, and without a vote if the action is taken by written consent in lieu of a meeting in accordance with the provisions of Section 607.0704 of the Florida Statutes, as amended or any successor law thereto.

## ARTICLE III - DIRECTORS

Section 1.    **Powers**.  Except as otherwise provided by applicable law or by the Corporation's Articles, all corporate powers shall be exercised by or under the authority of, and the property, business and affairs of the Corporation shall be managed under the direction of, the Board of Directors.

Section 2.    **Number, Term and Qualifications**.  The number of members of the Board of Directors of the Corporation shall be no fewer than five (5), with the exact number of directors to be fixed from time to time by the shareholders of the Corporation at the annual meeting of the shareholders or at any special meeting thereof, but, in the absence of an affirmative determination, the number of directors shall be the same as the number last previously determined by the shareholders; provided, however, that a majority of the full Board of Directors may, at any time during the year following the annual meeting of shareholders, increase the number of directors of the Corporation by not more than two (2) and appoint persons to fill the resulting vacancies. Each director shall meet such qualifications as may be required by the applicable laws of Florida (including, without limitation, Chapters 607, 655 and 658 of the Florida Statutes, as amended or any successor laws thereto). Each director elected shall hold office until the next annual shareholders' meeting  and until his/her successor has been duly elected and qualified or until his/her earlier resignation, removal from office or death.

Section 3.    **Election of Directors**.  Members of the Board of Directors shall be elected at the annual meeting of shareholders of the Corporation or at a special meeting of the shareholders duly called for that purpose (in each case, at which a quorum is present) by the affirmative vote of the holders of a plurality of the shares represented in person or by proxy at the meeting and entitled to vote thereon. Elections of directors need not be by ballot unless a shareholder demands election by ballot before the voting begins. At each election of directors,

every shareholder entitled to vote at such election shall have the right to vote the number of shares owned by him for as many persons as there are Directors to be elected and for whose election he has a right to vote. A shareholder may not cumulate his votes by giving one candidate as many votes as the number of such directors multiplied by the aggregate number of his votes shall equal.

Section 4. **Regular Meetings**. A regular meeting of the Board of Directors shall be held, without notice other than this Bylaw provision, immediately after and at the same location as the annual election of directors. The Board of Directors may, from time to time, by resolution appoint the date, time and place, either within or outside the State of Florida, for holding other regular meetings of the Board if it deems such action advisable. Such regular meetings shall thereupon be held on the date and at the time and location so appointed, without any necessity for the giving of notice with regard thereto.

Section 5. **Special Meetings**. Special meetings of the Board of Directors shall be held whenever called by the Chairman of the Board of Directors, the Chief Executive Officer, the President (if no Chief Executive Officer has been elected or appointed) or by the Secretary upon the written request of no fewer than four (4) directors. The person(s) authorized to call special meetings of the Board of Directors may fix any place, either within or outside the State of Florida, and any time, as the place and time for holding any special meeting of the Board of Directors called by him, her or them.

Section 6. **Notice of Special Meeting**. Notice to a director of a call for any special meeting of the Board of Directors or for any other purpose may be given by (a) overnight delivery by a nationally recognized air courier service, and such notice shall be deemed to be given on the first business day following the day in which it was timely deposited for overnight delivery with such air courier service, (b) ground courier, and such notice shall be deemed to be given upon delivery of such notice or refusal of such delivery; and/or (c) transmitting the same to the e-mail address of such director (as and if such address has been made available (and not revoked) to the Corporation by such director for the purpose of receiving notices of meetings of the shareholders and/or the Board of Directors), and such notice shall be deemed to be delivered when sent unless the person who sends the e-mail notice receives electronic notification that the e-mail transmission failed for any reason. In each of the foregoing cases, notice to a director must be provided so that the director receives (or is deemed to have received) such notice not less than 48 hours before the scheduled time for commencement of the meeting. Except as otherwise provided in these Bylaws, or as may be indicated in the notice thereof, any and all business may be transacted at any special meeting. When a special meeting of the Board of Directors is adjourned to another date, time or place, no notice of the adjourned meeting need be given if the date, time and place to which the meeting is adjourned are announced at the meeting at which the adjournment is taken unless the meeting is adjourned to a date more than one hundred and twenty (120) days after the date fixed for the original meeting, in which case, an additional notice of such meeting shall be provided to the directors in accordance with the provisions of this Section.

Section 7. **Waiver of Notice**. A director may waive the requirement of notice of a special meeting of the Board of Directors by signing a waiver of notice either before or after the meeting. The attendance of a director at a meeting shall constitute a waiver of notice of such

meeting and a waiver of any and all objections to the place or time of such meeting or the manner in which it has been called or convened, except when the director states, at the beginning of the meeting, any objection to the transaction of business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors need be specified in the notice or waiver of notice of such meeting.

Section 8.     **Quorum and Action**.  A majority of the total number of directors then in office shall constitute a quorum for the transaction of business at any meeting of the Board of Directors, but if less than such majority is present at the meeting, a majority of the directors present may adjourn the meeting from time to time until a quorum shall have been obtained. Directors shall be deemed present at a meeting of the Board of Directors if a conference telephone, or similar communications equipment by means of which all persons participating in the meeting can hear each other, is used. The affirmative vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors except and to the extent otherwise required by law or the Articles.

Section 9.     **Presumption of Assent**.  A director of the Corporation who is present at a meeting of its Board of Directors at which action on any corporate matter is taken shall be presumed to have assented to the action taken unless he or she votes against such action or abstains from voting in respect thereto because of an asserted conflict of interest.

Section 10.     **Action Without a Meeting**.  Any action required or permitted to be taken at a meeting of the Board of Directors (or of a committee of the Board of Directors) may be taken without a meeting, without prior notice and without a vote if the action is taken by the written consent of all then members of the Board of Directors (or of such committee of the Board of Directors).  The action must be evidenced by one or more written consents describing the action taken and signed by each director (or committee member), which consent(s) shall be filed in the official minute books of the Corporation in which proceedings of meetings of the Board of Directors are recorded.  The action taken by written consent shall be deemed effective when the last director signs the consent, unless the consent specifies otherwise, and shall have the effect of a meeting vote and may be described as such in any document.

Section 11.     **Compensation of Directors**.  Subject to compliance with applicable laws (including, without limitation and as applicable Section 658.35 of the Florida Statutes, as amended or any successor law thereto), the Corporation may (but is not required to): (i) pay each director fees for attendance at meetings of the Board of Directors or any committee thereof so long as such fees have been previously approved by the Board of Directors and such fees represent reasonable compensation for service as a director or member of a committee; (ii) issue to directors shares of the Corporation's capital stock in exchange for Board service (whether past or future) or grant stock options therefor; and/or (iii) reimburse each director for his or her expenses of attendance at each such meeting. The Board of Directors may also pay to each director rendering services to the Corporation not ordinarily rendered by directors, as such, special compensation appropriate to the value of such services, as determined by the Board of Directors from time to time. None of these payments shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor. The Board of Directors

may determine the compensation of a director who is also an officer, for service as an officer, as well as for service as a director.

Section 12.   **Resignation**.  Any director of the Corporation may resign at any time upon written notice to the Corporation. The death of a director shall be deemed a resignation. Any resignation shall take effect at the time specified therefor, and unless otherwise specified with respect thereto, the acceptance of such resignation shall not be necessary to make it effective.

Section 13.   **Removal**.  A director may be removed from office, with or without cause, if the number of votes cast and entitled to vote to remove the director exceeds the number of votes cast and entitled to vote not to remove him or her, at a meeting of the shareholders at which a quorum is present provided the notice of the meeting states that the purpose, or one of the purposes, of the meeting is removal of the director.

Section 14.   **Vacancies**.   Vacancies on the Board of Directors resulting from resignation, removal or otherwise and newly created directorships resulting from any increase in the number of directors may be filled by the affirmative vote of a majority of all remaining directors, though less than a quorum of the Board of Directors, or at a special meeting of the shareholders duly called for that purpose at which a quorum is present by the affirmative vote of the holders of a plurality of the shares represented in person or by proxy at the meeting and entitled to vote thereon.  Each director so elected shall hold office for a term that shall coincide with the term to which the resigned or removed director shall have been elected. If there are no directors in office, then an election of directors may be held in accordance with Florida law.

Section 15.   **Committees**.  The Board of Directors, by resolution adopted by a majority of its full membership, may designate one or more board committees, the membership of which shall consist of one or more directors, and each of which committees, to the extent provided in such resolution, shall have and may exercise all the authority of the Board of Directors, as limited by Section 607.0825 of the Florida Statutes, as amended or any successor law thereto. Subject to applicable law, the Board of Directors shall have power at any time, by resolution adopted by a majority of its full membership, to fill vacancies in, change the membership of, designate one or more directors as alternate members of, or discharge any such committee.  A majority of the total number of directors then serving on a committee of the Board of Directors shall constitute a quorum for the transaction of business at any meeting of such committee, but if less than such majority is present at the meeting, a majority of the directors present may adjourn the meeting from time to time until a quorum shall have been obtained.  Directors shall be deemed present at a meeting of a committee of the Board of Directors if a conference telephone, or similar communications equipment by means of which all persons participating in the meeting can hear each other, is used.  The affirmative vote of the majority of the directors that are members of a committee and present at a meeting of such committee at which a quorum is present shall be the act of such committee except and to the extent otherwise required by law or the Articles

Section 16.   **Chairman of the Board of Directors**.  The Chairman of the Board of Directors shall be elected by the members of the Board of Directors in its organizational action and thereafter at the regular meeting of the Board of Directors held immediately following the

annual election of directors. The Chairman of the Board of Directors shall hold office until the regular meeting of the Board of Directors following the annual election of directors in the next subsequent year and until his or her successor shall have been duly elected and shall have qualified, or until his or her earlier resignation, removal from office, or both. The Chairman of the Board of Directors may be removed from office at any time by action of the Board of Directors taken in accordance with any contractual agreement between the Corporation and the Chairman of the Board of Directors, and otherwise with or without cause.  A vacancy in the office of Chairman of the Board of Directors may be filled by action of the Board of Directors which may be taken at a special meeting thereof, and its appointee shall hold office for the unexpired term or until his or her successor is elected and qualified, or until his or her earlier resignation, removal from office or death. The Chairman of the Board of Directors shall preside, when available, at all meetings of the shareholders and the Board of Directors, shall have the specific powers conferred by these Bylaws, and shall also have and may exercise such further powers and duties as from time to time may be conferred upon or assigned to him or her by the Board of Directors.

Section 17.   **Indemnification of Directors**.   The Corporation shall indemnify any person (and the heirs, executors and administrators of such person) made or threatened to be made a party to any action, suit or proceeding by reason of the fact that he is or was a director of the Corporation against any and all liability, damages, costs and expenses, including reasonable attorneys' fees and disbursements, asserted against him or her or incurred by him or her in connection with such proceeding, to the maximum extent allowed and pursuant to the procedures set forth in Florida Statute Section 607.0850, as amended from time to time. The foregoing right of indemnification shall not be exclusive of other rights to which those seeking an indemnification may be entitled. The Corporation may maintain insurance, at its expense, to protect itself and any such person against any such fine, liability, damage, claims, cost or expense, whether or not the Corporation would have the legal power to directly indemnify such person against such liability.

## ARTICLE IV - OFFICERS

Section 1.   **Executive Officers**.   The executive officers of the Corporation shall include a Chief Executive Officer, a President, a Secretary, a Treasurer and such other officers and assistant officers as may be deemed by the Board of Directors necessary or appropriate to the operation of the Corporation. Each executive officer shall be elected by the Board of Directors. Any two or more offices herein designated may be held by the same individual, and if the offices of Chief Executive Officer and President are so combined, the President shall constitute the chief executive officer of the Corporation with or without such formal designation being applied. Notification to the Office of the impending election or appointment of an individual to an executive officer position shall be provided in accordance with Section 655.0385, Florida Statutes, as amended or any successor law thereto.

Section 2.   **Election and Term of Office**.   The executive officers of the Corporation shall be elected at the regular meeting of the Board of Directors held immediately following the annual election of directors. Each such officer shall hold office until the regular meeting of the Board of Directors immediately following the annual election of directors in the succeeding year

and until his or her successor shall have been duly elected and shall have qualified, or until his or her earlier resignation, removal from office or death.

Section 3.  **Removal from Office**.  Any executive officer may be removed from office at any time by action of the Board of Directors taken in accordance with any contractual agreement between the Corporation and the executive, and otherwise with or without cause.

Section 4.  **Vacancies**.  A vacancy in any executive office may be filled by action of the Board of Directors which may be taken at a special meeting thereof, and its appointee shall hold office for the unexpired term or until his or her successor is elected and qualified, or until his or her earlier resignation, removal from office or death.

Section 5.  **Chief Executive Officer**.  The Chief Executive Officer, in the absence of the Chairman (or any Vice-Chairman) of the Board of Directors, shall preside at meetings of the shareholders and of the Board of Directors. The Chief Executive Officer shall have general charge of the day-to-day management and direction of the business, properties and affairs of the Corporation and the power to implement all plans and policies in connection therewith, subject to the adoption of such plans and policies by, and the control and oversight of, the Board of Directors. He or she shall have general executive powers, including all powers required by law to be exercised by a chief executive officer of a profit seeking corporation, as well as such additional powers and duties conferred by these Bylaws and by the Board of Directors.  He or she shall keep the Board of Directors fully informed and shall consult regularly with the Board of Directors concerning the business and affairs of the Corporation.

Section 6.  **President**.  Subject to the preceding Section 5, the President shall have general charge of the day-to-day management and direction of the business, properties and affairs of the Corporation and the power to implement all plans and policies in connection therewith, subject to the direction and oversight of the Chief Executive Officer (if different from the President), and the adoption of such plans and policies by, and the control and oversight of, the Board of Directors.  He or she shall have general executive powers, including all powers required by law to be exercised by a president of a profit seeking corporation, as well as such additional powers and duties conferred by these Bylaws and by the Board of Directors.  He or she shall keep the Chief Executive Officer (if different from the President) and the Board of Directors fully informed and shall consult regularly with the Chief Executive Officer (if different from the President) and the Board of Directors concerning the business and affairs of the Corporation. When the offices of the Chief Executive Officer and the President are occupied by different individuals, the President shall report and be subject to the direct supervision and control of the Chief Executive Officer, and in his or her absence shall perform the duties of the Chairman, with all power of and restrictions upon that office.

Section 7.  **Vice President**.  In the absence of the President, or in the event of his or her death, inability, or refusal to act, the Vice President, if one has been appointed or elected by the Board of Directors (or in the event there shall be more than one Vice President, the Vice Presidents in the order designated at the time of their appointment or election (with Executive Vice Presidents having seniority over any Senior Vice Presidents and any Senior Vice Presidents having seniority over any Vice Presidents), or in the absence of any designation, then in the order of their appointment or election), shall perform the duties of the President and, when so acting,

shall have all of the powers of, and be subject to all of the restrictions upon, the President. Each Vice President shall have general executive powers, as well as the specific powers conferred by these Bylaws and by the Board of Directors.

Section 8.     **Secretary**.  The Secretary shall (a) keep the minutes of the proceedings of the Board of Directors and the shareholders in one or more books provided for that purpose, (b) see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law, (c) be custodian of the corporate records and of the seal of the Corporation and see that the seal of the Corporation is affixed to all documents the execution of which on behalf of the Corporation under its seal is duly authorized, (d) be the registrar of the Corporation and keep a register of the addresses of all shareholders which shall be furnished to the Secretary by the shareholders or by the Corporation's transfer agent, (e) have general charge of the stock transfer books and records of the Corporation, and (f) in general, perform all duties incident to the office of Secretary and such other duties as from time to time may be assigned to him or her by the Board of Directors.

Section 9.     **Treasurer**.  The Treasurer shall (a) have charge and custody of, and be responsible for, all funds and securities of the Corporation, (b) receive and give receipts for monies due and payable to the Corporation from any source, and deposit all such monies in the name of the Corporation in such depositories as the Board of Directors may direct or authorize, and (c) in general, perform all of the duties as from time to time may be assigned to him or her by the Board of Directors. If required by the Board of Directors, the Treasurer shall give a bond for the faithful discharge of his or her duties in such sum, and with such surety or sureties, as the Board of Directors shall determine.

Section 10.     **Salaries**.  No officer shall be prevented from receiving a salary by reason of the fact that he or she is also a director of the Corporation.

## ARTICLE V - CERTIFICATES FOR SHARES AND THEIR TRANSFER

Section 1.     **Certificates for Shares**.  Certificates representing shares of the Corporation shall be in such form as shall be determined by the Board of Directors. Every holder of capital stock in the Corporation shall be entitled to have a certificate signed by the Chief Executive Officer or the President and by the Secretary, and sealed with the corporate seal or a facsimile thereof, certifying the number of shares owned by him, her or it in the Corporation. The signatures of the Chief Executive Officer or the President and the Secretary may be facsimiles if the certificate is manually signed on behalf of a transfer agent or a registrar other than the Corporation or another executive officer of the Corporation. Each certificate shall be consecutively numbered or otherwise identified. The name and residential address of each individual to whom the shares represented thereby are issued, and business address of each entity shareholder, with the number of shares and date of issue, shall be entered in the stock transfer records of the Corporation, which shall be maintained at the principal office of the Corporation, and such information shall be available for inspection by any shareholder during normal business hours. No certificate shall be issued for any share until such share is fully paid. In case any officer, transfer agent, or registrar who has signed, or whose facsimile signature has been placed upon, a certificate shall have ceased to be such officer, transfer agent, or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he were such

officer, transfer agent, or registrar at the date of issue. Each certificate shall be sealed with the seal of the Corporation, or a facsimile thereof.

Section 2.    **Transfer of Shares**.  The Corporation or its duly authorized agent shall register a certificate for shares presented to it for transfer if (a) the certificate is endorsed by the appropriate person(s), (b) reasonable assurance is given that those endorsements are genuine and effective, (c) the Corporation or its duly authorized agent has no duty to inquire into adverse claims, or has discharged any such duty, (d) any applicable law relating to the collection of taxes has been complied with, and (e) the transfer is in fact rightful, or is to a purchaser for value in good faith, and without notice of any adverse claim. The new certificate(s) shall be issued only upon surrender of the old certificate, which shall be canceled upon the issuance of the new certificate(s). The person in whose name shares appear in the records of the Corporation shall be deemed by the Corporation to be the owner thereof for all purposes, and the Corporation shall not be bound to recognize an equitable or other claim to, or interest in, such share on the part of any other person whether or not it shall have express or other notice thereof, except as expressly provided by the laws of the State of Florida.

Section 3.    **Lost, Stolen or Destroyed Stock Certificates; Issuance of New Certificates**.  The Corporation may issue a new certificate of stock in place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate, or his or her legal representative, to (i) submit proof in affidavit form that it has been lost, stolen or destroyed; (ii) give the Corporation a bond or other form of indemnity designated by the Corporation sufficient to indemnify the Corporation, the transfer agent and the registrar against any claim that may be made against any of them on account of the alleged loss, theft or destruction of any such certificate, or the issuance of such new certificate; and (iii) satisfies any other reasonable requirements imposed by the Corporation.

## ARTICLE VI - RECORDS

The Corporation shall keep correct and complete records of its accounts, its material business transactions and the proceedings of its shareholders, Board of Directors and Board committees. As a financial institution, the Corporation's records are generally confidential and may be made available for inspection and examination only in accordance with Sections 655.059 and 658.39, Florida Statutes, or any successor laws thereto.

## ARTICLE VII - BYLAW AMENDMENTS

Section 1.    **By Shareholders**.  New Bylaws may be adopted or these Bylaws may be repealed or amended at the annual or any other meeting of shareholders called for that purpose, in each case, at which a quorum is present, by the affirmative vote of the holders of a majority of the shares represented in person or by proxy at the meeting and entitled to vote thereon.

Section 2.    **By Board of Directors**.  Subject to the right of the shareholders to adopt, amend or repeal Bylaws, as provided in Section 1 above of this Article VII, the Board of Directors may adopt, amend or repeal any of these Bylaws, other than Section 2 of Article III, provided that neither the shareholders nor the Board of Directors may adopt, amend or repeal any

Bylaw, which adoption, amendment or repeal contravenes the Florida Financial Institutions Codes or the rules of the Office.

Section 3. **Record of Amendments**. Whenever an amendment to or repeal of any existing Bylaw is adopted, or an additional Bylaw provision is approved, a replacement page containing such new, amended or additional provision, or reflecting the removal of such repealed provision, and noting the date and manner of its adoption shall be inserted in the original Bylaws, in the appropriate place.

## ARTICLE VIII - MISCELLANEOUS PROVISIONS

Section 1. **Fiscal Year**. The fiscal year of the Corporation shall be determined from time to time by the Board of Directors.

Section 2. **Dividends**. The Board of Directors may from time to time declare, and the Corporation may pay, dividends on its outstanding shares in the manner, and upon the terms and conditions, as allowed by applicable law.

Section 3. **Corporate Seal**. The Board of Directors shall provide a corporate seal which shall be circular in form and shall have inscribed thereon the name of the Corporation and the state of incorporation.

Section 4. **Execution of Instruments**. All bills, notes, checks, other instruments for the payment of money, agreements, indentures, mortgages, deeds, conveyances, transfers, certificates, declarations, receipts, discharges, releases, satisfactions, settlements, petitions, schedules, accounts, affidavits, bonds, undertakings, proxies and other instruments or documents may be signed, executed, acknowledged, verified, delivered or accepted on behalf of the Corporation by the Chief Executive Officer, the President, any Vice President, the Secretary, or the Treasurer. Any such instruments may also be signed, executed, acknowledged, verified, delivered or accepted on behalf of the Corporation in such other manner, and by such other officers, employees or agents of the Corporation as the Board of Directors may from time to time direct.

Section 5. **Consent to Meeting**. The transactions approved at any meeting of the Board of Directors, however called and noticed, shall be as valid as though acted upon at a meeting duly held after regular call and notice, if a quorum is present and if, either before or after the meeting, each of the directors not present signs a written waiver of notice, or a consent to the holding of such meeting, or an approval of the minutes thereof. All such waivers, consents or approvals shall be filed with the corporate records or made a part of the minutes of the meeting.

EXHIBIT 8.2(e)(iii)

FORM OF OPINION OF COUNSEL TO CCB

[*LETTERHEAD OF IGLER & DOUGHERTY, P.A.*]

[_____, 2010]

BCOM CCB Holdings, LLC
19950 W. Country Club Drive
8th Floor
Aventura, Florida 33180

Ladies and Gentlemen:

We are furnishing this opinion to you pursuant to Section 8.2(e)(iii) of the Stock Purchase Agreement, dated as of February ___, 2010 (collectively with any and all exhibits, schedules, addenda, Disclosure Memoranda and other attachments thereto, the "Purchase Agreement"), by and between BCOM CCB Holdings, LLC, a Delaware limited liability company ("BCOM"), and Cortez Community Bank, a Florida banking corporation ("Cortez"). Capitalized terms used but not defined herein have the respective meanings ascribed thereto in the Purchase Agreement.

We have acted as counsel to Cortez in connection with the sale and issuance to BCOM of 8,108,108 shares (the "New Shares") of the common stock, $1.00 par value per share, of CCB (the "Cortez Common Stock") on the date hereof, and the preparation, execution and delivery of the following documents in connection therewith (collectively, the "Documents"): the Purchase Agreement (including, without limitation, the Cortez Disclosure Memorandum) and the other agreements, certificates and other documents and instruments executed and delivered pursuant to or in connection with the Purchase Agreement. We have examined the Documents and such other records, certificates and other documents and instruments, and have made such other investigations and inquiries, as we have deemed necessary and appropriate to render this opinion. We have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals and the conformity to original documents of all documents submitted to us as copies. For purposes of this opinion, we have assumed that each of the Documents to which BCOM is a party constitute the valid and binding obligation of BCOM.

Based upon and subject to the foregoing, we are of the opinion that:

MIAMI 2062243.4 7876331198

1. Cortez is a corporation duly organized and validly existing and in active status under the laws of the State of Florida and has the requisite corporate power and authority to own, operate and/or lease (as applicable) its properties and assets and to carry on its businesses and operations as now being conducted. Cortez is qualified or otherwise authorized to transact business as a foreign corporation in all jurisdictions in which such qualification or authorization is required by law.

2. Cortez has full power and authority to execute, deliver and perform its obligations under the Purchase Agreement and each and all related Documents to which Cortez is a party, and all necessary and appropriate corporate and other actions by and on behalf of Cortez, its Board of Directors and its shareholders have been duly taken to authorize the execution, delivery and performance of the Purchase Agreement and each and all other Documents to which Cortez is a party and the consummation by Cortez of any and all of the transactions contemplated thereby, including, without limitation, the amendments to the Articles of Incorporation and the Bylaws of Cortez (the "Organizational Documents' Amendments"), the authorization, offering, sale and issuance of the New Shares to BCOM (the "New Shares Issuance") and the authorization, offering, sale and issuance of the Existing Shareholders' Offering Shares, if any, in each case, as contemplated by the Purchase Agreement.

3. The Purchase Agreement and each and all related Documents to which Cortez is a party have been duly executed and delivered by Cortez and constitute the legal, valid and binding obligations thereof, enforceable against Cortez in accordance with such Documents' respective terms except as enforceability may be subject: (i) any applicable bankruptcy, insolvency, reorganization or other law relating to or affecting creditors' rights; and (ii) general principles of equity.

4. Neither the execution and delivery of the Documents by Cortez, nor the consummation by Cortez of the transactions contemplated thereby (including, without limitation, the New Shares Issuance):

(i) has resulted or will result in: (A) a violation of or conflict with any provision of the Articles of Incorporation or the Bylaws of Cortez, in each case, as amended pursuant to the Organizational Documents' Amendments, (B) a violation of or conflict with any law, statute, rule or regulation of any Regulatory Authority binding upon Cortez, or any order, judgment, injunction, decree or requirement of any court, arbitrator or other Regulatory Authority applicable to Cortez; or by which any of its assets, properties or securities is bound, (C) to our knowledge after inquiry, a violation of or conflict with any Contract or other instrument to which Cortez is a party or by which Cortez or any of its assets, properties or securities is bound, or give rise to any right of termination, cancellation, acceleration or the loss of any Material benefit to Cortez thereunder, or (D) the creation or imposition of any Lien on the assets, properties or securities of Cortez or on the ability of Cortez to consummate the transactions contemplated by the Documents (including, without limitation, the Organizational Documents'

Amendments, the New Shares Issuance and the Existing Shareholders' Offering); or

(ii) except as set forth in Sections 4.2(b) or 8.1(b) of the Cortez Disclosure Memorandum, require any filing with, notice to, or permit, consent or approval of, any Regulatory Authority or other Person.

5. The Organizational Documents' Amendments were each duly and validly authorized and adopted by the Board of Directors of Cortez pursuant to resolutions thereof unanimously adopted at a Special Meeting of the Cortez Board of Directors duly called and held on February 17, 2010 and by the shareholders of Cortez at the Shareholders' Meeting held on _____. Such amendment to the Articles of Incorporation of Cortez, when filed with the Department of State of the State of Florida, and such amendment to the bylaws, upon adoption by the board of directors and shareholders of Cortez as hereinabove provided, each became effective under the laws of the State of Florida and, thereupon, became the valid and binding obligations of Cortez, enforceable in accordance with their respective terms.

6. To our knowledge after inquiry, except as set forth in Section 4.17 of the Cortez Disclosure Memorandum, there are no actions, suits, litigations, arbitrations, mediations, hearings, proceedings, claims, disputes, inquiries, orders, injunctions, examinations, inspections or investigations pending or threatened against or affecting the New Shares or Cortez or its assets, properties, business or operations, whether at law or in equity, or before or by any federal, state, municipal or other court or other Regulatory Authority.

7. To our knowledge after inquiry, except for the Existing Shareholders' Offering and the New Shares Issuance as provided in the Purchase Agreement and except as set forth in Section 4.3(a) of the Cortez Disclosure Memorandum, there are no agreements, subscriptions, warrants, preemptive rights, options, claims, rights or other arrangements of any kind: (i) pursuant to which Cortez is or may become, or pursuant to which BCOM may become upon consummation of the New Shares Issuance, obligated to issue, acquire, sell, transfer, otherwise dispose of, register, purchase, return or redeem or otherwise take any action with respect to the capital stock of Cortez; or (ii) with respect to the direct or indirect voting or control of any capital stock of Cortez (including, without limitation, any shareholder agreements, voting trusts, proxies, voting agreements or other similar Contracts of any kind) that are or may become binding on Cortez or upon BCOM upon the consummation of the New Shares Issuance. To our knowledge after inquiry, Cortez has no, and has never had any, Subsidiaries or any "subsidiaries" or "affiliates" (as such terms are defined in 12 C.F.R. Section 223.2) or any direct or indirect record or beneficial equity or other ownership interest in any Person.

8. The New Shares have been duly and validly authorized and, when sold and issued on the date hereof in the manner contemplated by the Purchase Agreement and upon receipt by Cortez of the Consideration as payment therefor as provided in the Purchase Agreement, will be legally and validly issued, fully paid and nonassessable and free and clear of any and all Liens.

9. The offer, sale and issuance of the Existing Shareholders' Offering Shares, if any, and (in reliance upon the representations and warranties made by BCOM in Section 5.4 of the Purchase Agreement) the New Shares, in each case, as provided in the Purchase Agreement, constitute transactions exempt from the registration requirements of the Securities Laws.

We acknowledge and agree that both you and your counsel, Bilzin Sumberg Baena Price & Axelrod LLP, can and may rely upon the opinions expressed herein. The opinion, however, may not be published, quoted or filed by you or your counsel, or relied upon by any third party without our written consent.

Very truly yours,

Igler & Dougherty, P.A.

A. George Igler

For the Firm

cc:  Cortez Community Bank

c/o Donald R. Page,

Chief Executive Officer and President



# IGLER ▼ DOUGHERTY

ATTORNEYS AT LAW



2457 Care Drive
Tallahassee, Florida 32308
(850) 878-2411 - Telephone
(850) 878-1230 - Facsimile

500 N. Westshore Blvd., Suite 1010
Tampa, Florida 33609
(813) 289-1020 - Telephone
(813) 289-1070 - Facsimile

**<u>VIA FEDERAL EXPRESS</u>**

October 14, 2010

Michael Baumann
President
Trade Street Holdings, LLC
19950 W. Country Club Drive
8th Floor
Aventura, FL 33180

**RE: <u>Stock Purchase Agreement by and between Cortez Community Bank
and Trade Street Holdings, LLC a Delaware limited liability company
f/k/a/ BCOM THE BANK Holdings, LLC</u>**

Dear Mr. Baumann:

We, on behalf of our client, Cortez Community Bank ("Bank"), are writing in response to your letter dated October 4, 2010, regarding Trade Street Holdings, LLC's ("Trade Street") decision to terminate the Stock Purchase Agreement dated as of February 22, 2010 (the "Agreement") by and between the Bank and Trade Street. Your letter states that Trade Street has decided to terminate the Agreement because new shares could not be and were not consummated on or prior to September 30, 2010, and thus under Section 9.1(f) of the Agreement, Trade Street elected to terminate the Agreement, and additionally pursuant to Section 9.2(d) Trade Street stated, there was no subsequent remedies available to either party as a result of the termination. However, this assertion by Trade Street is in error, as the proper party to terminate the Agreement is the Bank.

The Bank does not agree with Trade Street's position and is hereby demanding the payment of $400,000, within ten (10) days of this letter, to be made payable to the Bank pursuant to Section 9.2(e) of the Agreement. According to the terms of Section 9.2(e) of the Agreement, where the Bank has effectuated a termination of the Agreement pursuant to Section 9.1(d) because of, or in connection with, any knowing, intentional, fraudulent or willful breach of violation by Trade Street of any representation, warranties, covenants and/or agreements hereunder...then as the Bank's sole and exclusive remedy in connection with such a termination, the Bank shall be entitled to a termination fee in the amount of $400,000 which Trade Street is required to pay within ten (10) days after the effective date of termination.

EXHIBIT
"B"

*Michael Baumann*
*October 14, 2010*
*Page 2 of 3*

While, your letter has attempted to characterize the termination by Trade Street as a Section 9.1(f) termination, which states that either party may choose to terminate the Agreement in the event that "New Shares Issuance shall not have been consummated on or prior to September 30, 2010; provided however that if the failure to consummate the transactions contemplated hereby on or before such date is caused by any *breach* or *violation* of this Agreement by a Party, then right of termination under this Section 9.1(f) shall *only* be available to the other Party." (Emphasis added). Since the terms of Section 9.1(f) specify that only a Party who has not breached or violated any other term of the Agreement may elect to use Section 9.1(f) to terminate the Agreement, Trade Street is without recourse to utilize Section 9.1(f), due to its violation of the terms of the Agreement.

The Bank is hereby asserting its right to terminate the Agreement. The Bank is the only proper party entitled to terminate the Agreement as a result of Trade Street's breach of the Agreement. Under Section 8.1(c), both parties are required to obtain any and all "Consents" required for the consummation of the "New Shares Issuance" and the other transactions. Trade Street has failed to get the Consent of the Board of Governor's of the Federal Reserve (the "FRB") in order to consummate the New Shares Issuance. Trade Street was responsible for filing the applications necessary to consummate the transaction, however, Trade Street elected to only submit a preliminary application with the FRB and received comments from the FRB, the latest dated September 8, 2010 ("FRB Letter"). The FRB Letter did not require a separate response, but noted that additional information needed to be included in the formal FRY-3 Application (the "Application") filed to be by Trade Street and South Florida Carpenter's Pension Fund. Trade Street has elected not to file the Application, which would be necessary to attain the final Consent. As a result of, Trade Street's breach of Section 8.1(c), the Bank has consequently elected to terminate the Agreement, pursuant to Section 9.1(d) and seek its remedy owed under Section 9.1(e).

In further support of the Bank's demand, is the fact that under Section 8.3 the obligations of the Bank to perform and consummate the New Shares Issuance and the other transactions contemplated by this Agreement are subject to the satisfaction of Section 8.3(a) and (b) by Trade Street. Under Section 8.3(a) all of Trade Street's "representations and warranties...contained in this Agreement or any other document or instrument executed and delivered in connection with the transactions contemplated shall be true and correct in all Material respects." Moreover Section 8.3(b) requires that "each and all of the agreements and covenants of Trade Street, to be performed and complied with pursuant to this Agreement and the other certificates and other documents and instruments contemplated hereby prior to the closing shall have been duly performed and complied with...or in the case of any non-performance or non-compliance which is curable, such breach has been cured to the Bank's reasonable satisfaction within ten (10) days written notice thereof by the Bank to Trade Street." The Bank, therefore, asserts that Trade Street is liable under Sections 8.1(c), 8.3(a) and (b) for its neglect and voluntary failure to respond and comply with the FRB Letter.

Michael Bauman
October 14, 2010
Page 3 of 3

Finally, it should be noted that the Bank noted a marked decline in both Trade Street's level of interest and its efforts in seeing to the consummation of the Agreement upon the departure of Denny St. Romain from Trade Street. The Bank has also noted a shift in desire, of Trade Street's internal management, to see to the successful consummation of the Agreement. Upon the change in management, the decreased lack of interest, cooperation, and forthright dealings in relation to the Agreement, by Trade Street was not only noted by the Bank but is also viewed as a major contributing factor as to why Trade Street deliberately neglected not to meet the requests outlined by the FRB's Letter, and thus led to the ultimate failure to consummate the Agreement.

For the reasons stated above, the Bank is asserting its right and to the termination fee Section 9.2(e), by electing to terminate the Agreement pursuant to Section 9.1(d), based on a breach by Trade Street of Section 8.1(c).

Sincerely,

**IGLER & DOUGHERTY, P.A.**

A. George Igler

cc: Thomas S. Hogan, Jr., Esq.
    Donald R. Page, President- Cortez Community Bank
    Alan D. Axelrod, Esq.
    Michael Basile, Esq.
    Carlos F. Junco, Esq.

IN THE CIRCUIT COURT OF THE
11th JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.: 11-7003 CA 04

CORTEZ COMMUNITY BANK,

    Plaintiff,

vs.

TRADE STREET HOLDINGS, LLC F/K/A
BCOM CCB HOLDINGS, LLC

    Defendant.

_____/

THE ORIGINAL
FILED ON:
JUN 2 9 2011
IN THE OFFICE OF
CIRCUIT COURT DADE CO. FL

## NOTICE OF SUBSTITUTION OF COUNSEL

The undersigned counsel, Michael D. Ehrenstein, Esq. of Ehrenstein Charbonneau Calderin, pursuant to Local Rule 11.1(D), gives Notice of Substitution of Counsel, substituting Ehrenstein Charbonneau Calderin, as counsel of record for Plaintiff CORTEZ COMMUNITY BANK, in place and instead of Robert J. Angerer, Jr. Esq. and Nicolette L. Bidarian, Esq of Igler & Dougherty, P.A.

The undersigned respectfully request that this Court enter an Order approving the stipulation and relieving Robert J. Angerer, Jr. Esq. and Nicolette L. Bidarian, Esq of Igler & Dougherty, P.A from any further responsibility with respect to the representation of the Plaintiff CORTEZ COMMUNITY BANK in this matter.

Respectfully Submitted,
By: _____

Michael D. Ehrenstein, Esq
Ehrenstein Charbonneau Calderin
501 Brickell Key Drive Suite 300
Miami FL 33131

Respectfully Submitted,
By: _____

Robert J. Angerer, Jr. Esq,
Igler &Dougherty, P.A.
2457 Care Drive,
Tallahassee, FL 32308

1

Florida Bar No.: 857378                 Florida Bar No.:83795
                                        Nicolette L. Bidarian, Esq.
                                        Florida Bar No: 83795

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was served via U.S. Mail and electronic mail on this 28th day of June, 2011 upon: Michael N. Kreitzer, Esq, Bilzin Sumberg Baena Price & Axelrod LLP 1450 Brickell Ave, Suite 2300 Miami FL 33131.

By: _____

Michael D. Ehrenstein, Esq.
Fla. Bar. No. 857378
michael@ecclegal.com
Latasha N. Johnson, Esq.
lnj@ecclegal.com
Fla. Bar. No. 81970

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2011-7003 CA 01

**CORTEZ COMMUNITY BANK,**

      Plaintiff,

vs.

**TRADE STREET HOLDINGS, LLC**
**f/k/a BCOM CCB HOLDINGS, LLC,**

      Defendant.

_____/

## NOTICE OF APPEARANCE

The law firm of Bilzin Sumberg Baena Price & Axelrod LLP hereby enters its appearance in this action as counsel for Defendant, Trade Street Holdings, LLC f/k/a BCOM CCB Holdings, LLC, in this cause.  Undersigned counsel requests that any and all further papers of any kind filed in this action be served upon undersigned counsel in accordance with the Florida Rules of Civil Procedure.

Respectfully submitted,

**BILZIN SUMBERG BAENA PRICE**
**& AXELROD LLP**
*Attorneys for Trade Street Holdings, LLC*
1450 Brickell Ave, Suite 2300
Miami, Florida 33131-3456
T: (305) 374-7580
F: (305) 374-7593

By: _____
    Michael N. Kreitzer
    Florida Bar Number: 705561
    mkreitzer@bilzin.com

CASE NO.: 2011-7003 CA 01

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _18_ day of April, 2011 a true and correct copy of the foregoing was served E-Mail and U.S. Mail on:

Robert J. Angerer, Jr., Esq.
Nicolette L. Bidarian, Esq.
Igler & Dougherty, P.A.
2457 Care Drive
Tallahassee, FL 32308

*Attorneys for Plaintiff*

Michael N. Kreitzer

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

CASE NO.: 11-7003 CA 01

**CORTEZ COMMUNITY BANK,**

      Plaintiff,

vs.

**TRADE STREET HOLDINGS, LLC**
**f/k/a BCOM CCB HOLDINGS, LLC,**

      Defendant.

_____/

## DEFENDANT'S MOTION FOR AN ENLARGEMENT OF
## TIME TO RESPOND TO COMPLAINT

Defendant, Trade Street Holdings, LLC ("Trade Street"), hereby moves for an enlargement of time to respond to Plaintiff's Complaint, and in support thereof states as follows:

1.      Trade Street was served with the Complaint in this matter on March 25, 2011.  Before a response was due, Trade Street sought and obtained an enlargement of time to respond to the Complaint.   On Friday, April 29, 2011, Plaintiff, Cortez Community Bank, was closed by the Florida Office of Financial Regulation, and the Federal Deposit Insurance Corporation (FDIC) was named Receiver.

2.      Under State and Federal law, the State and the Receiver have an obligation to review all pending actions brought on behalf of the Bank and make a determination as to whether the matter should proceed or be dismissed.

3.      The undersigned has contacted counsel for Cortez who indicates that his firm may or may not continue in the representation of the Plaintiff.   Further, the

undersigned is advised that the Receiver has not yet made a determination as to whether FDIC and/or the government will continue to pursue this action.

4.      The undersigned has requested from Plaintiff's counsel an additional enlargement of time to respond to the complaint pending a decision by the Receiver; however, Plaintiff counsel advises that he did not have the authority to grant or deny such a request.

5.      The claims asserted in this lawsuit are completely without a legal or factual basis and Trade Street is confident that the matter will be dismissed.

6.      Consequently, in order to conserve judicial resources and expenditure of unnecessary legal fees, Trade Street respectfully requests that the Court grant an enlargement of time to respond to the complaint until such time as the Receiver or some other authorized representative of the FDIC announces its intentions with respect to the pursuit of this matter.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456



CASE NO.: 11-7003 CA 01

WHEREFORE, Trade Street respectfully requests that the Court grant an enlargement of time to respond to the complaint until such time as the Receiver or some other authorized representative of the FDIC announces its intentions with respect to the pursuit of this matter.

Respectfully submitted,

**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
*Attorneys for Trade Street Holdings, LLC*
1450 Brickell Ave, Suite 2300
Miami, Florida 33131-3456
T: (305) 374-7580
F: (305) 374-7593

By: _____
Michael N. Kreitzer
Florida Bar Number: 705561
mkreitzer@bilzin.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _17_ day of May, 2011 a true and correct copy of the foregoing was served E-Mail and U.S. Mail on:

Robert J. Angerer, Jr., Esq.
Nicolette L. Bidarian, Esq.
Igler & Dougherty, P.A.
2457 Care Drive
Tallahassee, FL 32308

*Attorneys for Plaintiff*

_____
Michael N. Kreitzer

MIAMI 2544637.1 7945735865

3

IN THE CIRCUIT COURT OF THE
11th JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.: 11-7003 CA 04

CORTEZ COMMUNITY BANK,

    Plaintiff,

vs.

TRADE STREET HOLDINGS, LLC F/K/A
BCOM CCB HOLDINGS, LLC

    Defendant.

_____/

THE ORIGINAL
FILED ON:

JUL 13 2011

IN THE OFFICE OF
CIRCUIT COURT DADE CO. FL

## MOTION FOR SUBSTITUTION OF PARTY

The FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC"), as receiver for

CORTEZ COMMUNITY BANK ("Cortez"), by and through undersigned counsel and pursuant

to the Florida Rule of Civil Procedure 1.260 (c), hereby files this Motion for Substitution of

Party and in support states:

## INTRODUCTION

Cortez initiated the present lawsuit against Defendant TRADE STREET HOLDINGS,

LLC F/K/A BCOM CCB HOLDINGS, LLC ("Trade Street") on or about March 3, 2011.

Through its Complaint, Cortez seeks damages for breach of contract arising from an investment

agreement executed between Cortez and Trade Street. Because FDIC has succeeded Cortez as

party in interest, Cortez now requests to substitute the FDIC as plaintiff in this matter.

1

## II.   ARGUMENT

1.      On Friday, April 29, 2011, Plaintiff, Cortez Community Bank of Brooksville, FL was closed by the Florida Office of Financial Regulation, and the FDIC was appointed Receiver.

2.      Title 12 of the United States Code provides that the FDIC, as receiver of a failed federally insured financial institution, succeeds by operation of law to "all rights, titles, powers, and privileges of the insured depository institution" and those of any "stockholder, member, accountholder, depositor, officer, or director of such institution, with respect to the institution and the assets of the institution." 12 U .S.C. § 1821 (d)(2)(A)(i).

3.      As a result, upon its appointment the FDIC "steps into the shoes" of the failed institution and succeeds to the failed institution's status and rights. Therefore, FDIC now stands in the shoes of Cortez bank.

4.      Accordingly, FDIC now seeks to substitute for Cortez as plaintiff in these proceedings pursuant to Fla. R. Civ. Pro 1.260 (c), which states in pertinent part:

> In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party.

5.      Because there has been a transfer of interest from Cortez to the FDIC, FDIC moves to substitute as plaintiff in this matter.

**WHEREFORE**, FDIC, respectfully requests that this Honorable Court enter an Order substituting the FDIC as Plaintiff.

Respectfully Submitted,

EHRENSTEIN CHARBONNEAU CALDERIN
*Counsel for Plaintiff*
501 Brickell Key Drive Suite 300
Miami, FL 33131
T: 305.722.2002  F: 305.722.2001

2

By: _____

    Michael D. Ehrenstein, Esq.
    Fla. Bar. No. 857378
    michael@ecclegal.com
    Latasha N. Johnson, Esq.
    lnj@ecclegal.com
    Fla. Bar. No. 81970

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was served via U.S. Mail and electronic mail on this 11th day of July, 2011 upon: Michael N. Kreitzer, Esq, Bilzin Sumberg Baena Price & Axelrod LLP 1450 Brickell Ave, Suite 2300 Miami FL 33131.

By: _____

    Michael D. Ehrenstein, Esq.
    Fla. Bar. No. 857378
    michael@ecclegal.com
    Latasha N. Johnson, Esq.
    lnj@ecclegal.com
    Fla. Bar. No. 81970

3

CORTEZ COMMUNITY BAN

Plaintiff(s),

vs.

TRADE STREET HOLDING

Defendant(s).

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR DADE
COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO.: 11- 7003-CA-01
Section No.  04

## NOTICE OF LACK OF PROSECUTION

PLEASE TAKE NOTICE  that it appears  that on the face of the  record that no
activity by  filing of  pleadings, order of court, or otherwise has occurred for
a period of 10 months immediately preceding service of this notice, and no stay
has been issued or approved by the court.  Pursuant to rule 1.420(e), if no stay
is issued or approved during such 60 day period, this action may be dismissed by
the court on its own motion for lack of prosecution at the scheduled hearing set
forth below, unless a party shows good cause in writing at least 5 days before
the  hearing on the  motion why  the  action  should remain  pending.  If record
activity  occurs within 60 days  following the service of this notice,  you must
**provide the court with a copy of the docket showing the record activity attached
to your good cause filing or appear at the scheduled hearing.**

## NOTICE OF HEARING ON THE COURT'S MOTION
## TO DISMISS FOR LACK OF PROSECUTION

Pursuant  to 1.420 of the  Fla.R.Civ.P. the parties are  hereby  directed to
appear before  the undersigned Judge  at     9:30 A.M.  on  the   5th  day of
 OCTOBER,  2012   for a hearing on  the Court's motion to dismiss the above
styled  cause for lack of prosecution.  The hearing shall take place at the Dade
County Courthouse, 73 West Flagler St., Miami, FL 33130 in room   4-3  before the
Honorable  JACQUELINE HOGAN SCOLA  .  It shall be the responsibility and burden
of proof of the party  opposing  the motion of dismissal for lack of prosecution
to  appear at the hearing  and to  affirmatively demonstrate (1) that there  had
been record  activity within 10 months  prior to service of the "Notice" or that
the  Court had a stay of the  action on stipulation or  otherwise which  was in
effect within the 10 months  proceeding  the  notice; or (2) that there had been
record activity within 60 days immediately following the service of  such notice
or that the  Court had  issued a  stay of the action on stipulated or  otherwise
prior to the  expiration of the 60 day period.  In the absence of record activity
or of any order  staying the  action as above described, a party  must show good
cause in writing at least 5 days before the hearing why the action should remain
pending.

The failure of the party opposing the motion to appear at the hearing and to
timely file a showing of good cause in writing, if required, shall constitute an
abandonment of any  justified defense to the motion and the above styled action
shall be  dismissed for  lack of prosecution upon further  order of Court on the
date of the hearing set forth above.

DONE and ORDERED in  Chambers at Miami-Dade County, Florida, this      day
of   JUL 0 2 2012 .

cc: Counsel/Parties of Record

Circuit Court Judge

If you are  a person with a disability who needs any  accommodation in
order to participate in this proceeding, you are entitled, at no cost to
you, to  the provision of certain assistance. Please contact  the Eleventh
Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse
Center, 175 NW 1st Ave., Suite 2702, Miami, FL.  33128, Telephone
(305) 349-7175; TDD (305) 349-7174; Fax (305) 349-7355; at least 7 days
before  your  scheduled  court appearance, or immediately  upon receiving
this  notification, if  the time before the scheduled appearance is less  than
7 days; if you are hearing or voice impaired, call 711.

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION
CASE NO: 11-700

Plaintiff(s),

vs.

Defendant(s),

**ORDER
GRANTING/DENYING
PLAINTIFF'S/DEFENDANT'S**

**THIS CAUSE** having come on to be heard on July 19, 2012
on Plaintiff's/Defendant's Motion

and the Court having heard arguments of counsel, and being otherwise advised in the premises, it is hereupon

**ORDERED AND ADJUDGED** that said Motion be, and the same is hereby

**DONE AND ORDERED** in Chambers at Miami-Dade County, Florida this

day of

**CONFORMED COPY**

**JUL 1 9 2012**

**JACQUELINE HOGAN SCOLA
CIRCUIT COURT JUDGE**

Copies furnished to: Counsel of Record

**CIRCUIT COURT JUDGE**

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 11-7003 CA 01

**FEDERAL DEPOSIT INSURANCE CORP.,**

      Plaintiff,

vs.

**TRADE STREET HOLDINGS, LLC f/k/a BCOM CCB HOLDINGS, LLC,**

      Defendant.

_____/

## DEFENDANT'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO SERVE ITS RESPONSIVE PLEADING TO PLAINTIFF'S COMPLAINT

Defendant TRADE STREET HOLDINGS, LLC f/k/a BCOM CCB Holdings, LLC ("Trade Street"), by and through undersigned counsel, hereby moves to extend the time for it to serve its Responsive Pleading to Plaintiff's Complaint, and states as follows:

1.    On July 19, 2012, the Court entered an Order granting Plaintiff's Motion for Substitution of Parties, and ordered the Defendant to respond to the Complaint in 10 days, thus ordering a response by July 30, 2012.

2.    At the hearing on Plaintiff's Motion to Substitute Parties, the undersigned had requested 30 days to respond to the Complaint.  The Court entered its Order granting 10 days to respond, but stated on the record that should the Defendant require additional time, it should seek the approval of opposing counsel, and the Court would then grant such request upon Motion by the Defendant.

3.    The Defendant hereby so moves for an additional twenty (20) days to respond to the Complaint.

CASE NO.: 11-7003 CA 01

4.    Undersigned counsel certifies that he has conferred with opposing counsel who does not oppose the relief sought in this motion.

5.    This motion is not made to hinder or delay these proceedings.  No party will be prejudiced by the relief sought herein since the matter is not scheduled for trial.

**WHEREFORE**, TRADE STREET HOLDINGS, LLC f/k/a BCOM CCB Holdings, LLC respectfully requests the Court enter an Order granting it an extension of time through and including Monday August 20, 2012, to serve its responsive pleading to Plaintiff's Complaint.

Respectfully submitted,

**BILZIN SUMBERG BAENA PRICE
& AXELROD LLP**
*Attorneys for Trade Street Holdings, LLC*
1450 Brickell Ave, Suite 2300
Miami, Florida 33131-3456
T: (305) 374-7580
F: (305) 374-7593

By: _____
      Michael N. Kreitzer
      Florida Bar Number: 705561
      mkreitzer@bilzin.com
      Russell Koonin
      Florida Bar Number: 474479
      rkoonin@bilzin.com

CASE NO.: 11-7003 CA 01

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of July, 2012 a true and correct copy

of the foregoing was served E-Mail and U.S. Mail on:

Michael D. Ehrenstein
Latasha N. Johnson
EHRENSTEIN CHARBONNEAU CALDERIN
501 Brickell Key Drive Suite 300
Miami, FL 33131
lnj@ecclegal.com

Russell Koonin

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456